UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------- X

SIKHS FOR JUSTICE INC on behalf of deceased :
and injured members of the Sikh community, :
JASBIR SINGH, MOHENDER SINGH, :
Individually and on behalf of his deceased father :   CIVIL ACTION NO.
SARDAR DARSHAN SINGH, DAVINDER :
PAL BHATIA, IQBAL KAUR BHATIA, :   10 CV 2940 (RWS)
Individually and on behalf of her deceased father :
ANANT SINGH and deceased son MANVINDER :
SINGH BHATIA, MANJIT SINGH and :
TEJINDER SINGH, on behalf of their deceased :
brother GURSHARAN SINGH RISHI and :
KAMALJIT KAUR GIRIN, Individually and on :   FIRST AMENDED
behalf of her deceased husband JARNAIL SINGH:    COMPLAINT
GIRIN, :
 :
            Plaintiffs, :
 :
      - against - :
 :   CLASS ACTION
INDIAN NATIONAL CONGRESS PARTY, :
a/k/a, "CONGRESS (I)" and KAMAL NATH, :
a national and citizen of India, :
 :
            Defendants, :   PLAINTIFFS DEMAND
 :   A TRIAL BY JURY
      and :
 :
INDIAN HERITAGE GROUP, :
 :
            Intervenor. :

------------------------------------------------------------- X

    Plaintiffs, on behalf of themselves, their deceased family members and all

others similarly situated who were victims of or related to the victims of "The Sikh

1

Massacre of 1984"  (collectively "Plaintiffs"), as and for their first amended complaint in this action respectfully allege as follows:

## PRELIMINARY STATEMENT

1.  On or about February 15, 2011, a mass grave was discovered in the Village of Hondh-Chillar, Haryana, India, that contained the remains of men, women and children who had been tortured and murdered in what has become known as " The Sikh Massacre of 1984."  This discovery coming twenty-six years after the fact is evidence not only of the genocide that took place throughout India then but also of the cover up that began all those years before which continues to this day.

2.  From November 1 through November 4, 1984 approximately 30,000 members of a minority religious group known as the "Sikhs" were intentionally tortured, raped and murdered by groups that were incited, organized, controlled and armed by the ruling political party known as India National Congress Party a/k/a, "Congress (I)" (hereinafter "Congress (I)").

3.  Kamal Nath, a member of the Indian Parliament and a Congress (I) leader at that time, played an active role in the massacre, exercised command responsibility over it, conspired with and aided and abetted others including local police officers, fellow Congress (I) officials, para-military groups and persons or

2

groups acting in coordination with the them or under their control, in carrying out the genocide, crimes against humanity and attempted extermination of the entire Sikh community in India (hereinafter "Defendant Nath").

4.  This is an action for compensatory and punitive damages for torts committed by Congress (I) and Nath (hereinafter "Defendants") in violation of the laws of nations, customary international law, treaties of the United States including the Convention on the Prevention and Punishment of the Crime of Genocide of 1948, the Torture Victim Protection Act and federal common law who, at all relevant times, were acting under color of state law of the state of India and with the actual or apparent authority of the Government of India.

## JURISDICTION AND VENUE

5.  Plaintiffs allege that Defendants are liable, jointly and severally,  for genocide, extrajudicial killings, torture, crimes against humanity, forced exile, attempted extrajudicial killings, torture and genocide and for conspiring with and aiding and abetting others in the aforementioned conduct.  Therefore, this Court has jurisdiction over this action based on the Alien Tort Statute, 28 U.S.C. 1350, the Torture Victim Protection Act, Pub. L. No. 102-256, 106 Stat. 73 (1992) (codified at 28 U.S.C. 1350 (note)) ("TVPA"), federal common law and 28 USC 1331.

6.  Venue, upon information and belief, is proper in the Southern District of New York pursuant of 28 USC § 1391 (b), © and (d).

7.  This Court has personal jurisdiction of the Defendants pursuant to Rule 4, Fed. R. Civ. P. and N.Y.C.P.L.R. 301 (McKinney 2010).

## THE PARTIES

8.  Plaintiff "Sikhs for Justice" is a domestic not-for-profit corporation organized and existing pursuant to the laws of the State of New York with its principal place of business located at New York, New York and was formed to seek justice and compensation for those Sikhs who were injured or whose family members were killed and whose property was destroyed during the Sikh Massacre of November 1984.

9.  Plaintiff Jasbir Singh is a citizen of India, a resident alien of the United States currently residing in the State of California and, at all relevant times, was and is a member of the Sikh religious community.  Plaintiff Jasbir Singh sues on behalf of himself for the severe physical injuries and severe mental and emotional pain and suffering sustained by him during The Sikh Massacre of 1984.

10.  Plaintiff Mohender Singh is a citizen of India, a resident alien of the United States currently residing in the State of California and, at all relevant times, was and is a member of the Sikh religious community.  Plaintiff Mohender

Singh sues on behalf of himself and his deceased father Sardar Darshan Singh.

Plaintiff Mohender Singh is the lawful heir and next of kin of his late father and a

proper claimant under foreign and domestic law to assert claims on his behalf.  To

the extent there are individuals with priority or equal right to assert these claims

they have renounced or otherwise waived their right to do so and have assigned

those rights to Plaintiff Mohender Singh.

11.  Plaintiff Davinder Pal Bhatia is a citizen of India, a resident alien of the

United States currently residing in the State of New York and, at all relevant

times, is and was a member of the Sikh religious community.  Plaintiff Davinder

Pal Bhatia sues on behalf of himself for the severe physical injuries and mental

and emotional pain and suffering sustained by him during The Sikh Massacre of

1984.

12.  Plaintiff Iqbal Kaur Bhatia is a citizen of India, a resident alien of the

United States currently residing in the State of New York and, at all relevant

times, is and was a member of the Sikh religious community.  Plaintiff Iqbal Kaur

Bhatia is bringing this action on behalf of herself, her late father Anant Singh and

her late son Manvinder Singh Bhatia.  Plaintiff Iqbal Kauer Bhatia is the lawful

heir and next of kin of her late father and son and a proper claimant under foreign

and domestic law to assert claims on their behalf.  To the extent there are

5

individuals with priority or equal right to assert these claims they have renounced or otherwise waived their right to do so and have assigned those rights to Plaintiff Iqbal Kauer Bhatia.

13.  Plaintiffs Manjit Singh and Tejinder Singh are citizens of India currently residing in New Delhi and, at all relevant times, were and are members of the Sikh religious community.  Plaintiffs Manjit Singh and Tejinder Singh sue on behalf of their late brother Gursharan Singh Rishi ("Rishi") who is survived only by his two brothers who are, therefore, the lawful heirs, next of kin and proper claimants under foreign and domestic law to assert claims on his behalf.

14.  Plaintiff Kamaljit Kaur Girin is a citizen of India currently residing in Toronto, Canada and, at all relevant times, is and was a member of the Sikh religious community.  Plaintiff Kamaljit Kaur Girin is the surviving spouse of her late husband Jarnail Singh Girin and who is, therefore, the lawful heir, next of kin and proper claimant under foreign and domestic law to assert claims on his behalf.

