UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------X

SIKHS FOR JUSTICE, on behalf of
deceased and injured members of the
Sikh community, ET AL.,

                    Plaintiffs,           10 Civ. 2940

    -against-                  OPINION

KAMAL NATH, and
INDIAN NATIONAL CONGRESS PARTY,

                    Defendants,

    -and-

INDIAN LEGAL HERITAGE,

                    Intervenor.

------------------------------------X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 9/21/12

A P P E A R A N C E S:

        Attorney for Plaintiffs

        MICHAEL F. FITZGERALD, ESQ.
        100 Park Avenue, Suite 1600
        New York, NY  10017

        Attorneys for Defendant Kamal Nath

        PILLSBURY WINTHROP SHAW PITTMAN LLP
        1540 Broadway
        New York, NY  10036

        By:  David M. Lindley, Esq.
             Ranah L. Esmaili, Esq.
             Anne C. Lefever, Esq.
             Tameka M. Beckford-Young, Esq.

Attorneys for Defendant Indian National Congress Party

JONES DAY
222 East 41st Street
New York, NY 10017

By:  Geoffrey Shannon Stewart, Esq.
     Thomas E. Lynch, Esq.

**Sweet D.J.**

Currently before the Court are several motions and a
cross-motion filed by the parties to this action.

The plaintiffs Sikhs for Justice and seven individuals
(collectively, the "Plaintiffs") moved pursuant to Rules 54(a),
59(e) and 60(b) of the Federal Rules of Civil Procedure and
Local Rule 6.3 for reconsideration or reargument of the opinion
of this Court ("Motion to Reconsider"), entered on March 7,
2012, which dismissed the first amended complaint ("FAC") as to
defendant Kamal Nath ("Nath") without prejudice.

The Plaintiffs also moved for default judgment against
the defendant Indian National Congress Party ("INC") pursuant to
Rule 55(b)(2) of the Federal Rules of Civil Procedure and Local
Rule 55.2(b) ("Motion for Default Judgment").

While the Plaintiffs' motions were sub judice, the INC
moved pursuant to Rules 12(b)(1), 12(b)(2), 12(b)(5) and
12(b)(6) of the Federal Rules of Civil Procedure to dismiss the

Plaintiffs' FAC as to the INC, or in the alternative, for a stay of proceedings pending the Supreme Court's resolution of <u>Kiobel v. Royal Dutch Petroleum Co.</u>, 621 F.3d 111 (2d Cir. 2010), <u>cert. granted</u>, 132 S. Ct. 472 (2012) ("Motion to Dismiss").  The Plaintiffs opposed the motion and made a cross-motion seeking various relief including:  (a) the consolidation of the motions presently pending before the Court for purposes of determination and possible appeal; (b) leave to conduct jurisdictional discovery, if necessary; (c) the declaration that service has been effected on the Defendants or prescribing an alternative method of service, if necessary; and (d) the further amendment of the Complaint in the event the Defendants' motion is granted in whole or in part.

Upon the facts and conclusions set forth below, the Motions for Reconsideration and Default Judgment are denied, the Motion to Dismiss is denied in part and granted in part, the INC's motion to stay the proceedings is granted and the Plaintiffs' cross-motion is denied in part and granted in part.

## I. **Prior Proceedings**

4

The original complaint in this action was filed on April 6, 2010.  It alleged nine claims against Nath for violations of international law under the Alien Tort Statute ("ATS"), 28 U.S.C. § 1350, and Torture Victim Protection Act of 1991 ("TVPA"), Pub. L. No. 102-256, 106 Stat. 73 (1992) (codified at 28 U.S.C. § 1350) and under state law for wrongful death, negligence, public nuisance, battery, intentional infliction of emotional distress and negligent infliction of emotional distress.  (Dkt. No. 1).

On March 1, 2011, the Plaintiffs filed the FAC, adding plaintiffs and the defendant INC and dropping all state law claims.  (Dkt. No. 16).  As to Nath, the Plaintiffs allege claims of genocide, rape, torture, summary executions, extrajudicial killings, and crimes against humanity under the ATS (FAC ¶¶ 160-65); torture and extrajudicial killings under the TVPA (Id. ¶¶ 166-73); and for the aiding and abetting the commission of those violations under the ATS and TVPA.  (Id. ¶¶ 174-79).  With regard to the INC, the Plaintiffs allege claims under the ATS for genocide, rape, torture, summary executions, and extrajudicial killings (Id. ¶¶ 146-53); and for the aiding and abetting the commission and conspiracy to commit those violations under both the ATS and TVPA.  (Id. ¶¶ 154-59).

5

The FAC alleges that the individually-named Plaintiffs and the individuals they represent were present and/or injured in states throughout India when officials organized, armed and led attacks on Sikhs.  (Id. ¶¶ 34-66, 73-106).  According to the FAC, during the relevant time period, the INC "virtually had complete control over the governance of India" at that time, and "[a]s the ruling political party of India nationally and locally, [the INC] was able to pursue a policy of genocide against the Sikhs under color of state law and with the apparent or actual authority of the Government of India."  (Id. ¶¶ 28-30, 108).  Nath appears in the FAC in connection with one site of violence in New Delhi on November 1, 1984.  (Id. ¶¶ 37-39, 66-72).  The Plaintiffs additionally allege that Nath aided and abetted the violence in India by his presence and participation at a meeting of the INC where the violence was planned.  (Id. ¶¶ 37-39).

On June 24, 2011, Nath moved to dismiss the FAC, asserting lack of jurisdiction based upon failure of service, immunity, lack of standing, and the act of state doctrine. (Dkt. No. 31).  The motion was heard and marked fully submitted

6

on September 21, 2011 and the Court issued its Opinion granting
Nath's motion to dismiss the FAC on March 7, 2012.  See Sikhs
for Justice v. Nath, --- F. Supp. 2d ---, 2012 WL 760164
(S.D.N.Y. March 7, 2012) ("Sikhs I" or the "March Opinion").

    While Nath's motion was sub judice, the Plaintiffs
moved for default judgment against the INC pursuant to Rule
55(b)(2) of the Federal Rules of Civil Procedure and Local Rule
55.2(b) on February 2, 2012.  The motion was heard and marked
fully submitted on May 9, 2012.

    On March 21, 2012, the Plaintiffs filed their motion
for reconsideration pursuant to Rules 54(a), 59(e) and 60(b) of
the Federal Rules of Civil Procedure and Local Rule 6.3,
requesting that the Court revisit its March Opinion, which
dismissed without prejudice the FAC as to Nath.  The motion was
heard on submission and marked fully submitted on April 18,
2012.

    On May 29, 2012, the INC moved to dismiss the FAC, or
in the alternative, for a stay of proceedings pending the

7

Supreme Court's resolution of <u>Kiobel v. Royal Dutch Petroleum</u>.
The Plaintiffs subsequently filed a cross-motion on June 29,
2012 for consolidation of the pending motions, jurisdictional
discovery, a declaration that service had been effected or, an
alternate method of service and for leave to further amend the
complaint if the INC's Motion to Dismiss was granted in whole or
in part.  The motion and cross-motion were heard on submission
and marked fully submitted on July 18, 2012.


## II.   **The Facts**


        The facts underlying this action are set out in the
March Opinion, the parties' affidavits and the FAC, familiarity
with which is assumed.  The facts relevant to the instant
motions are set forth in below.


        The Plaintiffs are a class consisting of resident and
non-resident Sikh men, women and children who survived the
allegedly unlawful attacks on them in India in November 1984 and
the lawful heirs and claimants of those men, women and children
that did not survive.  (FAC ¶ 17).  The class also consists of

8

Sikhs whose homes, businesses, temples and personal property were allegedly damaged.  (Id.).  The class period is from November 1 to November 4, 1984.  (Id.).

In 1984, the assassination of former Prime Minister Indira Gandhi sparked violence throughout India, during which a large number of Sikhs were killed and injured.  (Id. ¶¶ 2, 31-36, 109-11).  Throughout the relevant period, Nath was an elected Member of Parliament or Union Minister for the Government of India.  (Id. ¶ 16).  He was also a member of the INC, the ruling political party during the relevant period. (Id.).

According to the FAC, as the ruling political party of India, the INC was able to pursue a policy of genocide against the Sikhs under color of state law and with the apparent or actual authority of the Government of India.  (Id. ¶ 108).   The Plaintiffs allege that Nath and the INC committed various human rights violations, including acts of genocide, gang rape, torture, summary executions, extra-judicial killings and wholesale property destruction against the Plaintiffs.  (Id. ¶¶ 148-51, 162-63).  The Plaintiffs also allege that Nath and the

INC aided, abetted and provided practical assistance to each other, the Government of India and its proxies, local Indian governments and their proxies, INC workers and officials, local police departments and para-military groups in the killing, torturing and raping of Sikhs.  (Id. ¶¶ 155-57, 175-77).


          The FAC alleges that the INC "conducts ongoing and significant business in the United States particularly in the State and City of New York both directly and through its wholly owned subsidiary "Indian National Overseas Congress" (hereinafter "INOC") which is a corporation organized and existing pursuant to the laws of the State of New York with its principal place of business located at Queens County, State of New York."  (Id. ¶ 15).  "Upon information and belief," the Plaintiffs contend that the INC "operates INOC as a department or agent and controls its activities."  (Id.).


## III. **The Motion for Reconsideration is Denied**


A) The Applicable Standard

The standards governing motions under Local Rule 6.3 along with Fed. R. Civ. P. 59 are the same, and a court may grant reconsideration where the party moving for reconsideration demonstrates an "intervening change in controlling law, the availability of new evidence, or the need to correct a clear error or prevent manifest injustice." Henderson v. Metro. Bank & Trust Co., 502 F. Supp. 2d 372, 375-76 (S.D.N.Y. 2007) (quotation marks and citations omitted); Parrish v. Sollecito, 253 F. Supp. 2d 713, 715 (S.D.N.Y. 2003) ("Reconsideration may be granted to correct clear error, prevent manifest injustice or review the court's decision in light of the availability of new evidence.") (citing Virgin Atl. Airways, Ltd. v. Nat'l Mediation Bd., 956 F.2d 1245, 1255 (2d Cir. 1992)).

"Reconsideration of a court's previous order is an 'extraordinary remedy to be employed sparingly in the interests of finality and conservation of scarce judicial resources.'" Montanile v. Nat'l Broad. Co., 216 F. Supp. 2d 341, 342 (S.D.N.Y. 2002) (quoting In re Health Mgmt. Sys. Inc. Secs. Litig., 113 F. Supp. 2d 613, 614 (S.D.N.Y. 2000)). Accordingly, the standard of review applicable to such a motion is "strict." Shrader v. CSX Transp., Inc., 70 F.3d 255, 257 (2d Cir. 1995).

11

The burden is on the movant to demonstrate that the
Court overlooked controlling decisions or material facts that
were before it on the original motion, and that might
"'materially have influenced its earlier decision.'"  Anglo Am.
Ins. Group v. CalFed, Inc., 940 F. Supp. 554, 557 (S.D.N.Y.
1996) (quoting Morser v. AT & T Information Sys., 715 F. Supp.
516, 517 (S.D.N.Y. 1989)).  A party seeking reconsideration may
neither repeat "arguments already briefed, considered and
decided," nor "advance new facts, issues or arguments not
previously presented to the Court."  Schonberger v. Serchuk, 742
F. Supp. 108, 119 (S.D.N.Y. 1990) (citations omitted).  Rather,
he must "point to controlling decisions or data that the court
overlooked – matters, in other words, that might reasonably be
expected to alter the conclusion reached by the court."
Shrader, 70 F.3d at 257 (citations omitted).