15.  Defendant Congress (I) is and was at all relevant times a private political party organization created pursuant to the laws of India. Congress(I) conducts ongoing and significant business in the United States particularly in the State and City of New York both directly and through its wholly owned subsidiary "Indian National Overseas Congress" (hereinafter "INOC") which is a corporation

organized and existing pursuant to the laws of the State of New York with its principal place of business located at Queen County, State of New York.  Upon information and belief, Congress (I) operates INOC as a department or agent and controls its activities.

16.  Defendant Nath is and was at all relevant times a citizen of India and a leader of Congress (I).  In October and November 1984, Nath was a Congress (I) Member of Parliament.  As set forth in more detail below, Nath played an active role in inciting, organizing and controlling groups of people that attacked and killed innocent Sikhs in the City of New Delhi.  Nath also purposefully aided and abetted the actions of others including the local police who joined in the carnage and refused to come to the aid of  Sikhs who were being tortured, raped and killed and whose property was being destroyed during the campaign of terror.

## THE CLASS ALLEGATIONS

17.  The class consists of all Sikh men, women and children who survived the unlawful attacks on them in India in November 1984 and the lawful heirs and claimants of those  men, women and children that did not survive.  The class also consists of Sikhs whose homes, businesses and temples were damaged or destroyed and whose personal property was damaged or stolen.  The class period is from November 1 to November 4, 1984 and includes resident and non-resident

alien Sikhs and Sikhs currently residing in India.  The class also may properly be

certified as sub-classes as follows:

> (a) <u>Surviving Parents' Class</u> - all persons who are the surviving parents of persons who were executed, murdered and/or killed in India between November 1 and 4, 1984 in connection with "The Sikh Massacre of 1984."

> (b) <u>Surviving Children's or Dependent's Class</u> - all persons who are the surviving children or dependents of persons who were executed, murdered and/or killed in India between November 1 and 4, 1984 in connection with "The Sikh Massacre of 1984."

> ( c ) <u>Surviving Spouse Class</u> - all persons who are the surviving spouses of persons who were executed, murdered and/or killed in India between November 1 and 4, 1984 in connection with "The Sikh Massacre of 1984."

> (d) <u>Torture Victim's Class</u> - all persons who were themselves tortured and/or subjected to crimes against humanity in India between November 1 and 4, 1984 in connection with "The Sikh Massacre of 1984."

> (e) <u>Property Damage Class</u> - all persons whose homes, businesses, temples, religious shrines and personal property were damaged, destroyed, stolen and/or confiscated in India between November 1 and 4, 1984 in connection with "The Sikh Massacre of 1984."

18.  The exact number of class members is not known, however, the

official figures of the Indian Government put the number of Sikhs that were killed

by the violence orchestrated by defendants in November 1984 in New Delhi alone

at approximately 3,000.

19.   The claims of the named plaintiffs, the class representatives, are typical of the claims of the class. The named plaintiffs are able to and will fairly and adequately protect the interests of the class.

20.   There are common questions of law and fact in this action that affect and relate to each member of the class including:

a.   Whether the defendants committed and/or ordered the killing, assault and torture of Sikhs and the looting and destruction of their homes, businesses and temples between November 1 and 4, 1984 in India.

b.   Whether the defendants purposefully aided and abetted others in the killing, assault and torture of Sikhs and the looting and destruction of their homes, businesses and temples between  November 1 and 4, 1984 in India.

c.   Whether the conduct of the defendants between November 1 and 4, 1984 in India in connection with the genocide and attempted genocide of Sikhs gives rise to liability under applicable international and domestic laws,  international treaties and federal common law.

d.   Whether the acts and omissions of the defendants were committed as part of a widespread or systematic attack directed against a distinct civilian population as to constitute crimes against humanity.

21.     This action is properly maintained as a class action because: a) defendants acted and failed to act in a way generally applicable to the class, making any declaratory relief awarded appropriate to the class as a whole; and b) questions of law and fact common to the class predominate over questions affecting individual members and a class action is superior to other available methods for the fair and efficient adjudication of the controversy.

## STATEMENT OF FACTS

### A.  The Background

22.  The Nation of India is a Federal Parliamentary Republic that is headed by a Prime Minister who is an elected representative of the people.

23.  India is governed by the "Central" or "Union" Government (hereinafter "Central Government") which is comprised of numerous departments, agencies and ministries.

24.  There are twenty-eight[1] states or provinces in India that are governed by elected officials called Chief Ministers who in turn appoint officials to run the local agencies, departments and instrumentalities of the state.

25.  The Central Government and the states are administered, controlled and otherwise run by the political party that holds the majority of seats in the

---

[1] In October-November 1984, India consisted of only twenty-five (25) states. Three additional states were carved out in later years.

Parliament and State Assemblies, respectively.

26.   The seat of the Central Government is located in the capital city of New Delhi.

27.   New Delhi's municipal government is traditionally administered and controlled by the political party in power in the Central Government.

28.   In October and November of 1984, Defendant Congress (I) was the ruling political party of the Central Government of India with a majority in the Indian Parliament and, thus, was also in control of the local government of New Delhi.

29.   Moreover, in October and November 1984 Congress (I) also held majorities in eighteen of the twenty-two Indian States.

30.   In other words, Congress (I) virtually had complete control over the governance of India in October and November 1984.

31.   The Prime Minister of India in 1984 was Indira Gandhi, the daughter of Jawaharlal Nehru, the first Prime Minister of India post- Independence and protégée of Mahatma Gandhi.

32.   Both Gandhi and Nehru were leaders of Congress (I) following independence in 1947 and Indira Gandhi was the leader of Congress (I) at the time she served as Prime Minister.

11

33.  On October 31, 1984, Prime Minister Gandhi was shot by two of her body guards who happened to be Sikhs.

34.  In less than twenty-four hours, an organized targeting of Sikhs throughout India began particularly in the capital of New Delhi that continued unabated until November 4, 1984.

35.  During the four day rampage, more than 3,000 Sikhs were killed in New Delhi alone, hundreds of women were gang raped, children were brutally tortured, hundreds of houses and properties were looted and destroyed and scores of Sikh temples were ransacked and burned to the ground.

36.  As a result, more than 300,000 Sikhs across India were displaced.

37.  The Sikh Massacre was planned at a meeting held at Congress (I) headquarters located at 24 Akbar Road, New Delhi on October 31, 1984, the night Indira Ghandi was killed.

38.  According to eyewitnesses, the meeting was attended by Congress (I) members of parliament and senior officers of Congress (I) including Jagdish Tytler, Sajjan Kumar, HKL Bhagat, Lalit Maken, Arjun Das and Defendant Nath.