The reason for the rule confining reconsideration to
matters that were "overlooked" is to "ensure the finality of
decisions and to prevent the practice of a losing party
examining a decision and then plugging the gaps of a lost motion
with additional matters."  Polsby v. St. Martin's Press, Inc.,
No. 97-690(MBM), 2000 WL 98057, at *1 (S.D.N.Y. Jan. 18, 2000)
(citation and quotation marks omitted).  Motions for

12

reconsideration "are not vehicles for taking a second bite at the apple, . . . and [the court] [should] not consider facts not in the record to be facts that the court overlooked." Rafter v. Liddle, 288 Fed. App'x. 768, 769 (2d Cir. 2008) (citation and quotation marks omitted). Thus, a court must narrowly construe and strictly apply Local Rule 6.3, so as to avoid duplicative rulings on previously considered issues, and to prevent the rule from being used as a substitute for appealing a final judgment. See In re Bear Stearns Cos., Inc. Sec., Derivative and ERISA Litig., 08 M.D.L. No. 1963, 2009 WL 2168767, at *1 (S.D.N.Y. Jul. 16, 2009) ("A motion for reconsideration is not a motion to reargue those issues already considered when a party does not like the way the original motion was resolved.") (citation and quotation omitted).

B) The Plaintiffs Raise No Controlling Law or Facts That the March Opinion Overlooked to Warrant Reconsideration

          The Plaintiffs have failed to cite to any controlling law that has changed since the March Opinion or pointed to any new evidence that would have affected the Court's decision. Instead, the Plaintiffs argue that, in the March Opinion, the Court "overlooked material information put forward by plaintiffs which at worst revealed genuine issues of fact regarding both

13

service and general jurisdiction and misapplied the applicable
law in this Circuit as it related to dismissals based on
insufficiency of service and lack of personal jurisdiction."
(Pl. Memo – Motion for Reconsideration at 1).

In a motion for reconsideration, the moveant's burden
demonstrating that the law or matters were overlooked is high
and thus, must "reasonably be expected to alter the conclusion
reached by the court." Shrader, 70 F.3d at 257.  To advance
their argument, the Plaintiffs contend that the FAC should not
have been dismissed for insufficient service of process.
According to the Plaintiffs, there is no dispute that Nath had
actual notice of the suit and that Nath regularly travelled to
New York since 1984 to conduct personal business here with local
publisher McGraw-Hill, and thus, even if they conceded that
service on an agent was not shown, they "ought to be given an
opportunity to perfect service" on Nath.  (Pl. Memo – Motion for
Reconsideration at 3).

The Plaintiffs' assertions fail to point to newly
discovered evidence that would have affected the Court's
decision.  Instead, the Motion for Reconsideration is based on
the same evidence and "the record before the Court" that the

14

Plaintiffs proffered to oppose Nath's motion to dismiss. (Id. at 4). Moreover, the Court squarely considered and addressed each of the three facts that the Plaintiffs contend the Court overlooked. First, the Plaintiffs point to a remark made by Nath to reporters about the frequency of his visits to New York. (Pl. Memo – Motion for Reconsideration at 3). The March Opinion expressly considered Nath's April 2010 trip and quoted the full text of the alleged comment. Sikhs I, 2012 WL 760164, at *7. Similarly, the Plaintiffs point to Nath's book deal and urge the Court "to consider that which was not stated in defendant's self-serving affidavit." (Pl. Reply – Motion for Reconsideration at 7). The Court, however, considered that Nath had submitted a sworn statement that he had yet to receive any royalties from his book as well as the fact that the Plaintiffs had not provided averments as to additional contacts Nath might have had with New York due to the book, other than that its publisher is located here. Sikhs I, 2012 WL 760164, at *8. The March Opinion also recited and addressed the facts surrounding the affidavit of Ms. Yoselin Genao ("Genao"), filed on August 5, 2010. Id. at *3. The Plaintiffs "disagreement with the Court's previous opinion is an insufficient basis" for a motion for reconsideration. Jackson v. Walker, No. 96-1064(JGK), 1998 WL 851600, at *2 (S.D.N.Y. Dec. 8, 1998).

In addition, the Plaintiffs contend that the Court incorrectly found that they violated Rule 4(m)'s 120 day time limit and ignored Rule 4(f)'s option to seek assistance from the Court for service abroad. (Pl. Memo - Motion for Reconsideration at 3). They maintain that the clock on the 120-day time limit to commence service under Rule 4(m) started to run when they filed the FAC on March 1, 2011, not when they filed the original complaint on April 6, 2012. (Id. at 3-4). Thus, their attempt to serve Nath under the Hague Service Convention was timely. See Convention on the Service Abroad of Judicial and Extrajudicial Documents in Civil or Commercial Matters, 20 U.S.T. 361, T.I.A.S. No. 6638, 658 U.N.T.S. 163 (Nov. 15, 1865) (the "Hague Convention"). According to the Plaintiffs, "[w]hen this Court granted plaintiffs' request to amend the summons and complaint those documents superceded the original summons and complaint and therefore had to be served on this defendant." (Pl. Memo - Motion for Reconsideration at 3). They argue that, until that point, they believed that Nath was properly served on April 6, 2010, within Rule 4(m)'s 120-day limit and therefore did not seek court intervention. (Id. at 4).

The filing of an amended complaint, however, does not restart the 120 day period for service under Rule 4(m). See Cioce v. County of Westchester, No. 02-3604(HB), 2003 WL 21750052, at *3 (S.D.N.Y. July 28, 2003) (dismissing the complaint and finding that the defendant was "mistaken in thinking that the time began to run under the Rule [4(m)] from the filing of any amended complaint and not the institution of the lawsuit.") aff'd 128 Fed. App'x 181 (2d Cir. 2005); see also Georgia ex rel. Saunders v. Mortgage Electronic Registration Sys., Inc., No. 10-3419-TWT-RGV, 2011 WL 1335824, at *5 (N.D. Ga. Mar. 11, 2011) (stating that "[t]he 120-day time limit imposed by Rule 4(m) expires 120 days the first complaint in which the defendant is named, however, and does not restart each time a plaintiff files a new amended complaint. . . unless the plaintiff can show good cause why service was not made within that period.") (citations omitted) (emphasis in the original).

Plaintiffs rely on Gear Inc. v. LA Gear California, Inc., 637 F. Supp 1323 (S.D.N.Y. 1986), in which the court allowed the 120 day clock start anew with the filing of the amended complaint.  However, the Court found that the plaintiffs

in that case had demonstrated good cause for their delay in
service.  Id. at 1326 (finding that "[m]uch of the 120 day
period was consumed awaiting L.A. Ltd's first pleading – a
period during which plaintiff had no reason to believe service
would be challenged.").  Here, conversely, the Court found that
"Plaintiffs [had] put forth no good cause for their failure to
serve Nath or attempt Hague Convention service during the 120-
day period."  Sikhs I, 2012 WL 760164, at *5.

     In addition, as stated in the March Opinion, "[n]o one
handed the summons or complaint to Nath outside of the Indian
Consulate on April 6, 2010" and "[s]ervice was thus not affected
under Rule 4(e)(2)(A)."  Id. at *4 ("Nath's receipt of the
complaint during a press conference inside the Indian Consulate
[did] not constitute proper service under the Vienna Convention"
as "[s]ervice of process at . . . consular premises is
prohibited.").  "A mistaken belief that service was proper does
not constitute good cause."  Jonas v. Citibank, N.A., 414 F.
Supp. 2d 411, 416 (S.D.N.Y. 2006).  "Good cause exists only in
exceptional circumstances, where the insufficiency of service
results from circumstances beyond the plaintiff's control."
Khanukayev v. City of New York, No. 09-6175, 2011 WL 5531496, at
*3 (S.D.N.Y. Nov. 15, 2011).  Thus, the Plaintiffs had not

substantially complied with the service requirements within Rule
4(m)'s window and should have applied for an extension of time
or for the court intervention they now seek.


        The Plaintiffs cite to Romandette v. Weetabix Co., 807
F.2d 309 (2d Cir. 1986) and Jaiyeola v. Carrier Corp., 73 Fed.
App'x 492 (2d Cir. 2003) for the propositions that defective
service may be excused where proper service may "still be
obtained" and that they had "every right to rely on the Central
Authority in India to comply with the treaty that nation
signed." (Pl. Memo - Motion for Reconsideration at 4-5).  The
Plaintiffs' reliance on these cases, however, is misplaced.  In
Romandette, the Court found persuasive that Romandette was an
incarcerated pro se litigant, proceeding in forma pauperis while
incarcerated, who was "entitled to rely on service by the U.S.
Marshals" because the Marshals Service "had indicated that it
would personally serve the defendant." 807 F.2d at 310-11.  In
holding that untimely service should be permitted, the Court
found that "Romandette plainly exhibited good cause" as he "had
done everything in his power to comply with Rule 4." Id. at
311-12.  Similarly, in Jaiyeola, the plaintiff was acting pro se
and the Court emphasized whether he had done everything in his
power to effectuate service.  73 Fed. App'x at 494.

The Plaintiffs also quote this Court's decision in Burda Media, Inc. v. Blumenberg for the proposition that that "[T]he Hague Convention should be read together with Rule 4, which 'stresses actual notice, rather than strict formalism.'" No. 97-7167(RWS), 2004 WL 1110419, at *6 (S.D.N.Y. May 18, 2004). In finding that the failure to comply strictly with the requirements of the Hague Convention was not automatically fatal to effective service, this Court found persuasive that the plaintiff had made every effort to effectuate service, including multiple requests for extensions. Id. at *6 ("Burda has persuasively shown that its two requests for extensions of the 120 day time limit were appropriate because it was uncertain at the time whether service would take place domestically or internationally.").

Here, the Plaintiffs are represented by counsel and have not sought extensions from the Court during the 120 day period. The Plaintiffs have also "not called to our attention any case in which this Court has ruled that the good-cause requirement specified in Rule 4(m) may be disregarded, and we are aware of no such case." Bogle-Assegai v. Connecticut, 470 F.3d 488, 508 (2d Cir. 2006) (finding no excuse for defective

20

service where the plaintiff failed to establish good cause as to
why service was not made within the 120 day limit and never
requested an extension of time during the 600 days when the case
was pending).

         In addition, instead of citing to a change in the law,
the Plaintiffs claim that the Court "misapplied the applicable
law." (Pl. Memo - Motion for Reconsideration at 1) and cite to
the same authorities cited in their opposition to Nath's motion
to dismiss. Compare Id. at 2 (citing Romandette, 807 F.2d 309
(2d Cir. 1986)) with (Pl. MTD Memo. at 23) (citing same);
compare (Pl. Memo - Motion for Reconsideration at 5 (citing
Burda Media, 2004 WL 1110419 (S.D.N.Y. May 19, 2004) and
Jaiyeola, 73 F. App'x 492 (2d Cir. 2003)) with (Pl. MTD Memo. at
23 n.8, 25 n.10 (citing same). Misapplication of the law,
however, is a ground for appeal, not reconsideration. See e.g.,
Gotti v. United States, No. 08-7178(HB), 2009 WL 2366465, at *2
(S.D.N.Y. Aug. 3, 2009) (stating that "[i]f petitioner wishes to
advance arguments that . . . controlling law [was] misapplied,
those arguments may be raised on appeal."); Dellefave v. Access
Temps., Inc., No. 99-6098(RWS), 2001 WL 286771, at *6 (S.D.N.Y.
Mar. 22, 2001) (denying a motion to reconsider a sanctions order
in part because movant argued that "the Court misapplied the

                                21

law," and "[a]s such, the motion in effect seeks to appeal the
prior decision rather than to ask the Court to reconsider it
under the proper standard.").

        Moreover, even if the Plaintiffs managed to serve Nath
in India pursuant to the Hague Convention, such service would
not establish personal jurisdiction in this case.  See Sikhs I,
2012 WL 760164, at *5-9.  Accordingly, the Motion for
Reconsideration is denied.