39.  Leaders and officials of Congress (I) delivered inflammatory speeches and created slogans like "Khoon ka badla khoon" (blood for blood) and "khoon ki chintey sikhon ke ghar tak pahunchni chahiye" (splashes of blood should reach the

12

doorsteps of Sikhs) in order to incite a genocidal riot directed at the Sikhs ostensibly to avenge the death of Indira Ghandi.

40.  While the news of the attack on the Prime Minister did not bring any immediate peril to the Sikhs, after the Congress (I) meeting on October 31 a widespread, systematic and organized effort was underway the next day lead by Congress (I) officials acting under the authority of Congress (I) to incite, organize and weaponize  groups of people to kill Sikhs initially in New Delhi and then throughout India.

41.  Prisoners, criminals and professional thugs were hired by Congress (I) leaders, coupled with Congress (I) workers and supplied with flammable substances including kerosene oil, to burn Sikhs as well as their houses, businesses and temples.

42.  Indeed, police officers even supplied diesel from police jeeps to these groups to help carry out the carnage.

43.  In addition, Indian police either actively participated in murdering Sikhs or stood by as silent spectators while Sikhs were being killed and, in some instances, burned alive.

44.  Between November 1 and 4, 1984, Congress (I) ruled and controlled 18 states where it organized, directed, controlled and/or purposefully aided and

abetted "The Sikh Massacre."

45.  In the State of Madhya Pradesh[2] the Chief Minister was Arjun Singh of Congress (I). Between November 1 and 4, 1984 throughout the state of Madhya Pradesh, Sikhs were attacked, killed, tortured and  raped, their properties looted and their temples burned.  According to news reports and government figures, in 43 of the state's 45 districts Sikh communities were attacked and destroyed. One of the  *modus operandi* of the attacks on the Sikhs who were travelling on trains at that time took place in the City of Morena. A crowd of 1,000 people comprised mostly of Congress (I) workers and sympathizers and led by Congress (I) leaders gathered at the railway station. They first stopped the Utkal Express Train going to New Delhi, but found no Sikh passengers on it. Almost immediately the Chahtisgarh Express Train from New Delhi pulled in to the station and was brought to a halt by the crowd which then proceeded to drag out two dozen Sikh men, women and children from the train and slaughtered twelve including a ticket taker.  Plaintiff Kamaljit Kaur Girin's husband was attacked and killed in the state of Madhya Pradesh.

46.  In October-November 1984, the present State of Chhattisgarh was a

---

[2] Madhya Pradesh is the home state of defendant Nath who has continuously been winning the election as Member of Parliament (MP) from the state since 1984. MPs exert and enjoy a great deal of control and influence over the party workers and cadres in their home states.

region located within the State of Madhya Pradesh where Congress(I) officials, members and workers directed and took part in attacks on Sikh people, properties and temples which resulted in at least thirteen deaths.

47.  In the State of Utter Pradesh ("UP") the Chief Minister was Narayan Dutt (ND) Tiwari of Congress (I).  According to the Central Government's official records, 260 Sikhs were killed across the state between November 1 and 4, 1984. These numbers are believed to be grossly understated.  For example, in the City of Kanpur alone, approximately 3,000 FIRs ("First Information Reports" of crime filed with the police under the Indian Criminal Law Procedure), were lodged with the police.  Approximately 4,200 houses, shops, godowns and factories were destroyed in the violence that went on for 36 hours starting on November 1, 1984.

48.  The details of the attack on Plaintiffs Davinder Pal and Iqbal Bhatia serve as another example of the *modus operandi* of the  attacks on Sikhs throughout the states in that the attackers were led by Congress (I) leaders, officials and workers and the police and local administrators either purposefully assisted the attackers and/or planned the attacks.

49.  In October-November 1984 the present State of Uttarkhand was a region located in the State of Uttar Pradesh ("UP") and was controlled and governed by the State of Madhya Pradesh under Congress (I) Chief Minister Arjun

Singh.

50.  In the areas comprising today's state of Uttarkhand at least 201 attacks were directed and/or carried out against the Sikhs, their properties and temples by Congress (I) leaders, workers and sympathizers with the purposeful and substantial assistance of the local police and administrators.

51.  In the State of Bihar the Chief Minister was Chandrashekhar Singh of Congress (I).  Throughout the State of Bihar 160 attacks on Sikh lives and properties took place between November 1 and 4, 1984 led by Congress (I) officials, leaders and workers where Sikhs were murdered and many others tortured and where Sikh properties were looted and destroyed.

52.  In October-November 1984, the present State of  Jharkhand was part of the State of Bihar which was governed and controlled by Congress (I) and Chief Minister Chandrashekhar Singh.

53.  In the areas comprising today's state of Jharkhand at least 460 attacks were directed at the Sikhs, their properties and temples by Congress (I) officials, leaders and workers and the police and local administrators either purposefully assisted the attackers and/or planned the attacks.  At least 84 Sikhs lost their lives in those attacks and several hundred were seriously injured.

54.  In the State of Gujarat the Chief Minister was Madhav Singh Solanki of

Congress (I).  Many attacks on Sikh lives and properties took place between November 1 and 4, 1984 across the State of Gujarat, however, no accurate account of the casualties has ever been released by the government.

55.  In the State of Haryana[3] the Chief Minister was Bhajan Lal of Congress (I). Throughout the State of Bihar 65 attacks on Sikh lives and properties took place between November 1 and 4, 1984 led and/or directed by Congress (I) officials, leaders and workers and the police and local administrators either purposefully assisted the attackers and/or planned the attacks.  The attacks resulted in numerous deaths, serious injuries by torture and damage to real and personal property.

56.  In the State of Himachal Pradesh the Chief Minister was Virbhadra Singh of Congress (I).   Throughout the State of Himachal Pradesh 78 attacks on Sikh lives and properties took place between November 1 and 4, 1984 which were led and/or directed by Congress (I) officials, leaders and workers and the police and local administrators  purposefully assisted the attackers and/or planned the attacks.  The attacks resulted in numerous deaths, serious injuries by torture and

---

[3]  Haryana is the state where on February 15, 2011, a "Mass Grave" of Sikhs killed on November 02, 1984 was discovered in village Hondh-Chillar in District Rewari. The residents of the village were killed, women raped, Sikh Temple burnt and desecrated by attackers, who according to eyewitnesses came in buses owned and operated by the Government of Haryana. The attackers were led by Congress leaders and they exclusively targeted Sikh population of the village

damage to real and personal property.

57.  In the State of Maharashtra the Chief Minister was Vasantdada Patil of Congress (I).  Numerous attacks on Sikh lives and properties took place between November 1 and 4, 1984 across the state of Maharashtra, however, no accurate account of the deaths and injuries suffered by Sikhs has ever been released.

58.  In the State of Manipur the Chief Minister was Rishang Keishing of Congress (I).  Numerous attacks on Sikh lives and properties took place between November 1 and 4, 1984 across the state of Manipur, however, no accurate account of the deaths and injuries suffered by Sikhs has ever been released.

59.  In the State of Kerala the Chief Minister was K. Karunakaran of Congress (I).  Numerous attacks on Sikh lives and properties took place between November 1 and 4, 1984 across the state of Kerela, however, no accurate account of the deaths and injuries suffered by Sikhs has ever been released.