C) The Plaintiffs Are Not Entitled to Jurisdictional Discovery
as to Defendant Nath


        The Plaintiffs contend that they are entitled to
jurisdictional discovery because they have made a prima facie
showing of jurisdiction and demonstrated genuine issues of
jurisdictional fact as to (1) whether Nath authorized "Sandeep"
as his agent for service of process; (2) Nath's visits to New
York; and (3) Nath's contract with McGraw-Hill.  (Pl. Memo –
Motion for Reconsideration at 6-9).  They argue that the Court
"abused its discretion by ordering dismissal without first
affording plaintiffs jurisdictional discovery and if necessary,
an evidentiary hearing and an opportunity to further amend the

complaint, in light of the showing they made that personal
jurisdiction exists over this defendant." (Id. at 6).

         As an initial matter, while the Defendants argue that
the Plaintiffs have not made a prima facie showing of
jurisdiction and therefore should be denied jurisdictional
discovery, "[t]he failure to make out a prima facie showing of
jurisdiction is not a bar to jurisdictional discovery." Licci
v. American Exp. Bank Ltd., 704 F. Supp. 2d 403, 408 (S.D.N.Y.
2010); Ehrenfeld v. Mahfouz, 489 F.3d 542, 550 n.6 (2d Cir.
2007) (clarifying the ruling in Jazini v. Nissan Motor Co., 148
F.3d 181 (2d Cir. 1998), by stating that "[i]f the District
Court understood Jazini as forbidding jurisdictional discovery
any time a plaintiff does not make a prima facie showing of
jurisdiction, this would indeed be legal error."). However,
"where the plaintiff has failed to make out a prima facie case,
courts have displayed an unwillingness to grant additional
discovery on jurisdictional issues." Langenberg v. Sofair, No.
03-8339(KMK), 2006 WL 2628348, at *5 (S.D.N.Y. Sept. 11, 2006).
"A district court has wide latitude to determine the scope of
discovery, and is typically within its discretion to deny
jurisdictional discovery when the plaintiff has not made out a
prima facie case for jurisdiction." Frontera Res. Azerbaijan

23

Corp. v. State Oil Co. of Azerbaijan Republic, 582 F.3d 393, 401
(2d Cir. 2009).


          As noted in the March Opinion, the FAC makes a single
allegation regarding personal jurisdiction over Nath:  "This
Court has personal jurisdiction of the Defendants pursuant to
Rule 4, Fed. R. Civ. P. and N.Y.C.P.L.R. 301."  Sikhs I, 2012 WL
760164, at *7; FAC ¶ 7.  The Plaintiffs contend that the
authority to accept service and Nath's contacts with New York
presented genuine issues of jurisdictional facts.  None of the
offered facts justifying discovery, however, satisfy the
Plaintiffs' burden of stating a colorable claim of jurisdiction.


          To support their argument, the Plaintiffs continue to
point to Genao's sworn statement regarding the information she
was given by the Consulate security guard that the individual
named Sandeep was authorized to accept the summons and complaint
on behalf of Nath.  (Pl. Memo - Motion for Reconsideration at
7).  They argue that they should be afforded limited discovery
because Nath did not submit a reply affidavit to the Court to
specifically address the issue regarding the authority of
Sandeep to accept process.  (Id.).

While an "agent's authority to accept service may be
implied in fact," "implied from the surrounding circumstances,"
"implied from the type of relationship between defendant and
alleged agent," or in some cases "by resort to the doctrine of
apparent authority or agency by estoppel," "[a] party, however,
cannot fabricate such implied authority from whole cloth to cure
a deficient service[.]"  U.S. v. Ziegler Bolt and Parts Co., 111
F.3d 878, 881 (Fed. Cir. 1997) (citations and quotations
omitted).  Instead, a party "must present facts and
circumstances showing the proper relationship between the
defendant and agent."  Id. (quoting 2 MOORE'S FEDERAL PRACTICE ¶
4.10[4], at 4-174-75) ("[T]he mere appointment of an agent, even
with broad authority, is not enough; it must be shown that the
agent had specific authority, express or implied, for the
receipt of service of process.").


Here, Nath has submitted a sworn statement that he did
not authorize anyone to accept service on his behalf.
(Affidavit of Kamal Nath ¶ 9).  The Plaintiffs argue that Nath
did not submit a reply affidavit specifically addressing the
authority of Sandeep to accept service.  (Pl. Memo - Motion for

25

Reconsideration at 7).  The Defendants counter that there was no need for a reply affidavit because Nath's "intial affidavit addressed every relevant jurisdictional fact and refuted every jurisdictional allegation made by Plaintiffs."  (Def. Opposition at 14).  Nath's affidavit denying authority to receive service overcomes the unsupported hearsay of Genao's claim that an unnamed consulate official told her that "a member of his government . . . may well have designated this person" (Id. at 8).  Nor does Genao's statement shift the burden to Nath to affirmatively contest and present proof to the contrary.

Plaintiffs also argue that, by his own admission, Nath has been voluntarily visiting New York City at least three times a year from 1984 to 2010.  (Pl. Memo – Motion for Reconsideration at 9).  They state that "it cannot be seriously contended that someone who has returned to New York time and time again over a consecutive twenty-six year period does not have a more permanent connection with the jurisdiction that he is willing to admit or that he should not reasonably expect to be subject to the courts of this state . . ." (Id. at 10).  However, no evidence has been shown demonstrating that Nath's travels to New York have been outside of his official capacity.  Thus, his travels, without more, cannot be imputed to him for

purposes of this jurisdictional analysis.  See In re Terrorist
Attacks on Sept. 11, 2001, 718 F. Supp. 2d 456, 476 (S.D.N.Y.
2010) (finding that a foreign governmental minister sued in his
personal capacity who only travelled to the U.S. on official
government visits was not subject to personal jurisdiction
because plaintiffs "failed to make any showing that [defendant]
himself independently has any contacts with the United
States."). Nor is the Plaintiffs' allegation that there may be
"a more permanent connection" sufficient.  See Gear, Inc., 637
F. Supp. at 1328 ("[d]iscovery need not be granted to allow
plaintiff to engage in an unfounded fishing expedition for
jurisdictional facts.").


        In requesting jurisdictional discovery, the Plaintiffs
additionally point to Nath's book deal with McGraw-Hill, which
published his book in the United States in 2007 (Pl. Memo –
Motion for Reconsideration at 9).  Plaintiffs assert that,
despite Nath's "claim that he has not received any royalties
from the sale of his book or his omissions regarding fees he may
have generated on his April 2010 junket to New York," they "have
the right to test those assertions."  (Id.).  Plaintiffs
speculate that Nath "may have undertaken" book tours, that he
"may have given" interviews and that he may have engaged

"professional people" in connection with his book.  (Id.).  The

Plaintiffs, however, have not provided any actual additional

factual averments, beyond speculating what Nath might have done

in New York, which would warrant conducting jurisdictional

discovery.


        In addition, Nath's affidavit contained a sworn

statement regarding his contract with McGraw-Hill, stating that

he had received no royalties from the sale of his book.

(Affidavit of Kamal Nath ¶ 14).  The Plaintiffs urge the Court

to ignore Nath's "self-serving statements relating to his

contact with this jurisdiction and the business activities he

has engaged in while here."  (Pl. Memo – Motion for

Reconsideration at 9).  The Plaintiffs cite to In re Terrorist

Attacks on September 11, 2001, 349 F. Supp. 2d 765 (S.D.N.Y.

2005), as an example where jurisdictional discovery was

warranted.  However, in that case, the Court only permitted

limited jurisdictional discovery because the status of a

commercial bank and public investment fund, and whether they

would qualify as an organ or political subdivision of the

Kingdom of Saudi Arabia, was not determinable on the current

record.  Id. at 792.  In most cases, "courts are authorized to

rely on affidavits submitted by the parties in deciding a Rule

12(b)(2) motion to dismiss," including consideration of an affidavit refuting jurisdictional allegations.  Langenberg, 2006 WL 2628348, at *5 (denying discovery in part because defendant submitted affidavits denying that she engaged in any activity "purposefully directed" at New York); see also A.W.L.I. Grp., Inc. v. Amber Freight Shipping Lines, 828 F. Supp. 2d 557, 575 (E.D.N.Y. 2011) (denying discovery because defendant submitted "affidavit that provides all the necessary facts and answers all the questions regarding jurisdiction," including denying that the defendant conducted business, derived revenue, or had agents in New York.").

Nath has also asserted an immunity defense pursuant to the Foreign Sovereign Immunities Act (the "FSIA") as well as pursuant to the doctrines of special missions immunity and common law sovereign immunity.  (Def. Opposition – Motion for Reconsideration at 12).  Immunity under the FSIA is immunity "not only from liability, but also from the costs, in time and expense, and other disruptions attendant to litigation."  Id. (internal citation omitted); see also Compania Del Bajo Caroni (Caromin) v. Bolivarian Republic of Venezuela, 556 F. Supp. 2d 272, 282-84 (S.D.N.Y. 2008) (denying jurisdictional discovery because defendant asserted FSIA defense).  In such cases,

"discovery should be ordered circumspectly and only to verify allegations of specific facts crucial to an immunity determination."  EM Ltd. v. Republic of Argentina, 473 F.3d 463, 486 (2d Cir. 2007) (affirming denial of discovery because defendant asserted immunity under the FSIA.).

Taken together, the Plaintiffs have not made an arguable showing of jurisdiction or identified a genuine issue of jurisdictional facts to warrant jurisdictional discovery. The Plaintiffs' factual allegations, if proven by additional discovery, would not change the outcome of the March Opinion nor establish jurisdiction.  Accordingly, jurisdictional discovery would be inappropriate against Nath and therefore Plaintiffs' request is denied.

## IV.  The Motion for Default Judgment is Denied

The Plaintiffs have moved for the entry of a judgment against the INC pursuant to Fed. R. Civ. P. 55(b)(2) and Local Rule 55.2(b).  The parties' arguments and any issues regarding jurisdiction are addressed below in Section V.

A) The Applicable Standard

        "A district court may enter a default judgment when a party has failed to plead or otherwise defend as provided by the Federal Rules of Civil Procedure." United States v. Brown, 267 Fed. App'x 96, 97 (2d Cir. 2008) (citing Fed. R. Civ. P. 55). The Second Circuit has repeatedly noted that the disposition of a motion for default judgment is within "the sound discretion of a district court." Palmieri v. Town of Babylon, 277 Fed. App'x 72, 74 (2d Cir. 2008); Shah v. N.Y. State Dep't of Civil Serv., 168 F.3d 610, 615 (2d Cir. 1999).

        In determining whether a default judgment should be entered under Rule 55(b)(2), courts are "guided by the same factors which apply to a motion to set aside entry of a default." Rodriguez v. Almighty Cleaning, Inc., 784 F. Supp. 2d 114, 123 (E.D.N.Y. 2011). These factors include (1) whether the default was willful; (2) whether defendant has a meritorious defense to plaintiff's claims; and (3) the level of prejudice the non-defaulting party would suffer as a result of the denial

31

of the motion for default judgment. Meehan v. Snow, 652 F.2d 274, 277 (2d Cir. 1981). This test should be applied in the context of the general preference "that litigation disputes be resolved on the merits, not on default." Cody v. Mello, 59 F.3d 13, 15, (2d Cir. 1995). Doubts should be resolved in the non-moveant's favor to increase the likelihood that the case may be resolved on the merits. See Enron Oil Corp. v. Diakuhara, 10 F.3d 90, 95-96 (2d Cir. 1993); see also Meehan, 652 F.2d at 277 (stating that "[w]hile courts are entitled to enforce compliance with the time limits of the Rules by various means, the extreme sanction of a default judgment must remain a weapon of last, rather than first, resort."); SEC v. Mgmt. Dynamics, Inc., 515 F.2d 801, 814 (2d Cir. 1975) (describing default judgments as "the most severe sanction which the court may apply.").