60.  In the State of Meghalaya the Chief Minister was W.A. Sangma of Congress (I).  Numerous attacks on Sikh lives and properties took place between November 1 and 4, 1984 across the state of Meghalaya, however, no accurate account of the deaths and injuries suffered by Sikhs has ever been released.

61.  In the State of Mizoram the Chief Minister was Pu Lalthanhawla of Congress (I).  Numerous attacks on Sikh lives and properties took place between

November 1 and 4, 1984 across the state of Mizoram, however, no accurate

account of the deaths, injuries and losses suffered by the Sikhs has ever been

released.

62.  In the State of Orissa the Chief Minister was Janaki Ballabh Pattanaik

of Congress (I).  Throughout the State of Orissa 143 attacks on Sikh lives and

properties took place between November 1 and 4, 1984 which were led and/or

directed by Congress (I) officials, leaders and workers and the police and local

administrators  purposefully and substantially assisted the attackers and/or planned

the attacks.  The attacks resulted in numerous deaths, serious injuries by torture

and damage to real and personal property.

63.  In the State of Rajasthan the Chief Minister was Shiv Charan Mathur of

Congress (I).  Numerous attacks on Sikh lives and properties took place between

November 1 and 4, 1984 across the state of Kerela, however, no accurate account

of the deaths and injuries suffered by Sikhs has ever been released.

64.  The Chief Ministers were the heads of state at the local level and

exercised complete control over the state machinery and the local Congress (I)

party machine and acted under the authority of Congress (I).

65.  Despite the widespread killings and lawlessness, martial law was never

imposed and the Indian Army was not called in until after November 4, 1984.

66.  On November 1, 1984  a group of over 4,000 people attacked a Sikh Temple ("Gurudwara Rakab Ganj") in New Delhi. Several Sikhs were captured and burned alive in this attack.  The temple, where Sikh men, women and children were sought refuge, was set on fire and was fired upon by local police officers. This group was led and controlled by then Member of Parliament and senior Congress (I) leader Defendant Kamal Nath.

67.  Eyewitnesses submitted sworn testimony that Nath was in control of the people at the scene.

68.  Although the police were present at the scene, instead of preventing the attack or rescuing the Sikhs, they joined the attackers and fired their guns at the temple while Defendant Nath looked on.

69.  In fact, Defendant Nath prevented the police from taking the Sikhs who were burned to the hospital and their bodies laid smoldering in front of the temple for the rest of the day.

70.  In a statement given to authorities Defendant Nath admitted that he was present at the scene along with the police and certain para-military groups but denied responsibility for what took place.

71.  Needless to say, Defendant Nath's version  conflicted with eyewitness accounts.

20

72.  Despite finding that Defendant Nath's statements were "vague" and a "little strange," and that the statement of Assistant Police Commissioner Gautam Kaul, who was with Nath at the scene, to be "inconsistent with other evidence," no further investigation or prosecution of them was ever conducted.

## B.  **The Victims**

### Plaintiff Jasbir Singh

73.  In November 1984 Plaintiff Jasbir Singh was living with his family in New Delhi, India.  On or about November 1, 1984, their home was attacked by a group led by Congress (I) leader Bhola Ram.  Plaintiff Jasbir Singh's uncle was murdered and he escaped an attempt on his life by running, hiding and cutting his hair to remove any evidence of his Sikh identity.  While he was hiding, Plaintiff Jasbir Singh over heard Congress (I) official Jagdish Tytler address a group of Congress (I) workers and complain that they were " not killing enough Sikhs." From that point on Plaintiff Jasbir Singh was very active in the justice campaign for the Sikh victims of 1984.  Because of his activities he was constantly threatened by Congress (I) party leaders and workers and was detained and tortured by local police on several occasions at the request of Congress (I) leaders. In fact, Congress (I) leader Jagdish Tytler had him kidnaped and tortured for submitting an affidavit to authorities regarding the former's actions on November

21

1, 1984.  Due to the above activities, Plaintiff Jasbir Singh was forced to flee India in 2002 and was granted political asylum by the United States in 2007 based on the above.   Thus, Plaintiff Jasbir Singh sues on behalf of himself for the severe physical injuries and severe mental and emotional pain and suffering sustained by him as a result of the assault, attempted extrajudicial killing and torture at the hands of the defendants during and after The Sikh Massacre of 1984.

Plaintiff Mohender Singh

74.  Plaintiff Mohender Singh sues on behalf of himself and his deceased father Sardar Darshan Singh for the severe physical injuries and severe mental and emotional pain and suffering sustained by them during The Sikh Massacre of 1984.

75.  At all relevant times Plaintiff Mohender Singh and his family lived together as residents of the City of New Delhi, India.

76.  On November 1, 1984, Congress (I) leader and Member of Parliament HKL Bhagat organized, armed and led an attack on the Mohender home by a group of Congress (I) workers including, but not limited to, Kishori, Mohammad Abbas, Dr. Zulfqar Kashaf (a/k/a "Lamboo") and Rampal Saroj.

77.  The group broke down the front door of the home and dragged Mohender Singh's father, Sardar Darshan Singh, and his two uncles from the

house and beat them with wood and iron clubs in the street.  They searched for Mohender Singh attempting to kill him and any other children they found.

78.  On the command of HKL Bhagat and other Congress (I) leaders present, the Congress (I) workers pulled out knives and hatchets and proceeded to cut Mohender Singh's father and two uncles to pieces.  They died on the street in front of their home and family including Plaintiff Mohender Singh.

79.  Plaintiff Mohender Singh was living under death threats in India ever since the events of November 1984 and was forced to leave his country for the United States in 2008.  He is now seeking political asylum based on the real and present danger he faces in India due to the  aforementioned conduct.  Plaintiff Mohender Singh is bringing this action on behalf of himself and his late father for the severe physical injuries and severe mental and emotional pain and suffering they sustained during The Sikh Massacre of 1984 and the economic damages he sustained as a result of the loss of his father.

<u>Plaintiff Davinder Pal Bhatia</u>

80.  Plaintiff Davinder Pal Bhatia sues on behalf of himself for the severe physical injuries and severe mental and emotional pain and suffering sustained by him during the Sikh Massacre of 1984.

81.  In October and November of 1984, Plaintiff Davinder Pal Bhatia was a

resident of Kanpur, a city in the State of Utter Pradesh (UP), India.  After the death of Prime Minister Indira Gandhi on October 31, 1984, Plaintiff and his family did not face any immediate attack. However, almost 24 hours later on November 01, 1984, Davinder's residence was attacked.

82.  The attack was led by Congress (I) leader "Bharti Mishra" who had command and control over the assailants who were armed with sticks, rods, flammable material and firearms. Plaintiff Davinder Pal Bhatia was shot several times and received wounds to his right arm and shoulder.  In the same attack, his brother Manvinder Bhatia and his maternal grandfather Anant Singh Bhatia were both shot and killed on the spot by the assailants.