B) The Motion for Default Judgment is Denied

        The Plaintiffs contend that they transmitted the summons and FAC along with the necessary documents to the Ministry of Justice in New Delhi, which India has designated to act as the Central Authority for the in state service of foreign judicial documents in accordance with Article 2 and 3 of the

32

Hague Convention.  (Pl. Memo - Motion for Default Judgment at

16).  According to the Plaintiffs, "every reasonable effort has

been made to obtain a certificate all to no avail" and no formal

Certificate of Service has been returned.  (Id.).  They argue

that they have attempted in good faith to comply with the Hague

Convention and that INC had actual notice of the suit and cannot

show prejudice.  (Id. at 17).  The Plaintiffs urge the Court to

consider service to have been effected and enter a judgment of

default.  (Id.).


        In determining whether a default judgment would be

appropriate, the delineated factors here weigh in the INC's

favor.  First, there was no willful conduct by the INC that

would justify the entry of the default judgment.  The Second

Circuit has interpreted willfulness in the default judgment

context "to refer to conduct that is more than merely negligent

or careless."  SEC v. McNulty, 137 F.3d 732, 738 (2d Cir. 1998).

Such conduct must be "egregious and . . . not satisfactorily

explained."  Id.; Martha Stewart Living Omnimedia LLC v. Beers

Flower Shop, Inc., No. 98-3398(RWS), 1998 WL 646648, at *4

(S.D.N.Y. Sept. 21, 1998) (citation omitted) ("The Second

Circuit has interpreted the willfulness standard to include

conduction which is deliberate, egregious, or evidencing bad faith.").

        Here, the Plaintiffs have not produced evidence that the INC acted willfully or that it sought a strategic advantage by defaulting.  The Plaintiffs insist that the default was "obviously willful" because the INC was "aware of the existence of the action and deliberately [chose] not to appear."  (Pl. Reply - Motion for Default Judgment at 11).  However, as the Plaintiffs themselves recount, after the FAC was filed adding the INC as a defendant, attorneys from different law firms entered appearances for the INC and subsequently withdrew as counsel.  The INC has responded that these lawyers who entered appearances had not been engaged by the INC and were not authorized to appear on its behalf.  (Decl. of Motilal Vora ¶ 15).  According to the INC, while it was aware that the Plaintiffs filed their FAC naming the INC as a defendant, it believed that "since it was not served . . . it did not need to appear."  (Id. ¶ 15).  This type of confusion does not rise to willful actions.  See Silva v. Bridgebar LLC, No. 09-8281(RWS), 2011 WL 3423917, at *3 (S.D.N.Y. Aug. 4, 2011) (finding that "a regular stream of adversities," which led to the defendant focusing "on this litigation only when it was brought to his

attention by counsel," while negligent, was the result of "difficult circumstances and confusion and was not willful."). Moreover, once the INC became aware that the Plaintiffs applied for a default judgment, it engaged current counsel to represent its interests. (Id. ¶ 16). See Gravatt v. City of New York, No. 97-0354(RWS), 1997 WL 419955, at *4 (S.D.N.Y. July 28, 1997) (finding that "the fact that [the defendant] immediately responded upon learning of the default judgment is evidence of a lack of obstructionist motives on their part.").


Additionally, even assuming there was proper service, the INC was under the belief that service had not been completed in accordance with the Hague Convention.  Courts have consistently recognized that such a mistake, while potentially negligent or careless, does not rise to willfulness.  See e.g., Myrieckes w. Woods, No. 08-4297(GBD)(THK), 2010 WL 4903621, at *1 (S.D.N.Y. Dec. 1, 2010) (finding that a mistaken belief that service was deficient by a defendant and her counsel and "their failure to respond was at most negligent, and does not evidence bad faith."); Westvaco Corp. v. Viva Magnetics Ltd., No. 00-9399(LTS)(KNF), 2002 WL 1683454, at *2 (S.D.N.Y. July 24, 2002) (holding that a default was not willful because the defendant "proffered a reasonable explanation for its delay in defending

the action, specifically, that it believed that services had not
been properly effected and that it was not, therefore, required
to respond to the Complaint."; Argent v. Office of Pers. Mgmt.
of U.S., No. 96-2516(PKL), 1997 WL 278115, at *3 (S.D.N.Y. May
22, 1997) (stating that although "[d]efense counsel was
negligent in his belief that service was improper . . .
negligence does not support a finding of willfulness on the part
of the defendants.").


          The INC has also alleged meritorious defenses that
would make a default judgment improper.  To establish a
meritorious defense sufficient to deny entry of a default
judgment, "the defendant need not establish his defense
conclusively," McNulty, 137 F.3d at 740, and the "defense need
not be ultimately persuasive at this stage." Martha Stewart
Living, 1998 WL 646648, at *5 (quotations omitted).  Rather, the
defendant "must present evidence of facts that, if proven at
trial, would constitute a complete defense." McNulty, 137 F.3d
732, 740 (2d Cir. 1998).   In other words, "[w]hile the
defendant must articulate a defense in such a manner that it
directly relates to the allegations set forth in the plaintiff's
pleadings, and raises a 'serious question' as to the validity of
those allegations, a defendant need not conclusively establish

the validity of the defense asserted or plead the defenses with
heightened particularity." Gravatt, 1997 WL 419955, at *5.


        The INC has asserted four specific defenses: (1) that
the act of state doctrine and principles of international comity
bar the Plaintiffs' claims; (2) that the FSIA bars jurisdiction
over a ruling foreign political party; (3) that the court lacks
personal jurisdiction over the INC; and that (4) that the
Plaintiffs' claims are barred by the statute of limitations.


        First, the INC asserts immunity defenses under the act
of state doctrine and the FSIA.  Under the act of state
doctrine, "the courts of one state will not question the
validity of public acts (acts jure imperii) performed by other
sovereigns within their own borders, even when such courts have
jurisdiction over a controversy in which one of the litigants
has standing to challenge those acts."  Republic of Austria v.
Altmann, 541 U.S. 677, 700, 124 S. Ct. 2240, 159 L. Ed. 2d 1
(2004); Banco Nacional de Cuba v. Sabbatino, 376 U.S. 398, 401,
84 S. Ct. 923, 11 L. Ed. 2d 804 (1964) ("The act of state
doctrine in its traditional formulation precludes the courts of
this country from inquiring into the validity of the public acts

37

a recognized foreign sovereign power committed within its own
territory.").


        The Plaintiffs cite to <u>Kadic v. Karadzic</u>, 70 F.3d 232
(2d Cir. 1995) to argue that the INC, as a private entity,
cannot apply the act of state doctrine to the instant case.  In
<u>Kadic</u>, the Second Circuit found that "the acts of even a state
official, taken in violation of a nation's fundamental law and
wholly ungratified by that nation's government, could [not]
properly be characterized as an act of state."  70 F.3d at 250.
Here, the Plaintiffs have alleged that the harms they suffered
were caused by official public acts of the Indian government
controlled by the INC and performed in India pursuant to
official governmental orders.  For example, the Plaintiffs
allege that the "Sikh Massacre was planned" at a meeting that
included "members of parliament."  (FAC ¶¶ 37-38).  The FAC also
alleges that the INC was, "at all relevant times . . . acting
under color of state law of the state of India and with the
actual or apparent authority of the Government of India."  (<u>Id.</u>
¶ 4.  Thus, the act of state doctrine may well be a facially
meritorious defense to the Plaintiffs' claims and may require an
analysis of India's alleged governmental actions.

In addition, the INC asserts the defense of immunity
under the FSIA, 28 U.S.C. §§ 1602-1611.  Under the FSIA, a
foreign state, defined to include "a political subdivision of a
foreign state or an agency or instrumentality of a foreign
state" is immune from the jurisdiction of the courts of the
United States.  Id. § 1603(a).   The Plaintiffs contend that,
under the plain language of the FSIA, the INC "is neither a
political subdivision of a foreign state or an agency or
instrumentality of India.  (Pl. Reply – Motion for Default
Judgment at 16).  The INC counters that, even if the suit is not
governed by the FSIA, the INC may be immune from suit under
common law.  (Def. Opp. – Motion for Default Judgment at 14)
(arguing that the Plaintiffs may be making an "artificial
attempt to circumvent India's immunity from suit under the FSIA
and its Prime Minister's immunity from suit under common law" by
naming INC instead.).  Thus, issues surrounding immunity and
whether the INC can be considered a political subdivision, or an
agency or instrumentality of India, may raise serious questions
as to the continuing validity of the Plaintiffs' allegations.

The INC also asserts defenses that this Court lacks
personal jurisdiction over the INC and that the Plaintiffs'
claims are barred by the statute of limitations.  As discussed
in more detail below, the INC points to several facts in its
briefs that justify further consideration.  Whether the INC has
minimum contacts with New York, whether the INC has even fewer
contacts with New York than Nath, and whether equitable tolling
is applicable to the instant case are currently unresolved.  At
this stage of the litigation, the defenses asserted by INC are
therefore directly related to the allegations set forth in the
FAC and warrant further briefing and factual inquiry.


        Lastly, the basic purpose of a default judgment is to
protect parties from undue delay resulting in harassment.
American Alliance Ins. Co., Ltd. v. Eagle Ins. Co., 92 F.3d 57 ,
61 (2d Cir. 1996).  However, delay alone is an insufficient
basis for establishing prejudice.  Silva, 2011 WL 3423917, at *2
(internal quotations omitted).  The movant must demonstrate that
the delay will result in the loss of evidence, create increased
difficulties of discovery, or provide greater opportunity for
fraud and collusion.  Id.  Here, by the Plaintiffs own
admission, there is nothing in the record that would strongly

40

support a finding of prejudice.  (Pl. Reply - Motion for Default Judgment at 17).

     In light of the absence of evidence establishing a willful default or prejudice to the Plaintiffs, the existence of facially meritorious defenses and the preference for adjudication on the merits, the motion for a default judgment is denied.

## V. __The Motion to Dismiss__

     Plaintiffs bring claims against the INC under the TVPA and ATS.  Defendant INC moves to dismiss the Plaintiff's suit under Rules 12(b)(1) and 12(b)(6) of the Federal Rules of Civil Procedure contending that this Court lacks subject matter jurisdiction over the Plaintiffs claims and that they fail to state a claim upon which relief can be granted.  The INC further moves to dismiss the Plaintiffs' suit under Rule 12(b)(2) for lack of personal jurisdiction and Rule 12(b)(5) for insufficient service of process.

A) <u>The Applicable Standards</u>

In considering a motion to dismiss pursuant to Rule 12, the Court construes the complaint liberally, accepting all factual allegations as true and drawing all reasonable inferences in the plaintiff's favor.  <u>Mills v. Polar Molecular Corp.</u>, 12 F.3d 1170, 1174 (2d Cir. 1993).  The issue "is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims."  <u>Villager Pond, Inc. v. Town of Darien</u>, 56 F.3d 375, 378 (2d Cir. 1995) (quoting <u>Scheuer v. Rhodes</u>, 416 U.S. 232, 235-36, 94 S. Ct. 1683, 40 L. Ed. 2d 90 (1974)).

A facially sufficient complaint may be "properly dismissed for lack of subject matter jurisdiction under Rule 12(b)(1) when the district court lacks the statutory or constitutional power to adjudicate it."  <u>Makarova v. United States</u>, 201 F.3d 110, 113 (2d Cir. 2000).  Once subject matter jurisdiction is challenged, the burden of establishing jurisdiction rests with the party asserting that it exists.  <u>See</u> <u>Thomson v. Gaskill</u>, 314 U.S. 442, 446, 62 S. Ct. 673, 86 L. Ed. 951 (1942) (citations omitted).  The party asserting subject matter jurisdiction has the burden of proving, by a

preponderance of the evidence, that the court has subject matter
jurisdiction. See Makarova, 201 F.3d at 113.