83.  Plaintiff Davinder Pal Bhatia was hospitalized from November 1 to November 12, 1984 and suffered severe physical and mental injuries.

84.  Ever since the attack Plaintiff Davinder Pal Bhatia has been publicly demanding that those responsible be brought to justice and has been an outspoken critic of the Government of India and Congress (I) for their failure to act in that regard.

85.  He has written numerous newspaper articles, attended rallies and participated in many other public activities in pursuit of justice for the Sikh community.

24

86.  Because of his actions, Plaintiff Davinder Pal Bhatia has received multiple threats of violence directed at him and his family from several quarters including Congress (I) workers and leaders.

87.  Plaintiff Davinder Pal Bhatia was forced to flee India in 2001 and was granted political asylum by the United States in 2005 based on the foregoing.

<u>Plaintiff Iqbal Kaur Bhatia</u>

88.  Plaintiff Iqbal Kaur Bhatia is bringing this action on behalf of herself, her late father Anant Singh and her late son Manvinder Singh Bhati.

89.  Plaintiff Iqbal Kaur Bhatia sues for the severe physical injuries and severe mental and emotional pain and suffering sustained by her, her son and her father during the Sikh Massacre of 1984.

90.  In October-November 1984, Plaintiff Iqbal Kaur Bhatia was living in a neighborhood called Barra, Hemant Vehar, in the city of Kanpur, UP. On November 01, 1984 Plaintiff Iqbal Kuar Bhatia's residence was attacked by a group of assailants led by Congress (I) leader "Bharti Mishra." Bharti Mishra had command and control over the assailants who were armed with sticks, rods, flammable material and firearms.

91.  Plaintiff Iqbal Kaur Bhatia received a gun shot to her left hand and lost her index finger.

25

92.  Paintiff Iqbal Kaur Bhatia's father, Anant Singh, and her son, Manvinder Singh Bhatia, were shot and killed on the spot by the assailants.

93.  While in the hospital Plaintiff Iqbal Kaur Bhatia received death threats and was warned to never name or go after the people who killed her father and son.

94.  In later years, Plaintiff Iqbal Kauer Bhatia again received death threats when her son Davinder Pal Bhatia (a co-plaintiff) took up the cause of seeking justice and prosecution of those who were responsible for attacks on the Bhatia family.  Plaintiff Iqbal Kauer Bhatia was forced to flee India for the United States in 2002 and was granted political asylum based on the above in 2006.

95.  Plaintiff Iqbal Kaur Bhatia is bringing this action on behalf of herself, her late father and late son for the severe physical injuries and severe mental and emotional pain and suffering they sustained during The Sikh Massacre of 1984.

<u>Plaintiffs Manjit Singh and Tejinder Singh</u>

96.  Plaintiffs Manjit Singh and Tejinder Singh sue on behalf of their late brother Gursharan Singh Rishi ("Rishi").

97.  The decedent passed away in February 2009 from the third degree burns he received in November 1984 when a group led by Congress (I) leader Sajjan Kumar tried to burn him alive.

98.  On November 1, 1984, Rishi  was in his home located in the Uttam Nagar area of New Delhi, when a group led by Congress (I) leader and then Member of Parliament Sajjan Kumar attacked his residence.

99.  On the directions and orders of Congress (I) leader Sajjan Kumar, the group attacked Rishi's father and killed his uncle.

100.  They then grabbed Rishi and on the directions of Sajjan Kumar, Rishi was thrown into a burning truck on the street.

101.  As a result, Rishi received third degree burns on more than half of his body and his lower body was left paralyzed.

102.  These  wounds were never treated properly and never healed.

103.  Rishi died from his injuries in February 2009.

104.  Plaintiffs Manjit Singh and Tejinder Singh are bringing this action on behalf of their late brother for the severe physical injuries and severe mental and emotional pain and suffering sustained by him during The Sikh Massacre of 1984.

<u>Plaintiff Kamaljit Kaur Girin</u>

105.  Plaintiff Kamaljit Kaur Girin is the surviving spouse of her late husband Jarnail Singh Girin on whose behalf she sues for the severe physical injuries and severe mental and emotional pain and suffering sustained by him during The Sikh Massacre of 1984 and the damages incurred by her due to his

death.

106.  In November 1984 Plaintiff Girin was living with her husband and family in the City of Shiv Puri, State of Madhya Pradesh.  On November 2, 1984, their home was attacked and set on fire by Congress (I) workers under the control and command of Congress (I) leader Ganeshi Lal.  Plaintiff's husband, Jaranil Singh Girin, tried to save his family but was overpowered by the group who first stoned him and then neck laced him in front of his family.  The local police were present and helped the attackers.  Although a fire station was across the street from the Girin house, both the house and Mr. Girin burned while the fire fighters refused to respond.  Plaintiff Girin and her family were forced to go into hiding in India from 1984 to 1987 and then fled to Canada where they currently reside still under threat of punishment from Congress (I) leaders.

**C.  <u>The Final Solution</u>**

107.  As the oldest and most established private political party organization in India, or organization overall, Congress (I) relied on and utilized the facilities, resources and machinery it already had in place to carry out the systematic and widespread campaign of terror against the Sikhs in November 1984.

108.  As the ruling political party of India nationally and locally, Congress (I) was able to pursue a policy of genocide against the Sikhs under color of state

28

law and with the apparent or actual authority of the Government of India.

109.  As noted above, Prime Minister Indira Gandhi was shot at her residence, No. 1 Safdarjung Road, New Delhi, at 9:15 AM on October 31, 1984. The news was immediately broadcast throughout India by All India Radio and Doorshan (state owned TV Channel and Radio). Hearing the news Congress (I) leaders, workers and sympathizers from all over India began to gather in New Delhi.

110.  The death of Indira Gandhi did not pose an immediate threat to the Sikhs; instead it was almost 24 hours later that on November 1, 1984 systematic attacks on Sikhs began all across India. Congress (I), the political party in power in Center and in the majority of the Indian States planned, orchestrated and carried out the attacks on Sikhs starting from November 1, 1984 till at least November 4, 1984.

111.  Indira Gandhi's death was officially announced in the afternoon of October 31, 1984.

112.  A few hours after the announcement of death a meeting of Congress (I) leaders and workers who had gathered from across the country took place at Congress (I) headquarters located at 24 Akbar Road, New Delhi. The conspiracy to attack, kill and destroy Sikhs throughout India was hatched in this meeting.

29

Among many other leaders, those present at the meeting included HKL Bhagat, Dharamdas Shastri, Lalit Maken, Sajjan Kumar, Jagdish Tytler and Kamal Nath. Congress leaders announced in this meeting that Congress (I) will avenge the death of Indira Gandhi by killing Sikh people and destroying their properties.