Rule 12(b)(2) requires that a court dismiss a claim if
the court does not have personal jurisdiction over the
defendant. See Fed. R. Civ. P. 12(b)(2). In determining a
motion to dismiss a complaint under Rule 12(b)(2) for lack of
personal jurisdiction, a court must first apply the law of the
state where the court sits to determine if personal jurisdiction
exists. Bank Brussels Lambert v. Fiddler Gonazlez & Rodriguez,
171 F.3d 779, 784 (2d Cir. 1999). The plaintiff bears the
burden of establishing that the court has jurisdiction over a
defendant when served with a Rule 12(b)(2) motion to dismiss.
DiStefano v. Carozzi North America Inc., 286 F.3d 81, 84 (2d
Cir. 2001).

"[J]urisdiction must be shown affirmatively, and that
showing is not made by drawing from the pleadings inferences
favorable to the party asserting it." Shipping Fin. Servs.
Corp. v. Drakos, 140 F.3d 129, 131 (2d Cir. 1998) (citations
omitted). As such, a court may rely on evidence outside of the
pleadings, including declarations submitted in support of the
motion and the records attached to these declarations. See

43

Makarova, 201 F.3d at 113 ("In resolving a motion to dismiss . .
. a district court . . . may refer to evidence outside the
pleadings.").


        Pursuant to Rule 12(b)(5), "a complaint may be
dismissed for insufficient service of process." Weston Funding,
LLC v. Consorcio G Grupo Dina, S.A. de C.V., 451 F. Supp. 2d
585, 589 (S.D.N.Y. 2006); see also Hawthorne v. Citicorp Data
Sys., Inc., 219 F.R.D. 47, 49 (E.D.N.Y. 2003) ("Without proper
service a court has no personal jurisdiction over a
defendant."). On such jurisdictional matters, the plaintiff
bears the burden of proof. See Commer v. McEntee, 283 F.Supp.2d
993, 997 (S.D.N.Y. 2003) ("Once a defendant challenges the
sufficiency of service of process, the burden of proof is on the
plaintiff to show the adequacy of service.").


        To survive dismissal under Rule 12(b)(6), "a complaint
must contain sufficient factual matter, accepted as true, to
'state a claim to relief that is plausible on its face.'"
Ashcroft v. Iqbal, 556 U.S. 662, 129 S. Ct. 1937, 1949, 173 L.
Ed. 2d 868 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S.
544, 570, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007)).
Plaintiffs must allege sufficient facts to "nudge[ ] their

44

claims across the line from conceivable to plausible." Twombly, 550 U.S. at 570. "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." Cohen v. Stevanovich, 772 F. Supp. 2d 416, 423 (S.D.N.Y. 2010). Though the court must accept the factual allegations of a complaint as true, it is "not bound to accept as true a legal conclusion couched as a factual allegation." Iqbal, 556 U.S. at 678. (quoting Twombly, 550 U.S. at 555).

Furthermore, allegations in a complaint must be complete enough to enable a reader to understand how each defendant was personally involved in the wrongdoing plaintiff is alleging. Onwuka v. NYC Taxi Limousine Comm'n, No. 10-5399(SLT)(LB); 2012 WL 34090, at *4-5 (E.D.N.Y. Jan. 6, 2012). "It is well-settled that 'where the complaint names a defendant in the caption but contains no allegations indicating how the defendant violated the law or injured the plaintiff, a motion to dismiss the complaint in regard to that defendant should be granted.'" Dove v. Fordham Univ., 56 F. Supp. 2d 330, 335 (S.D.N.Y. 1999) (quoting Morabito v. Blum, 528 F. Supp. 252, 262 (S.D.N.Y. 1981)).

45

B) The Plaintiffs' TVPA Claim is Foreclosed


        The Plaintiffs bring an aiding and abetting claim

against the INC under the TVPA.  The FAC states in passing that

"this Court has jurisdiction over this action based on the [ATS,

TVPA, federal common law and 28 U.S.C. § 1331]. . . ." (FAC ¶

5).  The INC argues that the Plaintiffs cannot state a claim

under the TVPA because the INC is not an individual and "[b]y

its terms, the TVPA creates a remedy against individuals" only.

(Def. Memo - Motion to Dismiss at 5).  Irrespective of issues of

personal jurisdiction, which will be discussed in further detail

below, the INC seeks dismissal of the TVPA claim for lack of

subject matter jurisdiction and for failure to state a claim.


        "The TVPA authorize[s] a federal statutory cause of

action on behalf of victims or their representatives for acts of

torture or extrajudicial killing."  Hurst v. Socialist People's

Libyan Arab Jamahiriya, 474 F. Supp. 2d 19, 29-30 (D.D.C. 2007).

More specifically, the TVPA provides that "[a]n individual who,

under actual or apparent authority, or color of law, of any

foreign nation . . . subjects an individual to torture [or

extrajudicial killing] shall, in a civil action, be liable for

46

damages to that individual." TVPA § 2(a). The statute, unlike
the ATS, "is not itself a jurisdictional statute." Kadic, 70
F.3d at 246. Rather, "the TVPA allows parties to pursue their
claims of official torture under the jurisdiction conferred by
the" ATS and "also under the general federal question
jurisdiction of section 1331." Arndt v. UBS AG, 342 F. Supp. 2d
132, 141 (E.D.N.Y. 2004) (citations and quotations omitted).[1]

        Until recently, there was some question whether, by
permitting suit against "[a]n individual," the TVPA contemplated
liability against natural persons and nonsovereign
organizations. In Mohamad v. Palestinian Authority, --- U.S. --
-, 132 S. Ct. 1702, 182 L. Ed. 2d 720 (2012), the Supreme Court
unanimously held that the term "individual," as used in the
TVPA, "encompasses only natural persons. Consequently, the Act
does not impose liability against organizations." Id. at 1705.
The Court reasoned that the "ordinary meaning" of the word
"individual" in the statute, fortified by its "statutory
context," established "that the Act authorizes suit against
natural persons alone." Id. at 1706. The Court declined "to

---

[1] As in Arndt, this Court declines to reach on "whether subject matter
jurisdiction for a claim asserted under the TVPA must be conferred on this
Court through the [ATS] or can be based solely on 28 U.S.C. § 1331." As it
"is a thorny issue which the Court does not need to resolve in deciding this
motion." Arndt, 342 F. Supp. 2d at 141.

read 'individual' so unnaturally" because "no one, we hazard to

guess, refers in normal parlance to an organization as an

'individual.'"  Id. at 1707.  In addition, the Court pointed out

that the TVPA's "liability provision uses the word 'individual'

five times in the same sentence:  once to refer to the

perpetrator (i.e., the defendant) and four times to refer to the

victim."  Id. at 1708.  Thus, "[o]nly a natural person can be a

victim of torture or extrajudicial killing," and therefore

Congress must have intended the word 'individual' to refer to

natural persons only.  Id. at 1708.  In sum, the Court concluded

that "[t]he text of the TVPA convinces us that Congress did not

extend liability to organizations, sovereign or not."  Id. at

1710.


          Consequently, the INC, as an organization and not a

natural person, cannot be held liable under the TVPA.  (See FAC

¶ 15) ("Defendant [INC] is an was at all relevant times a

private political party organization created pursuant to the

laws of India.").  The Plaintiffs concede that the INC "may not

be considered a proper defendant under the TVPA for primary

liability purposes."  (Pl. Opp - Motion to Dismiss at 12).

They, however, contend that "aiding and abetting liability may

be imposed on a party even though it does not have the legal

capacity to be found liable under the statute in question."
(Id. at 11-12).


        Contrary to the Plaintiffs' suggestion that the TVPA
may create accessorial liability against organizations like the
INC, courts have barred aiding and abetting claims for the same
reason as the direct claim.  See Mohamad v. Rajoub, 634 F.3d
604, 608-08 (D.C. Cir. 2011) ("[E]ven if we assume some form of
vicarious liability is possible, the text of the TVPA still
limits such liability to individuals, and we have already seen
that in this statute 'individual' comprises only natural
persons.") (internal quotation and citation omitted).
Additionally, some courts have specifically found that the TVPA
does not permit liability for aiding and abetting.  See
Weisskopf v. United Jewish Appeal - Federation of Jewish
Philanthropies of New York, Inc., --- F. Supp. ---, 2012 WL
3686692, at *8 (S.D. Tex. 2012) (finding that the "statute does
not permit liability for aiding and abetting a primary
violator"); Mastafa v. Chevron Corp., 759 F. Supp. 2d 297, 300
(S.D.N.Y. 2010) (dismissing TVPA claims because, among other
things, the "plain language" of the statute "does not permit
aiding-and-abetting liability"); Corrie v. Catepillar, Inc., 403
F. Supp. 2d 1019, 1027 (W.D. Wash. 2005) (holding that "an

aiding and abetting claim is inconsistent with the TVPA's explicit requirement that a defendant must have acted under 'color of law'"), aff'd 503 F.3d 974 (9th Cir. 2007).

The Plaintiffs cite to Khulumani v. Barclay Nat'l Bank Ltd., in which they argue the Second Circuit reaffirmed that "[i]n our domestic law, it is 'well settled that one may be found guilty of aiding and abetting another individual in this violation of a statute that the aider and abettor could not be charged personally with violating." 504 F.3d 254, 281 (2d Cir. 2007) (quoting In re Nofziger, 956 F.2d 287, 290 (D.C. Cir. 1992). However, in that case, the discussion of aiding and abetting liability concerned only the ATS claim, not the TVPA claim. See Khulumani, 504 F.3d at 282 (stating that the ATS specifically "provides jurisdiction for the courts to hear torts "committed in violation of the law of nations."). The Khulumani Court had already rejected the aiding and abetting claim under the TVPA because the defendants were not acting under the color of law. Id. at 259-60.

While the Plaintiffs maintain that there "is no indication that Congress intended to preclude this form of liability under the TVPA," (Pl. Opp. - Motion to Dismiss at 12),

neither is there any affirmative intention in the statute.  See

Burns v. U.S., 501 U.S. 129, 136, 111 S. Ct. 2182, 115 L. Ed. 2d

123 (1991) (quoting Ill. Dep't of Public Aid v. Schweiker, 707

F.2d 273, 277 (7th Cir. 1983)) ("Not every silence is pregnant .

. . An inference drawn from congressional silence certainly

cannot be credited when it is contrary to all other textual and

contextual evidence of congressional intent.").  The text of the

TVPA is silent as to aiding and abetting, and such silence

should not be interpreted as granting and authorizing that

liability.  See Central Bank, N.A. v. First Interstate Bank,

N.A., 511 U.S. 164, 177 (1994) (stating that if "Congress

intended to impose aiding and abetting liability, we presume it

would have used the words 'aid' and 'abet' in the statutory

text.").


        Moreover, even if we were to accept the Plaintiffs'

aiding and abetting theory, liability would still extend to

natural persons only.  The Supreme Court in Mohamad suggested

that any possible accessorial liability under the TVPA would be

limited to individuals.  132 S. Ct. at 1709 (stating that while

"the TVPA contemplates liability against officers who do not

personally execute the torture or extrajudicial killing, it does

not follow (as petitioners argue) that the Act embraces

liability against nonsovereign organizations."). Other courts
have explicitly stated that "[e]ven assuming arguendo that
aiding and abetting liability is available under the TVPA, [we]
would limit such liability to natural persons." Doe v. Exxon
Mobil Corp., 654 F.3d 11, 58 (D.C. Cir. 2011); see also Bowoto
v. Chevron Corp., 621 F.3d 1116, 1128 (9th Cir. 2010) ("Even
assuming the TVPA permits some form of vicarious liability, the
text limits such liability to individuals, meaning in this
statute, natural persons.").


          Accordingly, the Plaintiffs' TVPA claim against the
INC is dismissed as foreclosed by Mohamad.