113.  Different leaders of Congress (I) took responsibility to carry out and make possible the attacks on Sikhs in their respective areas of influence. The control of national electronic media (All India Radio and Doordarshan) was taken over by the Congress (I) leaders who then used the media to deliver hate speeches against Sikhs to instigate, provoke and activate Congress workers and sympathisers all over India to attack Sikhs. Messages such as *"Khun ka badla khun se lenge"* (Blood for Blood) or "*Sardar Qaum Ke Ghaddar*" (Sardars' (another name for Sikh men) are the nation's traitors) were broadcast through the state-owned TV channel Doordarshan.

114.  Rumours were spread that Sikhs have distributed sweets and have danced on the death of Indira Gandhi to justify the killing of Sikhs and quell any possible resistance from the general public.

115.  During the night of October 31 and early morning of November 1, Congress (I) party leaders met with their local supporters to implement their plan to massacre Sikhs and distribute weapons and money.

116.   Through the Home Ministry of India (under whose control the police and district administrations fall) which was then headed by Congress leader P.V. Narsimha Rao, police and district administrators of Delhi and other cities were either paralyzed or were used to attack the Sikhs.

117.   Sikhs in police, army and paramilitary forces were disarmed.

118.   Government issued voter lists and ration card lists were obtained and distributed to identify and locate Sikh populations.

119.   Congress (I) workers, supporters and others were contacted and recruited to attack the Sikhs.

120.   In northern parts of India, under-training recruits from "police training centers" were also brought in to attack Sikhs.

121.   Attackers were armed with wooden sticks, iron rods, tires for neck lacing, (the practice of putting a car tire around a victim's neck and setting it on fire), kerosene oil, Liquid Petroleum Gas (LPG) cylinders and other flammable material and weaponry.

122.   Trains, buses and other vehicles of the Indian Transport Authorities were commandeered to transport attackers to where Sikhs lived.

123.   Trains run by Indian Railways were directed by Congress (I) officials to make non-scheduled stops at designated locations where attackers were waiting

to pull the Sikhs out of the trains to torture and kill them.

124.  The Railway Protection Forces shot and killed Sikh passengers on many trains.

125.  Thousands of Sikh women were gang raped.

126.  Sikhs injured in attacks were refused medical treatment at the hospitals.

127.  Media outlets and reporters who tried to capture and report the incidents of violence were attacked by Congress (I) party workers. According to Mark Litke, a group of Congress (I) workers attacked an ABC-TV news crew filming the streets where Sikhs were massacred.

128.  Sikh temples were attacked in order to destroy, harm and injure the Sikh identity and dignity. In Delhi alone, 370 Sikh temples were attacked and desecrated. The number of temples attacked in other parts of India runs into the hundreds.

129.  Police, Railway Protection Forces and other para-military forces were commanded to participate in killing the Sikhs or ordered to stand down and watch as the Sikhs were being killed.

130.  The Indian Military was not allowed to defend and save Sikhs in the cities by civil administrators or mayors who were obligated under Indian civil law

to call on the army under these circumstances but refused.

131.  For example, in the City of Kanpur (UP) city administrator Brijindra Yadav refused for three days to hand over the city to the Army and during that time thousands of Sikhs were killed.

132.  The foregoing is based primarily on affidavits, interrogatories, depositions, first information reports and other evidence accumulated over twenty-six years most of which has been compiled by a variety of human rights organizations and catalogued in the United States Library of Congress.

133.  The above scenario however provides only a snapshot of the crimes against humanity that took place in India against a distinct minority religious group known as "Sikhs" between November 1 and 4, 1984 which, as of today, has seen no Congress (I) official or worker prosecuted or Sikh victim fairly and adequately compensated.

## EXHAUSTION OF REMEDIES AND EQUITABLE TOLLING

134.  The attitude at every level of the Indian government for twenty-six years can be best summed up by the comment made by Rajiv Gandhi the brother of Indira Gandhi who assumed the position of Prime Minister immediately upon her death.  Several weeks later in the aftermath of the obvious slaughter of Sikhs in November 1984, Rajiv Gandhi was asked how such a thing could happen and

stated: "When a big tree falls, the earth around it shakes."

135.  Plaintiffs would be in grave danger if they had to return to India to file a civil action or participate in any proceedings or litigation.  Most of the named plaintiffs either have been granted political asylum or are seeking it based on the death threats they have been consistently receiving for demanding that those responsible for The Sikh Massacre of 1984 be brought to justice and that they along with other victims be allowed to file civil actions in order to be properly compensated for their suffering and losses.

136.  For more than twenty-six years the Indian government has failed, neglected and refused to properly investigate the incident.

137.  All efforts by or on behalf of the plaintiffs to seek justice and pursue an adequate civil remedy have been undermined by the defendants through their influence and position.

138.  For example, an eyewitness to the atrocities in New Delhi, Springer Singh, provided a sworn statement to the authorities in 2008 detailing the horrific events of November 1, 1984.  He provided the statement while he was living in exile in the United States where he had fled to several months before following numerous death threats.

139.  Shortly after he gave his statement, he was contacted by Indian

34

officials and advised that unless he returned to India immediately, his wife and children would be tortured and executed.

140.  Upon his arrival at New Delhi Airport in February 2009, Springer Singh was detained by Indian officials and mercilessly tortured.  Two weeks after he was freed, he died in the hospital from the injuries he received while a guest of the Indian government.

141.  In short, Plaintiffs and those they represent have no adequate or available remedies in India.

142.  Moreover, India's twenty-six year quest for "domestic and international legitimacy and power" provided it with the incentive to intimidate witnesses, to suppress and destroy evidence, and to commit additional human rights abuses against those who spoke out including plaintiffs - an incentive Congress (I) has acted on since 1984 in an effort to protect their former and, in some cases, current leaders against charges of human rights abuses.

143.  Congress (I) has been effectively in control in India since at least 1984.  Thus, the extraordinary circumstances that confronted and continue to confront plaintiffs were and are beyond their control and unavoidable even with diligence.

144.  Indeed, on February 21, 2011, after the discovery of the mass grave of

Sikhs at Hond-Chhilar, Haryana, former Union Home Minister and Congress (I)

official, Buta Singh, publically confessed that the then Chief Minister of Haryana

Congress (I)'s Bhajan Lal was responsible not only for the massacre but also for

the cover up.

145.  The only chance for plaintiffs and those they seek to represent to

obtain a fair administration of justice is here and now.

### FIRST CLAIM FOR RELIEF

*(CONGRESS(I) -ATS - Genocide, Rape, Torture,*
<u>*Summary Executions and Extrajudicial Killings*</u> *)*

146.  Plaintiffs repeat and re-allege each and every allegation set forth in

paragraphs 1 through 145 of the complaint as if fully set forth herein at length.

147.  The abuses committed against Plaintiffs, the family members they

represent and the class they seek to represent constitute crimes against humanity

and were committed by the Defendant Congress (I) directly, intentionally and

deliberately in pursuit of, <u>inter</u> <u>alia</u>, genocide.

148.  Defendant Congress (I) committed acts of genocide, gang rape,

torture, summary executions, extra-judicial killings and wholesale property

destruction against Plaintiffs which were not authorized by a judgment

pronounced by a regularly constituted court affording all the judicial guarantees which are recognized as indispensable by civilized people.