C) The Plaintiffs' ATS Claim is Stayed Pending the Supreme
   Court's Decision in Kiobel v. Royal Dutch Petroleum

          The INC has moved to dismiss the ATS claim because
Kiobel, which is currently pending before the Supreme Court,
precludes the Plaintiffs' claim and because the statute itself
does not provide for its own extraterritorial application.  In
the alternative, the INC requests a stay of this action pending
the Supreme Court's decision in Kiobel.  Because the issue of
subject matter jurisdiction is dispositive as to whether this
action should proceed and because that particular issue will
likely be addressed by the Supreme Court, the stay is granted.

Subject Matter Jurisdiction Under the ATS

The ATS provides, in its entirety, that "[t]he district courts shall have original jurisdiction of any civil action by an alien for a tort only, committed in violation of the law of nations or a treaty of the United States."  28 U.S.C. § 1350.  However, "not all violations of the law of nations give rise to an ATS cause of action" and a court must have subject matter jurisdiction under the statute.  Institute of Cetacean Research v. Sea Shepherd Conservation Society, --- F. Supp. 2d ---, 2012 WL 958545, at *7 (W.D. Wash. 2012).  Thus, under the ATS, "federal subject matter jurisdiction exists when (1) an alien, (2) claims a tort, (3) was committed in violation of a United States treaty or the 'law of nations' — the latter now synonymous with 'customary international law.'" Arndt, 342 F. Supp. 2d at 138.

First, "[a] district court lacks subject matter jurisdiction under the ATS if the plaintiff is not an alien." Weisskopf, 2012 WL 3686692, at *5; see also Presbyterian Church of Sudan v. Talisman Energy, Inc., 453 F. Supp. 2d 633, 661 (S.D.N.Y. 2006).  Here, three of the named plaintiffs allege that they are citizens of India and were or are members of the

Sikh religious community, but do not allege that they are
aliens.  (See FAC ¶¶ 13, 14).  The FAC alleges that Manjit and
Tejinder Singh reside in New Delhi and that Kamaljit Kaur Girin
currently resides in Toronto, Canada.  There are no facts
supporting their status as aliens in the U.S.  Therefore, the
ATS claims by these named plaintiffs are dismissed.  See
Presbyterian Church, 453 F. Supp. 2d at 661 (stating that one of
the two institutional plaintiffs "is not an alien and may not
bring suit under the ATS.").

     In addition, the FAC proposes a class that "includes
resident and non-resident alien Sikhs and Sikhs currently
residing in India."  (FAC ¶ 17).  In its current phrasing, Sikhs
currently residing in India may bring suit regardless of their
alien status.  As only aliens may bring suit under the ATS,
because they lack "standing under the ATS, and the Court must
dismiss any ATS claims brought by those plaintiffs for lack of
subject matter jurisdiction," should the case proceed, the
complaint must be amended accordingly.  Weisskopf, 2012 WL
3686692, at *5; see Talisman Energy, 453 F. Supp. 2d at 661.

The Second Circuit's Decision in Kiobel

In reaching its decision in Kiobel, the Second Circuit
characterized corporate liability under the ATS as an issue of
subject matter jurisdiction.  The divided panel held that the
ATS "does not provide subject matter jurisdiction over claims
against corporations" and thus, corporate liability cannot "form
the basis of a suit [alleging a violation of the law of nations]
under the ATS."  Kiobel, 621 F.3d at 148-49.

In so holding, the Kiobel majority looked to whether
"specific, universal and obligatory" norms or customary
international law of human rights supported imposing such
liability.  Id. at 125-131.  After surveying the history and
conduct of international tribunals, international treaties, and
the works of scholars and jurists, the Court concluded that
these "sources of customary international law . . . explicitly
rejected the idea of corporate liability," whether civil,
criminal, or otherwise.  Id. at 148.  The sources consistently
found that only natural persons could be liable for violations
of international law.  See id. at 133 (citing the International
Military Tribunal at Nuremberg) ("granted the Tribunal
jurisdiction over natural persons only.") (emphasis in
original); id at 136 (citing the International Criminal Tribunal
for the former Yugoslavia and the International Criminal

55

Tribunal for Rwanda) ("expressly confined the tribunals'
jurisdiction to 'natural persons'"); id. (citing the Rome
Statute of the International Criminal Court) (the statute "also
limits that tribunal's jurisdiction to 'natural persons.'").
Thus, the Court concluded that corporate liability "is simply
not 'accepted by the civilized world and defined with a
specificity comparable to the features of the 18th-century
paradigms' recognized as providing a basis for suit under the
law prescribed by the ATS – that is, customary international
law."  Id. at 149 (citing Sosa v. Alvarez-Machain, 542 U.S. 692,
732, 124 S. Ct. 2739, 159 L. Ed. 2d 718 (2004)).


        The Defendants maintain that the Second Circuit's
Kiobel analysis "applies with equal force in this case and
dictates the conclusion that plaintiffs fail to state a claim
against the INC, a foreign political party organization."  (Def.
Memo – Motion to Dismiss at 3).  They argue that the Court did
not confine the application of its reasoning to corporations and
"specifically recognized that liability of 'organization' would
be inconsistent with the approach of the Nuremberg Tribunal."
(Id.) (citing Kiobel, 621 F.3d at 134) (granting tribunal
jurisdiction to "try and punish persons . . . whether as
individuals or as members of organizations").  On the other

56

hand, the Plaintiffs urge the Court to adopt a narrower holding
to include claims against corporations, but not organizations.
They argue that "[a]ll of the defendants in Kiobel were multi-
national business entities organized and existing as
corporations and designated as such," and that the Court's
"survey of international law was focused almost exclusively on
corporate liability in that context." (Pl. Opp. – Motion to
Dismiss at 5) (citing Kiobel, 621 F.3d at 117-18; 125-45).


## Considering the Potential Effect of the Supreme Court's Decision in Kiobel, A Stay is Appropriate

The Supreme Court granted certiorari in Kiobel and
heard oral argument in the case on February 28, 2012.  During
oral argument, the Justices considered questions of jurisdiction
and whether a corporation could be held liable under the ATS for
human rights violations.[2]  Some of the Justices also wondered

---

[2] More specifically, the 'Questions Presented" include:

1. Whether the issue of corporate civil tort liability under the Alien
   Tort Statute ("ATS"), 28 U.S.C. § 1350, is a merits question, as it has
   been treated by all courts prior to the decision below, or an issue of
   subject matter jurisdiction, as the court of appeals held for the first
   time.

2. Whether corporations are immune from tort liability for violations of
   the law of nations such as torture, extrajudicial executions or
   genocide, as the court of appeals decisions provides, or if
   corporations may be sued in the same manner as any other private party
   defendant under the ATS for such egregious violations, as the Eleventh
   Circuit has explicitly held.

whether the statute allowed for its application to violations of international law that occurred extraterritorially.[3]

Less than a week after hearing oral argument, the Supreme Court issued an order directing the parties to file supplemental briefs addressing the following question:  "Whether and under what circumstances the Alien Tort Statute, 28 U.S.C. § 1350, allows courts to recognize a cause of action for violations of the law of nations occurring within the territory of a sovereign other than the United States."

The issues raised by Kiobel have attracted a wide range of interest, including the filing of approximately 70 amicus and supplemental amicus briefs by parties including former Senator Arlen Specter, the American Bar Association, the Chevron Corporation, numerous professors and scholars of legal history, as well as the Solicitor General for the United States' position.  SCOTUSblog, http://www.scotusblog.com/case-

---

[3] See e.g., Transcript of Oral Argument at 11:16-11:24, Kiobel, 132 S. Ct. 472 (2012) (Justice Alito asking "The first statement – the first sentence in your brief in the statement of the case is really striking: "This case was filed ... by twelve Nigerian plaintiffs who alleged ... that Respondents aided and abetted the human rights violations committed against them by the Abacha dictatorship . . . in Nigeria between 1992 and 1995." What does a case like that -- what business does a case like that have in the courts of the United States?").

files/cases/kiobel-v-royal-dutch-petroleum-et-al/ (last visited Sept. 13, 2012).

In considering the arguments made by the parties in the instant case, the Supreme Court's decision in Kiobel may clarify and determine, among other matters: (1) whether the ATS applies to entities, organizations, and associations other than natural persons; (2) whether liability under the statute is a merits question or an issue of subject matter jurisdiction; (3) whether the ATS allows permits aiding and abetting liability; and (4) whether the statute allows this court to recognize a cause of action for acts that occurred extraterritorially.

It is well settled that district courts have the power to stay proceedings. See Landis v. North American Co., 299 U.S. 254, 57 S. Ct. 163, 81 L. Ed. 153 (1936) ("[T]he power to stay proceedings is incidental to the power inherent in every court to control the disposition of the causes on its own docket with economy of time and effort for itself, for counsel, and for litigants."). Courts considering stay applications must "exercise [their] judgment, which must weigh competing interests and maintain an even balance." Id. at 244-45.

In deciding whether a stay is appropriate, courts in typically consider five factors: "(1) the private interests of the plaintiffs in proceeding expeditiously with the civil litigation as balanced against the prejudice to the plaintiffs if delayed; (2) the private interests of and burden on the defendants; (3) the interests of the courts; (4) the interests of persons not parties to the civil litigation; and (5) the public interest." Wing Shing Products (BVI) Ltd. v. Simatelex Mfg. Co., No. 01-1044(RJH)(HBP), 2005 WL 912184, at *1 (S.D.N.Y. Apr. 19, 2005) (citing Kappel v. Comfort, 914 F. Supp. 1056, 1058 (S.D.N.Y. 1996)).

In weighing the relevant factors and interests of the parties and the public, a stay would be an appropriate exercise of this Court's discretion. A stay is not likely to prejudice or cause hardship to the Plaintiffs, considering that the alleged conduct giving rise to their causes of action occurred more than twenty-seven years ago. Any delay resulting from a stay will likely be of short duration, given that the Supreme Court has already heard oral argument in the case, and the reargument is scheduled for October 1, 2012.

In addition, a court may also properly exercise its staying power when a higher court is close to settling an important issue of law bearing on the action.  See e.g., Marshel v. AFW Fabric Corp., 552 F.2d 471, 472 (2d Cir. 1977) (instructing the district court to stay the proceedings pending a Supreme Court decision in a closely related case which was likely to determine the question of liability); Carter v. U.S., No. 1:06-225, 2007 WL 2439500, at *3 (D. Vt. Aug. 23, 2007) (finding that "it is common practice in this Circuit to postpone the final disposition of a case pending an upcoming decision in the United States Supreme Court."); Jungmohan v. Zola, No. 98-1509(DAB), 2000 WL 222186, at *5 (S.D.N.Y. Feb. 25, 2000) (stating that "[p]ostponing the final disposition of a case pending an upcoming decision by the United States Supreme Court is a practice exercised by the Second Circuit in the interest of judicial economy.").

Thus, where it is efficient for a trial court's docket and the fairest course for the parties, a stay is proper, even in cases where "the issues in such proceedings are [not] necessarily controlling on the action before the court." Goldstein v. Time Warner N.Y. City Cable Group, 3 F. Supp. 2d 423, 437-38 (S.D.N.Y. 1998) (citing Leyva v. Certified Grocers

of California, Ltd., 593 F.2d 857, 864 (9th Cir. 1979).  Here,
it "would be an inefficient use of time and resources of the
court and the parties to proceed in light of a pending U.S.
Supreme Court decision," particularly where that decision "'may
not settle every question of fact and law' before this Court,
"but in all likelihood it will settle many and simplify them
all."  In re Literary Works in Electronic Databases Copyright
Litigation, No. M-21-90, 2001 WL 204212, at *3 (S.D.N.Y. 2001)
(quoting Landis, 299 U.S. at 256).  Accordingly, the Plaintiffs'
ATS claim against the INC is stayed pending the Supreme Court's
Kiobel decision.