149.  Defendant Congress (I)'s acts and omissions constitute "tort[s] ... committed in violation of the law of nations or a treaty of the United States" as contemplated in the Alien Tort Statute, 28 U.S.C. 1350, in that the acts and omissions violated customary international law prohibiting genocide, torture, crimes against humanity, extrajudicial killings, mass rapes and summary executions as reflected, expressed and defined in multilateral treaties including, but not limited to, the Convention on the Prevention and Punishment of the Crime of Genocide, art. III(e), Dec. 9, 1948, 78 U.N.T.S. 277, 280, as well as other international and domestic instruments, resolutions, judicial decisions and other authorities.

150.  Congress (I) and its officials, leaders and workers who were acting under and with its authority, are liable, jointly and severally, for the torts committed by them and the other groups and entities against plaintiffs as described herein.

151.  Congress (I) also exercised command responsibility over its officials, leaders and workers and/or subordinates or persons or groups acting in coordination with it and/or them or under their control, in committing the acts of

genocide, gang rape, torture, summary executions, extra-judicial killings,

attempted extrajudicial killings and wholesale property destruction against

Plaintiffs.  Defendant Congress (I) knew or should have known that those crimes

were being committed by its officials, leaders and workers and/or subordinates or

persons or groups acting in coordination with it and/or them and/or under their

control, and it failed to prevent the crimes or to punish those responsible.

152.  Defendant Congress (I)'s conduct caused the crimes against Plaintiffs

and those they represent and caused them to sustain severe pain and suffering

and/or serious bodily injury or death as well as the loss of real and personal

property in amounts to be determined at trial.

153.  Defendant Congress (I)'s acts and omissions were deliberate, willful,

intentional, wanton and malicious and should be punished by an award of punitive

damages in an amount to be determined at trial.

### SECOND CLAIM FOR RELIEF

*(Congress (I) - ATS  and TVPA - Aiding and Abetting and Conspiring
with Others in the Commission of Genocide, Rape, Torture,
Summary Executions and Extrajudicial Killings )*

154.  Plaintiffs repeat and re-allege each and every allegation set forth in

paragraphs 1 through 153 of the complaint as if fully set forth herein at length.

155.  Defendant Congress (I) furthered the violations of customary

international norms, the laws of nations, treaties of the United States and the TVPA by purposefully, knowingly and substantially providing practical assistance to Defendant Nath, the Government of India and its proxies, local Indian governments and their proxies, Congress (I) workers and officials including, but not limited to, Jagdish Tytler, Sajjan Kumar, HKL Bhagat, Lalit Maken, Arjun Das, local police departments and para-military groups as well as groups of people and others in the killing, torturing and raping of Sikh men, women and children and the wholesale destruction of their property throughout India between November 1 and 4, 1984 which had a substantial effect on the perpetration of those crimes and it did so with the purpose of facilitating the commission of those crimes.

156.   Defendant Congress (I) furthered the violations of customary international norms, the laws of nations, treaties of the United States and the TVPA by purposefully, knowingly, and substantially providing practical assistance to Defendant Nath, the Government of India and its proxies, local Indian governments and their proxies, Congress (I) workers and officials including, but not limited to, Jagdish Tytler, Sajjan Kumar, HKL Bhagat, Lalit Maken, Arjun Das, local police departments,  and para-military groups as well as groups of people and others through encouraging, advising, contracting with or

otherwise soliciting them to commit the killing, torturing and raping of Sikh men, women and children and to destroy their real and personal property throughout India between November 1 and 4, 1984 which had a substantial effect on the perpetration of those crimes and it knew or should have known that the perpetrators would be violating clearly established customary international law norms in the process of completing those acts and it did so with the purpose of facilitating the commission of those crimes.

157.  Defendant Congress (I) furthered the violations of customary international norms, the laws of nations, treaties of the United States and the TVPA by purposefully, knowingly and substantially facilitating the commission of human rights violations against Plaintiffs and those they represent by providing practical assistance to Defendant Nath, the Government of India and its proxies, local Indian governments and their proxies, Congress (I) workers and officials including, but not limited to, Jagdish Tytler, Sajjan Kumar, HKL Bhagat, Lalit Maken, Arjun Das, local police departments, local governments and para-military groups as well as gangs of people and others in the form of tools, instrumentalities and services to commit those violations which had a substantial effect on the perpetration of those crimes and did so with actual and constructive knowledge that those tools, instrumentalities and services would be and could only be used in

connection with the killing, torturing and raping of Sikh men, women and children and the destruction of their property throughout India between November 1 and 4, 1984 and it did so with the purpose of facilitating the commission of those crimes.

158.  Defendant Congress (I)'s conduct caused the Plaintiffs and those they represent to sustain great pain and suffering and/or serious bodily injury or death as well as the loss of real and personal property in amounts to be determined at trial.

159.  Defendant Congress (I)'s  acts and omissions were deliberate, willful, intentional, wanton and malicious and should be punished by an award of punitive damages in an amount to be determined at trial.

## THIRD CLAIM FOR RELIEF

*(Kamal Nath - ATS - Genocide, Rape, Torture,*
*Summary Executions, Extrajudicial Killings*
*and Crimes Against Humanity )*

160.  Plaintiffs repeat and re-allege each and every allegation set forth in paragraphs 1 through 159 of the complaint as if fully set forth herein at length.

161.  The human rights abuses committed against Plaintiffs, the family members they represent and the class constitute crimes against humanity and were committed by Defendant Nath directly, intentionally and deliberately by those

under his control and with his authority in pursuit of, <u>inter alia</u>, genocide and he is liable, jointly and severally, for the torts committed by them against plaintiffs as described herein.

162.  Defendant Nath's acts of genocide, gang rape, torture, summary executions, extrajudicial killings, attempted extrajudicial killings, destruction of real and personal property against Plaintiffs and those they  represent constitute "tort[s] ... committed in violation of the law of nations or a treaty of the United States" as contemplated in the Alien Tort Statute, 28 U.S.C. 1350, in that the acts and omissions violated customary international law prohibiting, <u>inter alia,</u> genocide, as reflected, expressed, and defined in multilateral treaties including but not limited to the Convention on the Prevention and Punishment of the Crime of Genocide, art. III(e), Dec. 9, 1948, 78 U.N.T.S. 277, 280, as well as other international and domestic instruments, resolutions, judicial decisions and other authorities.

163.  Defendant Nath also exercised command responsibility over Congress (I) officials, leaders and workers and/or subordinates or persons or groups acting in coordination with them or under their control, in their commission of the acts of genocide, gang rape, torture, summary executions, extra-judicial killings, attempted extrajudicial killings and wholesale property destruction against

Plaintiffs.  Defendant Nath knew or should have known that those crimes were being committed by Congress (I) officials, leaders and workers and/or subordinates or persons or groups acting in coordination with them and he failed to prevent those crimes or to punish those responsible.