D) The Plaintiffs Have Not Established Personal Jurisdiction
   as to the INC But Limited Jurisdictional Discovery is
   Granted

        "To establish personal jurisdiction, [a plaintiff]
must show that [the defendant] has minimum contacts with the
forum state and was properly served."  Salmassi e. Kfr v. Euro-
America Container Line Ltd., No. 08-4892, 2010 WL 2194827, at *4
(S.D.N.Y. June 1, 2010) (citations omitted).  Once a defendant
has raised a jurisdictional defense on a Rule 12(b) motion to
dismiss, the plaintiff bears the burden of proving sufficient
contacts with the relevant forum to establish jurisdiction over

each defendant.  Whitaker v. American Telecasting, Inc., 261

F.3d 196, 208 (2d Cir. 2001).  Prior to discovery, a plaintiff

may carry this burden "by pleading in good faith . . .  legally

sufficient allegations of jurisdiction, i.e. by making a 'prima

facie showing' of jurisdiction."  Jazini v. Nissan Motor Co.,

148 F.3d 181, 184 (2d Cir. 1998).  However, "[c]onclusory

allegations are not enough to establish personal jurisdiction"

and the allegations must be well-pled.  Mende, 269 F. Supp. 2d

at 251.  A plaintiff can make this showing though his "own

affidavits and supporting materials[,]" Marine Midland Bank,

N.A. v. Miller, 664 F.2d 899, 904 (2d Cir. 1981), containing "an

averment of facts that, if credited . . . , would suffice to

establish jurisdiction over the defendant."  Metropolitan Life

Ins. Co. v. Robertson-Ceco Corp., 84 F.3d 560, 567 (2d Cir.

1996) (quoting Ball v. Metallurgie Hoboken-Overpelt, S.A., 902

F.2d 194, 197 (2d Cir. 1990).  "[W]here the issue is addressed

on affidavits, all allegations are construed in the light most

favorable to the plaintiff and doubts are resolved in the

plaintiff's favor[.]"  A.I. Trade Finance, Inc. v. Petra Bank,

989 F. 2d 76, 79-80 (2d Cir. 1993).


        Under the Federal Rules of Civil Procedure, a court

may exercise jurisdiction over any defendant "who could be

subjected to the jurisdiction in the state in which the district court is located," Fed. R. Civ. P. 4(k)(1)(a), provided that such exercise comports with due process.  Thus, "for this court to have personal jurisdiction over a defendant, New York law must provide the basis for exercising personal jurisdiction." Arquest, Inc. v. Kimberly-Clark Worldwide, Inc., No. 07-11202(CM), 2008 WL 2971775, at *5 (S.D.N.Y. July 31, 2008). Under New York's long-arm statute, a defendant has sufficient contacts with New York and is "'doing business' and is therefore 'present' in New York and subject to personal jurisdiction with respect to any cause of action, related or unrelated to the New York contracts, if it does business in New York not occasionally or casually, but with a fair measure of permanence and continuity."  Wiwa v. Royal Dutch Petroleum Co., 226 F.3d 88, 95 (2d Cir. 2000) (internal quotation marks omitted).  If personal jurisdiction exists under New York law, a court must ensure its exercise comports with federal due process.  Bank Brussels Lambert v. Fiddler Gonzalez & Rodriguez, 305 F.3d 120, 127 (2d Cir. 2002).

Here, the FAC alleges that the INC "conducts ongoing and significant business in the United States particularly in the State and City of New York both directly and through its

wholly owned subsidiary 'Indian National Overseas Congress'
("INOC") which is a corporation organized and existing pursuant
to the laws of the State of New York with its principal place of
business located at Queens County, State of New York." (FAC ¶
15). While the Plaintiffs suggest that INC does business
"directly" in New York (Id.), they provide no factual averments
as to INC's contacts with New York or the United States, and
such a conclusory statement is insufficient to establish
personal jurisdiction. See Mende, 269 F. Supp. 2d at 251.

The Plaintiffs' additional arguments supporting their
contention that the INC is subject to personal jurisdiction in
this district are directed primarily to the activities of the
INOC. (See FAC ¶ 15) (stating that "[u]pon information and
belief, [the INC] operated INOC as a department or agent and
controls its activities."). More specifically, the Plaintiffs
contend that the existence of the INOC, as wholly-owned
subsidiary of INC, renders the INC "present" in New York. (FAC
¶ 15). As examples, the Plaintiffs offer statements by Dr.
Surinder Malhotra ("Dr. Malhotra") that INC is a "wholly owned
subsidiary organization of the INC as well as declarations
through his attorney stating that the INOC "is the only element
of the party operating in the United States and specifically in

New York City."  (Pl. Opp. - Motion to Dismiss at 14).   The
Plaintiffs also offer a story from The Chicago Tribune entitled
"Indian National Congress Party Launches Overseas Chapter in
Chicago," which includes a statement from the organization's
newly installed President stating that he was looking forward to
"promoting the [INC] in Chicago and Midwest and actively promote
its mission [sic]," and another executive of the Chicago chapter
describing the INC "and its affiliate [INOC] as a party of
Mahatma Gandhi." (Id.).

        In this Circuit, an organization cannot be subject to
jurisdiction based on the activities of another entity unless it
is an agent or department of the party.  See Wiwa, 226 F.3d at
95.   Thus, "[t]here are two specific theories upon which New
York courts assert general jurisdiction over foreign
corporations that are deemed to be doing business in New York
vicariously:  agency and "mere department" analysis."  Arquest,
2008 WL 2971775, at *7 (citing N.Y.C.P.L.R. § 301).

        First, "a court of New York may assert jurisdiction
over a foreign corporation when it affiliates itself with a New
York representative entity and that New York representative
renders services on behalf of the foreign corporation."  Wiwa,

226 F.3d at 95.  These activities must "go beyond mere
solicitation" and must be "sufficiently important to the foreign
entity that the corporation itself would perform equivalent
services if no agent were available."  Id.  To come within the
rule, a plaintiff need not prove the existence of a formal
agency agreement, and the defendant need not exercise direct
control over its putative agent."  Id.  Instead, "the agent must
be primarily employed by the defendant and not engaged in
similar services for other clients."  Id.  Thus, there is no
personal jurisdiction based on agency where the entity "does not
have the power to bind [the party], nor does it act on behalf of
[the party] in New York."  Arquest, 2008 WL 2971775, at *8.

        In addition, in deciding whether the entity is a "mere
department" of the party, courts consider four factors:  "1)
common ownership, 2) financial dependency, 3) the degree to
which the parent corporation interferes with the selection and
assignment of the subsidiary's executive personnel and fails to
observe corporate formalities and 4) the degree of control over
the marketing and operational policies of the subsidiary
exercised by the parent."  Id. at *9.  The first factor, common
ownership, is "essential to the assertion of jurisdiction over a
foreign related corporation," while the other three factors are

67

"important."  Volkswagenwerk Aktiengesellschaft v. Beech

Aircraft Corp., 751 F.2d 117, 120 (2d Cir. 1984).   "The overall

weighing of the various factors thus necessitates a balancing

process, and not every factor need weigh entirely in the

plaintiffs' favor."  Aboud v. Rapid Rentals, Inc., No. 97-

1742(MGC), 1998 WL 132790, at *1 (S.D.N.Y. March 24, 1998)

(citations omitted).


          The INC has stated that "the INOC is not an affiliate,

subsidiary, department or agent of the INC."  (Def. Memo –

Motion to Dismiss at 10; Decl. of Motilal Vora ¶ 13).   The INC

also contends that they have no ownership interest in the INOC

and cannot control its activities.   (Id.).  However, the

Plaintiffs maintain that the record demonstrates that the INOC

is devoted to the INC and its purpose is to promote the INC and

its "mission" in the U.S.  (Pl. Opp. – Motion to Dismiss at 15).

They contend that the INC's officials and leaders meet with

their INOC colleagues "continuously and systematically in New

York and around the U.S. where they work together to bolster

relations with government officials for political and economic

reasons which benefit the party here and at home."  (Id.).  The

Plaintiffs also allege that the reconstitution of the board of

the INOC and Dr. Malhotra's assignment as head of litigation was

made in New Delhi, not New York.  (Id. at 16).  They argue that
"the degree of control, the failure to observe corporate
formalities, the selection of executives and their assignments,
and the open acknowledgement that the [INC and INOC] is the
party, are factors that actually favor a finding of
jurisdiction."  (Id.).

          It is a close question whether the Plaintiffs'
allegations demonstrate a relationship between the INC and INOC
to justify jurisdictional veil piercing.  While the INC contends
that INOC is not an INC subsidiary, the Plaintiffs have alleged
some facts that suggest that the INOC may be a wholly owned
subsidiary of the INC.  This factor of common ownership, which
is contested here, is "essential" to the assertion of
jurisdiction over the INC.  See Beech Aircraft, 751 F.2d at 120.
In addition, the INC has alleged facts that its members may be
involved in the appointment of INOC's officials.  While control
sufficient to justify holding a parent corporation subject to
jurisdiction where a subsidiary is located "requires more than
the parent's appointment of a few of the subsidiary's officers
or directors," these facts should be considered while weighing
all factors recognized by the Second Circuit in Beech Aircraft.

Accordingly, the Plaintiffs have raised issues of jurisdictional facts which are more than conclusory and warrant additional examination through discovery. See In re Terrorist Attacks on September 11, 2001, 349 F. Supp. 2d at 792, 812 (finding that the parties should have the opportunity to take discovery of the jurisdictionally relevant facts where the status of an organization was not determinable and where discovery could "uncover sufficient facts to sustain jurisdiction"); see also In re Magnetic Audiotape Antitrust Litig., 334 F.3d 204, 208 (2d Cir. 2003) (instructing the district court to permit discovery before granting motion to dismiss based on a fact-sensitive, multi-factor test).

Here, because the status of INOC's relationship to INC is not determinable on the current record, the Plaintiffs' request for jurisdictional discovery is granted. However, as discussed above, the Supreme Court's decision in Kiobel will be dispositive to whether this court has subject matter jurisdiction over the Plaintiffs' ATS claim against the INC, whether the statute would apply to claims occurring outside of the United States and whether aiding and abetting claims may proceed under the statute. Accordingly, should the applicable precedent in the Kiobel decision warrant the progress of the

instant case, limited jurisdictional discovery will be permitted to explore INOC's function, organizational structure and relationship to INC, not to exceed 60 days from the date of the publication of the Kiobel decision.  More specifically, the discovery shall be confined to whether the INOC acts as INC's agent in New York and to whether the INOC is a "mere department" of the INC with contacts in New York.  Within 14 days of the jurisdictional discovery deadline, the Defendants may renew its motion for dismissal on whatever grounds they choose, and the Plaintiffs will have 14 days to respond.  The Defendants may reply seven days thereafter.  See Krepps v. Reiner, No. 05-0107(RWS), 2005 WL 1793540, at *6 (S.D.N.Y. July 27, 2005) (deferring judgment on a motion to dismiss for lack of jurisdiction and granting plaintiff 30 days to submit any factual material or to initiate any jurisdictional discovery).


E) Service Was Effected Properly in Accordance with the Hague Convention

     "Before a federal court may exercise personal jurisdiction over a defendant, the procedural requirement of service of summons must be satisfied."  Dynegy v. Midstream Servs. v. Trammochem, 451 F.3d 89, 94 (2d Cir. 2006) (quoting Omni Capital Int'l v. Rudolf Wolff & Co., 484 U.S. 97, 104, 108

71

S. Ct. 404, 98 L. Ed. 2d 415 (1987)).  "When a defendant
contests personal jurisdiction based upon improper service of
process, the plaintiff has the burden to show that service was
effective."  F.D.I.C. v. O'Connor, No. 94-4218, 2008 WL 2557426,
at *2 (S.D.N.Y. June 26, 2008).  To meet this burden, the
plaintiff must show proper service "through specific factual
allegations and any supporting materials."  Jazini, 148 F.3d at
184.  In resolving a Rule 12(b)(5) motion to dismiss for
insufficient service of process, "a Court must look to matters
outside the complaint to determine whether it has jurisdiction."
Mende, 269 F. Supp. 2d at 251.