164.  Defendant Nath's conduct caused the commission of those crimes and caused Plaintiffs and those they represent to sustain great pain and suffering and/or serious bodily injury or death as well as the loss of real and personal property in amounts to be determined at trial.

165.  Defendant Nath's acts and omissions were deliberate, willful, intentional, wanton and malicious and should be punished by an award of punitive damages in an amount to be determined at trial.

## FOURTH CLAIM FOR RELIEF

### *(Kamal Nath - TVPA - Torture and Extrajudicial Killings)*

166.  Plaintiffs repeat and re-allege each and every allegation set forth in paragraphs 1 through 165 of the complaint as if fully set forth herein at length.

167.  The acts described herein constitute extrajudicial killing and torture as defined by the Torture Victim Protection Act, Pub. L. No. 102-256, 106 Stat. 73 (1992) (codified at 28 U.S.C. 1350 (note)).

168.  The acts of extrajudicial killing and the attempted acts of extrajudicial

killing described herein were deliberated killings and attempts at killing not authorized by a judgment pronounced by a regularly constituted court affording all the judicial guarantees which are recognized as indispensable by civilized peoples.

169.  The acts of torture described herein were inflicted deliberately and intentionally by Defendant Nath for purposes that include, <u>inter alia</u>, punishing and intimidating Plaintiffs and those they represent for ostensibly playing a role in the assassination of Indira Gandhi, obtaining and coercing information or confessions from them or third persons regarding the assassination and simply because they were members of an oppressed minority religious group in India known as the Sikhs.  The extrajudicial killings, attempted extrajudicial killings and torture did not arise from and was not inherent in or incidental to lawful sanctions.  At the times these acts occurred, Plaintiffs and those they represent were in the custody or physical control of their attackers.

170.  The acts of extrajudicial killings, attempted extrajudicial killings and torture committed against Plaintiffs, the family members they represent and the class were committed by Defendant Nath directly, intentionally and deliberately by those under his control and with his authority and he is therefore liable,  jointly and severally with them for those crimes.

171.  Defendant Nath also exercised command responsibility over Congress

44

(I) officials, leaders and workers and/or subordinates or persons or groups acting in coordination with them or under their control, in their commission of the acts of extra-judicial killings, attempted extrajudicial killings and torture against Plaintiffs.  Defendant Nath knew or should have known that those crimes were being committed by Congress (I) officials, leaders and workers and/or subordinates or persons or groups acting in coordination with them and he failed to prevent those crimes or to punish those responsible.

172.  Defendant Nath's conduct caused the commission of those crimes and caused Plaintiffs and those they represent to sustain great pain and suffering and/or serious bodily injury or death as well as the loss of real and personal property in amounts to be determined at trial.

173.  Defendant Nath's acts and omissions were deliberate, willful, intentional, wanton and malicious and should be punished by an award of punitive damages in an amount to be determined at trial.

## FIFTH CLAIM FOR RELIEF

*(Kamal Nath - ATS and TVPA - Aiding and Abetting*
*the Commission of Genocide, Rape, Torture, Summary Executions,*
<u>*Extrajudicial Killings and Crimes Against Humanity)*</u>

174.  Plaintiffs repeat and re-allege each and every allegation set forth in

paragraphs 1 through 173 of the complaint as if fully set forth herein at length.

175.  Defendant Nath furthered the violations of customary international norms, the laws of nations, treaties of the United States and the TVPA by purposefully, knowingly and substantially providing practical assistance to Congress (I), the Government of India and its proxies, local Indian governments and their proxies, Congress (I) officials including, but not limited to, Jagdish Tytler, Sajjan Kumar, HKL Bhagat, Lalit Maken, Arjun Das, local police departments and para-military groups as well as groups of people and others which had a substantial effect on the perpetration of the killing, torturing and raping of Sikh men, women and children and wholesale destruction of their property throughout India between November 1 and 4, 1984 and he did so with the purpose of facilitating the commission of those crimes.

176.  Defendant Nath furthered the violations of customary international norms, the laws of nations, treaties of the United States and the TVPA by purposefully, knowingly and substantially providing practical assistance to Congress (I), the Government of India and its proxies, local Indian governments and their proxies, Congress (I) officials including, but not limited to, Jagdish Tytler, Sajjan Kumar, HKL Bhagat, Lalit Maken, Arjun Das, local police departments, and para-military groups as well as groups of people and others

through encouraging, advising, contracting with or otherwise soliciting them to commit the killing, torturing and raping of Sikh men, women and children and to destroy their real and personal property throughout India between November 1 and 4, 1984 which had a substantial effect on the perpetration of those crimes and he knew or should have known that the perpetrators would be violating clearly established customary international and domestic law norms in the process of completing those acts and he did so with the purpose of facilitating the commission of those crimes.

177.   Defendant Nath furthered the violations of customary international norms, the laws of nations, treaties of the United States and the TVPA by purposefully, knowingly and substantially facilitating the commission of human rights violations against Plaintiffs and those they represent by providing practical assistance to Congress (I), the Government of India and its proxies, local Indian governments and their proxies, Congress (I) officials including, but not limited to, Jagdish Tytler, Sajjan Kumar, HKL Bhagat, Lalit Maken, Arjun Das, local police departments, local governments and para-military groups as well as gangs of people and others by supplying tools, instrumentalities and services to them to commit those violations which had a substantial effect on the perpetration of those crimes and he did so with actual and constructive knowledge that those tools,

instrumentalities and services would be and could only be used in connection with the killing, torturing and raping of Sikh men, women and children and the destruction of their property throughout India between November 1 and 4, 1984 and he did so with the purpose of facilitating the commission of those crimes.

178.  Defendant Nath's conduct caused the commission of those crimes and caused the Plaintiffs and those they represent to sustain severe pain and suffering and/or serious bodily injury or death as well as the loss of real and personal property in amounts to be determined at trial.

179.  Defendant's acts and omissions were deliberate, willful, intentional, wanton and malicious and should be punished by an award of punitive damages in an amount to be determined at trial.

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiffs on behalf of themselves and those they represent pray for judgment against the Defendants, jointly and severally, as follows:

a)    For compensatory damages in an amount to be proven at trial;

b)    For punitive and exemplary damages in an amount to be proven at trial;

c)    For reasonable attorney's fees, costs and interest;

d)    For a declaratory judgment holding that Defendants' conduct was in

48

violation of the laws of nations, customary international law and

domestic laws;

e)      For an Order certifying the plaintiffs' class as alleged herein; and

e)      For such other and further relief as the Court may deem just and

proper.


A jury trial is demanded on all issues.

Dated: New York, New York
            February 28, 2011


MICHAEL F. FITZGERALD, ESQ.


By S/ _____

            Michael F. Fitzgerald, Esq. (MF-4704)
                Attorney for Plaintiffs
            100 Park Avenue - Suite 1600
            New York, New York 10017
            (212) 939-7281
            (212) 880-6400 (f)
            Mfitzjustice@aol.com