        Rule 4(h)(2) of the Federal Rules of Civil Procedure
provides that service upon a foreign corporation, partnership or
association be made in accordance with Rule 4(f), which permits
service of process upon an individual abroad "by any
internationally agreed upon means reasonably calculated to give
notice, such as those authorized by the Hague Convention."  Fed.
R. Civ. P. 4(f)(1).  The Hague Convention governs service of
process upon entities located in signatory countries, which
includes the U.S. and India, and compliance is "mandatory in all
cases to which it applies."  Volkswagenwerk Aktiengesellschaft

v. Schlunk, 486 U.S. 694, 705, 108 S. Ct. 2104, 100 L. Ed. 2d
722 (1988); see Fed. R. Civ. P. 4(f)(1).


        Under Articles 2 through 7 of the Hague Convention, a
participating country is required to set up a Central Authority
for receiving and processing requests for service upon
defendants residing within the state.  See Hague Convention Art.
2-7.  "Under this method, an applicant must send a request for
service directly to the Central Authority designated by the
appropriate agency.  The Central Authority must then complete a
Certificate dealing how, where, and when service was made, or
explaining why service did not occur."  Unite Nat'l Ret. Fund v.
Ariela, Inc., 643 F. Supp. 2d 328, 333 (S.D.N.Y. 2008); id. at
Art. 2-6.  In addition, the Hague Convention provides that
"[e]ach contracting State shall be free to declare that the
judge . . . may give judgment even if no certificate of service
of delivery has been received, if all of the following
conditions are fulfilled . . . ."  Hague Convention Art. 15.
They include:

        "(a) the document was transmitted by one of the
        methods provided for in this Convention,

        (b) a period of time of not less than six months,
        considered adequate by the judge in the particular

73

case, has elapsed since the date of the transmission
of the document, [and]

(c) no certificate of any kind has been received, even
though every reasonable effort has been made to obtain
it through the competent authorities of the State
addressed."

Id.


Here, the INC contends that, because it did not

receive a copy of the summons and amended complaint from the

Central Authority in India, it has not been effectively served

pursuant to the Hague Convention.  (Def. Memo - Motion to

Dismiss at 12).  They argue that while the Plaintiffs may have

attempted to serve copies of the summons and complaint upon the

INC, those attempts were ineffective and not received by the

INC.  (Id. at 12-13).


The Plaintiffs, however, transmitted the summons and

FAC along with the necessary documents to the Ministry of

Justice in New Delhi, which India has designated to act as the

Central Authority for the in state service of foreign judicial

documents in accordance with Articles 2 and 3 of the Hague

Convention.  (Pl. Opp. - Motion to Dismiss at 18).  Further,

more than a year has passed since that transmission, but "the

Central Authority in India has failed to return a Certificate of

Service to the Plaintiffs, object to the request, state its refusal to comply or otherwise respond." (Id. at 18-19); see Hague Convention Arts. 4,6, 13 ("If the Central Authority considers that the request does not comply with the provisions of the present Convention it shall promptly inform the applicant and specify its objections to the request . . . . The Central Authority . . . shall complete a certificate  . . . . If the document has not been served, the certificate shall set out the reasons which have prevented service . . . .  The Central Authority shall, in case of refusal, promptly inform the applicant and state the reasons for the refusal."). The Plaintiffs also maintain that they have made "every reasonable effort" to obtain a certificate, all to no avail.[4] (Id. at 19).

As this Court has previously noted, "[t]he failure to comply strictly with the requirements of the Hague Convention is not automatically fatal to effective service." Burda Media, 2004 WL 1110419, at *6; see also Fox v. Regie Nationale des Usines Renault, 103 F.R.D. 453, 455 (D. Tenn. 1984) ("The Hague Convention carefully articulates the procedure for the forum

---

[4] The Plaintiffs point out that while the Hague Convention and Rule 4(f)(3) allow for alternate methods of service, India prohibits service outside of the Central Authority process. (Pl. Memo – Motion for Default Judgment at 16 n.5 (citing cases)).

Court to follow should an element of procedure fail."). The Plaintiffs have demonstrated that they complied with the Hague Convention procedures and that any failure of compliance was solely on the Central Authority to participate in the process. In addition, the INC was aware of the litigation and had actual notice of the suit. (Decl. of Motilal Vora ¶ 16 ("The [INC] became aware of the New York Litigation . . . .). Under these circumstances, the INC was served in accordance with the Hague Convention and service is valid.[5]

## F) The Question of the Statute of Limitations

The INC argues that the Plaintiffs' claims under both the TVPA and ATS are time-barred because they complain about alleged activities that occurred more than twenty-five years ago after all statutes of limitations have long expired.[6]  The ATS

---

[5] In addition, the summons and FAC were served by personal delivery to the New York State Secretary of State, on the belief that the INOC is a legal agent for INOC, and by personal service upon the Chief Executive Officer of the INOC, Dr. Malhotra. (Pl. Opp. - Motion to Dismiss at 18 n.8). Thus, should jurisdictional discovery prove that the INOC is an agent or department of the INC, service will have also been proper under Rule 4(h)(1)(A) and (B).  See Schlunk, 486 U.S. at 707-08 (finding that the Hague Convention does not apply and holding service proper "[w]here service on a domestic agent is valid and complete under both state law and the Due Process Clause, [and thus] our inquiry ends and the Convention has no further implications.").

[6] Under the TVPA, "[n]o action shall be maintained under this section unless it is commenced within 10 years after the cause of action arose."  TVPA § 2(c).  However, for the reasons set forth above, the Plaintiffs' TVPA claim is dismissed.

does not include a statute of limitations, but courts have consistently found that the statute carries a 10 year limitations period by applying the 10 year statute of limitations governing claims under the TVPA. See e.g., Shan v. China Const. Bank Corp, No. 09-8566(DLC), 2010 WL 2595095, at *2 n.8 (S.D.N.Y. June 28, 2010) ("The ATS does not contain a statute of limitations, however, courts have held that the TVPA, which is appended to the ATS provides the applicable limitations period.).

Here, all of the alleged events in the FAC occurred in November 1984, and thus fall outside of the 10 year statutes of limitations. The INC is correct that in general, claims arising under the TVPA and ATS must be filed within 10 years of the triggering event. This limitations period, however, may be equitably tolled in exceptional circumstances in which parties are "prevented in some extraordinary way from exercising [their] rights." Johnson v. Nyack Hosp., 86 F.3d 8, 12 (2d Cir. 1996).

While both parties briefed the issue of whether the Plaintiffs claims are barred by the applicable statute of limitations and whether equitable tolling is appropriate, in New York, a dismissal on the statute of limitations is a decision on

77

the merits with "full res judicata effect." Pharr v. Evergreen
Garden, Inc. 123 Fed. App'x. 420, 423 (2d Cir. 2005).  As
detailed above, because questions of jurisdiction have not yet
been resolved and remain open, the Court will reserve judgment
on the question of whether the Plaintiffs' claims are barred
under the statute of limitations and whether equitable tolling
is applicable until a later stage in this case, should the case
move forward.  See Magee v. Nassau County Med. Ctr., 27 F. Supp.
2d 154, 158 (E.D.N.Y. 1998) ("A court faced with a motion to
dismiss . . . must decide the jurisdictional question first
because a disposition of a Rule 12(b)(6) motion is a decision on
the merits and, therefore, an exercise of jurisdiction."); see
also Rhulen Agency, Inc. v. Alabama Ins. Guar. Ass'n, 896 F.2d
674, 678 (2d Cir. 1990).


## VI.  The Plaintiffs' Cross-Claims


        The Plaintiffs have made a cross-motion for
jurisdictional discovery, a declaration that service has been
effected, leave to further amend the complaint, and
consolidation of the pending motions.  (Dkt. 83).  Having

78

discussed and granted the first two requests above, the third
and fourth requests are now reviewed in turn.

The standard governing motions to amend is a
"permissive" one that is informed by a "strong preference for
resolving disputes on the merits." See Williams v. Citigroup
Inc., 659 F.3d 208, 212-13 (2d Cir. 2011) (citing New York v.
Green, 420 F.3d 99, 104 (2d Cir. 2005)); see also Pangburn v.
Culbertson, 200 F.3d 65, 70 (2d Cir. 1999) (referring to the
"relaxed standard" for motion to amend).  Rule 15(a) provides
that leave to amend shall be "freely given[n] . . . when justice
so requires."  Fed. R. Civ. P. 15(a)(2).  "If the underlying
facts or circumstances relied upon by a plaintiff may be a
proper subject of relief, he ought to be afforded an opportunity
to test his claims on the merits."  Foman v. Davis, 371 U.S.
178, 182, 83 S. Ct. 227, 9 L. Ed. 2d 222 (1962).

However, "[a] district court has discretion to deny
leave for good reason, including futility, bad faith, undue
delay, or undue prejudice to the opposing party." McCarthy v.
Dun & Bradstreet Corp., 482 F.3d 184, 200 (2d Cir. 2007); see
also AEP Energy Servs. Gas Holding Co. v. Bank of Am., N.A., 626
F.3d 699, 726 (2d Cir. 2010) ("Leave to amend may be denied on

79

grounds of futility if the proposed amendment fails to state a
legally cognizable claim or fails to raise triable issues of
fact.").

        The Defendants argue that the Plaintiffs' request is
premature as they "have neither supplied a copy of the proposed
amended complaint nor indicated what allegations they would add
if leave to amend were granted." (Def. Reply – Motion to
Dismiss at 16).  The Plaintiffs counter that "the failure to
file a proposed amended complaint is not fatal where there is no
undue prejudice to defendant." (Pl. Reply – Motion to Dismiss
at 9) (citing Sanders v. Grenadier Realty, Inc., No. 08-
3920(WHP), 2009 WL 1270226, at *4 (S.D.N.Y. May 6, 2009).  In
Sanders, however, the plaintiffs submitted affidavits setting
forth additional facts such that they "provide[d] the basis for
their proposed second complaint."  2009 WL 1270226, at *4.
Here, not only is there no proposed amended complaint or any
affidavits with additional facts, there is no suggestion as to
which allegations the Plaintiffs wish to amend.

        In addition, the Plaintiffs made their request to
amend based on "a change in or clarification of the applicable
law." (Dkt. No. 83).  This change or clarification has not yet

80

occurred, and until the Supreme Court makes its decision in
Kiobel, there is no justification for the Plaintiffs' request to
make conforming changes to their complaint.  Accordingly, the
Plaintiffs' request is denied, without prejudice to replead at a
later date and consistent with this Opinion.

          Lastly, the Plaintiffs move to consolidate the pending
motions presently pending before the Court for purposes of
determination and possible appeal.  (Dkt. No. 83).  As the
Defendants point out, the Plaintiffs do not identify the Federal
Rule of Civil Procedure or other law upon which their request is
based, nor do they specify what effect consolidation would have
on the determination of the motions or a possible appeal.  In
addition, considering that this Opinion addresses all pending
motions before the Court, this request is considered moot and
therefore denied.

## VII. Conclusion

          For the reasons set forth above, the Motion for
Reconsideration and the Motion for Default Judgment is denied.
The Defendant INC's Motion to Dismiss is granted in part and
denied in part and the motion for a stay is granted.  The

Plaintiffs' cross-motions are denied in part and granted in part.  Limited personal jurisdictional discovery is granted as to the INC, consistent with the procedures outlined herein and subject to the Supreme Court's outcome in Kiobel.

It is so ordered.

New York, NY
September /9 , 2012

ROBERT W. SWEET
U.S.D.J.