UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------- X

SIKHS FOR JUSTICE INC on behalf of deceased and injured members of the Sikh community, et al.,

Plaintiffs,

- against -

KAMAL NATH and
INDIAN NATIONAL CONGRESS PARTY,
a/k/a, "Congress (I),"

10 Civ. 2940 (RWS)

Defendants,

- and -

INDIAN LEGAL HERITAGE,

Intervenor.

------------------------------------------------------------------- X

**MEMORANDUM OF LAW OF PLAINTIFFS IN OPPOSITION TO THE MOTION TO DISMISS OF <u>DEFENDANT INDIAN NATIONAL CONGRESS PARTY</u>**

Michael F. Fitzgerald, Esq.
Attorney for Plaintiffs
410 Park Avenue - Suite 1530
New York, New York 10022
(212) 939-7281
(212) 751-3500 (f)
Mfitzjustice@aol.com

## TABLE OF CONTENTS


INTRODUCTION 1

PRELIMINARY STATEMENT 1

FACTUAL BACKGROUND 2

ARGUMENT 3

I. THIS COURT HAS SUBJECT MATTER JURISDICTION 3

A. Defendant's Rule 12(b)(1) and 12(h)(3) Motion Must Be Denied 3

B. Plaintiff Sikhs For Justice Inc. Has Standing 15

C. The Representative Plaintiffs Have Standing 16

D. The Statute of Limitations Does Not Bar Plaintiffs' Claims 20

II. PLAINTIFFS HAVE STATED VALID CLAIMS UNDER THE ATS 24

III. DEFENDANT'S FINAL ARGUMENT SHOULD BE WITHDRAWN 30

CONCLUSION 31

## INTRODUCTION

Plaintiffs, on behalf of themselves, their deceased family members and all others similarly situated (collectively "plaintiffs"), respectfully submit this memorandum of law in opposition to the motion to dismiss filed by defendant Indian National Congress Party, a/k/a "Congress I" (hereinafter "defendant"or "INC") pursuant to Rule 12(b)(1) and (6) and Rule 12(h)(3), Fed. R. Civ. P.

## PRELIMINARY STATEMENT

In its Decision and Order dated September 21, 2012, this court reserved decision on defendant's motion to dismiss plaintiffs' claims under the Alien Tort Statute, 28 U.S.C. §1350 ("ATS") and issued a stay of the action in anticipation of a decision from the United States Supreme Court in *Kiobel* v. *Royal Dutch Petrol. Co.*, 621 F.3d 111 (2d Cir. 2010), *cert. granted*, 132 S.Ct. 472 (2011). *Sikhs For Justice Inc.* v. *Nath*, 893 F. Supp. 2d 598, 619-22 (S.D.N.Y. 2012).[1] On April 17, 2013, the Supreme Court handed down its decision in *Kiobel* and held that a doctrine known as the "presumption against extraterritoriality" applied to claims asserted under the ATS and found that the presumption was not rebutted by the plaintiffs in that case. *Kiobel* v. *Royal Dutch Petrol. Co.*, 133 S.Ct. 1659, 1669 (2013) ("*Kiobel*").

In light of that decision, on May 29, 2013, the Court held a status conference with counsel to discuss the impact of *Kiobel* and plot a new course for the action. (D. E. 94). At the

[1] While the court reserved decision on plaintiffs' ATS claims, it did dismiss plaintiffs' claims under the Torture Victim Protection Act, Pub. L. No. 102-256, 106 Stat. 73(1992) (codified at 28 U.S.C. 1350 (note) ("TVPA") based largely on *Mohamad* v. *Palestinian Authority*, 132 S. Ct. 1702 (2012). *Sikhs For Justice*, *supra*, 893 F. Supp. 2d at 619. In addition, the court denied defendant's motion to dismiss for ineffective service of process; granted plaintiffs' motion for jurisdictional discovery and put on hold until a "later stage in this case" the question of statute of limitations. *Id.* at 625-28.

conference, the court granted plaintiffs leave to further amend their complaint to address *Kiobel* and cure any defects in their pleading which the court had highlighted in its decision *(Sikhs For Justice*, 893 F. Supp. 2d at 619-20) and the parties agreed to stay jurisdictional discovery pending resolution of the *Kiobel* question. Thus, on November 20, 2013, plaintiffs filed their second amended complaint ("SAC")[2] and on January 17, 2014, defendant filed the present motion. (D. E. 102, 109).[3]

**FACTUAL BACKGROUND**

Plaintiffs assume that the Court is familiar with the core facts and circumstances underlying the action and respectfully direct the Court's attention to the statement of facts contained in plaintiffs' memoranda of law previously filed in support of their motion for the entry of a judgment by default and in opposition to defendant's motion to dismiss the first amended complaint. (D. E. 50 ("MOL I"); 73 ("MOL II"); 84 ("MOL III").[4] In short, from November 1 through November 4, 1984 approximately 30,000 members of a minority religious group in India known as the "Sikhs" were murdered, tortured and raped and their property destroyed by individuals and groups that were organized, controlled, assisted and armed by a

---

[2] See Affirmation In Opposition to Motion to Dismiss of Michael F. Fitzgerald, Esq., affirmed the 17th day of February 2014 and exhibit attached thereto.

[3] INC correctly points out that the SAC reasserts the claims that were previously dismissed by this Court in order to preserve plaintiffs' rights on appeal. Br. at 1, n.1; *See* SAC, p.1 n.1 (discussing apparent confusion in the circuit). It should be also noted that at the suggestion of the Court the SAC was circulated to counsel prior to filing and no objection was raised. Thus, the claims presently before the Court are plaintiffs' direct and accessorial ATS claims . SAC, 166-73 ("First Claim For Relief"); 174-79 ("Second Claim For Relief").

[4] Since most of the arguments and operative facts were previously addressed, plaintiffs respectfully direct the Court's attention to the papers and memoranda submitted in support of their motion for the entry of a judgment by default, in opposition to INC's motion to dismiss the first amended complaint ("FAC") and in support of their cross motion, which are incorporated herein by reference. D. E. 48-51; 73; 83-85; 89-90.

1661, 1664 citing *Morrison* v. *Nat'l Austl. Bank Ltd.*,130 S. Ct 2869, 2877 (2010) ("[T]o ask what conduct §10(b) reaches is to ask what conduct §10(b) prohibits, which is a merits based question. Subject matter jurisdiction, by contrast, 'refers to a tribunal's power to hear a case'. . .. It presents an issue quite separate from the question whether the allegations the plaintiff makes entitle him to relief.") (citation omitted); *see also Reed Elsevier, Inc.* v. *Muchnick*, 130 S. Ct. 1237, 1244 (2010) (warning lower federal courts against confusing "true jurisdictional conditions" with "nonjurisdictional causes of action"); *Arbaugh* v. *Y&H Corp.*, 546 U.S. 500, 515 (2006)( limitation on a statute's scope shall count as jurisdictional" only when "the Legislature clearly states" that it is).[6]

In line with Supreme Court precedent, before reaching the merits based question of extraterritoriality under the ATS, the Court had to first determine whether it had subject matter jurisdiction. In *Steel Co. v. Communities for a Better Environment*, 523 U.S. 83, 88-89, 94-95 (1998), the Supreme Court held that federal courts should not hypothesize jurisdiction but rather first determine its existence before it examines issues relating to causes of action. Thus, the *Kiobel* Court necessarily decided that it had subject matter jurisdiction before it addressed a doctrine directed at the merits. In effect, the Supreme Court rejected the Second Circuit's holding that corporations could not be liable under the ATS. Indeed, both Justice Roberts and Justice Breyer used corporations as examples in their respective analyses of the application of the

---

[6] While the Supreme Court in *Sosa v. Alvarex-Machin,* 542 U. S. 692, 714 (2004) determined that the ATS was a jurisdictional statute, the only "limitation" imposed by it is on the class of plaintiffs (aliens), not defendants (corporations, organizations, etc.). The Second Circuit made the same mistake when it assumed that the issue of corporate liability under the ATS presented a question of subject matter jurisdiction. *Kiobel v. Royal Dutch Petrol. Co.,* 621 F.3d 111, 117-18; 124-25; 145, 149 (2010).

presumption against extraterritoriality in ATS actions. *See Kiobel*, 133 S. Ct. at 1669, 1677-78; *see also Doe v. Nestle,* 738 F.3d 1048 (9th Cir. 2013) ("In light of intervening developments in the law, we conclude that corporations can face liability for claims brought under [the ATS]" referring to *Kiobel's* "dicta" that "corporations may be liable under ATS so long as presumption against extraterritorial application is overcome."). As a matter of fact, the Supreme Court recently had another occasion to endorse Judge Cabranes' view in an ATS action involving corporate defendants but declined. *See Daimler v. Bauman*, No.11-965, 2014 WL 113486, at *12 (Jan. 14, 2014). Indeed, the Second Circuit has acknowledged the problem by remanding cases to the district courts to address the corporate liability issue notwithstanding its "groundbreaking" decision. *See Balintulo v. Daimler AG*, 727 F.3d 174 (August 21, 2013) ("*Balintulo*"); *Licci v. Lebanese Canadian Bank SAL*, 732 F.3d 161, 174 (October 18, 2013).[7] Moreover, as plaintiffs demonstrated in the first round of this dispute, the Second Circuit's *Kiobel* holding was expressly limited to corporations, not organizations and neither federal common law nor international law excludes corporate entities from civil liability for torts. *See* MOL I at 8-10; MOL II at 1-5; MOL III at 4-9.[8] It's worth repeating, this Court should adopt the

---

[7] Despite INC's argument to the contrary (Br. at 3-4), when the Supreme Court "casts doubt" on a circuit court's decision or overrules its rationale either "implicitly or expressly,"courts are not bound by that precedent. *See U.S. v. Plugh*, 648 F.3d 118, 124 (2d Cir. 2011); *In re Sokolowski*, 205 F.3d 532, 534-35 (2d Cir. 2000). Thus, INC's reliance on *Balintulo* is misplaced not only for these reasons but also because the opinion was delivered in the context of a petition for a writ of mandamus which does not have precedential value. *Balintulo, supra,* at n.21*;* (Br. at 3,4,5,11). Moreover, although Judge Cabranes recently reiterated his view that his *Kiobel* opinion was not disturbed by the Supreme Court, Judge Pooler noted that another circuit disagreed and identified his statement as "*dicta*." *See Chowdhury v. Worldtel Bangladesh Holding, Ltd.*, 2014 WL 503037, at *12 n.6 and n. 2 (2d Cir. Feb. 10, 2014) (Cabranes, J.) and (Pooler, J. concurring), respectively.

[8] Plaintiffs are confident that the Court will not be misled by INC's repeated mischaracterization of it structure as "corporate." *See* Br. at 2,4,6,7,9,15,27 ( "corporate political entity;" [INC] is a corporation;" "Indian political party corporation;" "separate and distinct corporation;" "the corporate defendant;" "a corporation;" "purely corporate").

sound reasoning of Judge Level as expressed in his concurrence: "No principle of domestic or international law supports the majority's conclusion that the norms enforceable through the ATS - such as the prohibition by international law of genocide, slavery, war crimes, piracy, etc. - apply only to natural persons and not to corporations, leaving corporations immune from suit and free to retain profits earned through such acts." (*Kiobel*, 621 F.3d at 153 (Leval, J., concurring).

In conclusion, the Supreme Court's holding in *Kiobel* confirmed that there is no special class of defendants subject to the ATS; that scope of liability issues under the ATS are not matters of subject matter jurisdiction; and, that the presumption against extraterritoriality poses a merits based question that is answered on a case by case basis. *See Morrison*, *supra*, 130 S. Ct. at 2876-77 (whether a federal statute has extraterritorial application is a merits based question); *Doe I v. Cisco Sys., Inc.,* 5:11-CV-02449-EJD, 2013 WL 5272923 (N.D. Cal. September 18, 2013) ("Whether the facts sufficiently 'touch and concern' the United States to overcome the presumption against extraterritoriality is a question on the merits."). Thus, defendant's motion to dismiss based on Rule 12(b)(1) and 12(h)(3) must be denied. *See Chowdhrury*, *supra*, at * 12 n.1 (Poole, J., concurring).

As noted above, on April 17, 2013, the Supreme Court entered its decision in *Kiobel.* The plaintiffs in *Kiobel* were residents of the Ogoniland area of Nigeria. Defendant Shell Petroleum Development Company of Nigeria, Ltd. ("SPDC"), a Nigerian corporation, was a joint subsidiary of Defendants Royal Dutch Petroleum Company and Shell Transport and Trading Company, p.l.c., holding companies incorporated in the Netherlands and England, respectively. SPDC was engaged in oil exploration and production in Ogoniland. According to the plaintiffs, after concerned residents of Ogoniland began protesting the environmental effects of SPDC's

practices, the three defendants aided and abetted the Nigerian government in suppressing the demonstrations through means such as beating, raping, and killing residents and destroying or looting their property. The plaintiffs sued the three foreign corporations under the ATS in U.S. federal court even though the defendants' "only presence in the United States consists of an office in New York City (actually owned by a separate but affiliated company) that helps to explain their business to potential investors." *Id.* at 1677.

Presented with these facts, the Supreme Court addressed the question of "whether and under what circumstances courts may recognize a cause of action under the [ATS], for violations of the law of nations occurring within the territory of a sovereign other than the United States." *Id.* at 1662. The Court approached the question by reference to "a canon of statutory interpretation known as the presumption against extraterritorial application," which "provides that '[w]hen a statute gives no clear indication of an extraterritorial application, it has none.'" *Id.* at 1664 (quoting *Morrison v. Nat'l Australia Bank Ltd.*, 561 U.S. 247, 130 S. Ct. 2869, 2878 (2010)). The Court concluded that "the presumption against extraterritoriality applies to claims under the ATS, and that nothing in the statute rebuts that presumption." *Id.* at 1669. Noting that "[o]n these facts, all the relevant conduct took place outside the United States," the Court held that the plaintiffs' case "seeking relief for violations of the law of nations occurring outside the United States is barred." *Id.*

INC finds in that language a bright-line rule that there can never be a claim under the ATS when the conduct in question occurred outside the United States. (*See* Br. at 7-8) ("Rather, 'absent congressional action, the ATS cannot provide jurisdiction for alleged violations of the law of nations where the alleged conduct occurred in territories outside the United States.'" (quoting

*Al Shimari v. CACI Int'l, Inc.*, No. 1:08-CV-827 GBL/JFA, 2013 WL 3229720, at *7 (E.D. Va. June 25, 2013))).) But that conclusion essentially ignores the final part of the Court's decision in *Kiobel*, in which Chief Justice Roberts went on to say that "even where the claims touch and concern the territory of the United States, they must do so with sufficient force to displace the presumption against extraterritorial application. Corporations are often present in many countries, and it would reach too far to say that mere corporate presence suffices." *Kiobel*, 133 S. Ct. at 1669 (citation omitted). That language plainly contemplates that there will be some circumstances (other than "mere corporate presence") in which the relevant conduct occurred outside the territory of the United States but the ATS claims nevertheless "touch and concern" the United States with sufficient force to displace the presumption against extraterritorial application. That some such circumstances exist is also apparent from the other opinions filed in *Kiobel*. Chief Justice Roberts delivered the decision for the Court in an opinion joined by Justices Scalia, Kennedy, Alito, and Thomas. Justice Kennedy filed his own concurring opinion, while Justice Alito filed a concurring opinion in which Justice Thomas joined. Justice Breyer filed an opinion concurring only in the judgment, in which Justices Ginsburg, Sotomayor, and Kagan joined. Each of the concurring opinions confirms the limited nature of the Court's decision in *Kiobel*. Justice Kennedy thus stated that "[t]he opinion for the Court is careful to leave open a number of significant questions regarding the reach and interpretation of the [ATS]," which in his view was "a proper disposition." *Id.* (Kennedy, J., concurring). Obviously, if the holding in *Kiobel* was as "firm" as INC contends, "the proper implementation of the presumption against extraterritorial application [in ATS] cases" would not "require some further elaboration and explanation," as indicated by Justice Kennedy. *Id.* (Kennedy, J. concurring).

Justice Alito, writing for himself and Justice Thomas, likewise noted that "[t]his ['touch and concern'] formulation obviously leaves much unanswered, and perhaps there is wisdom in the Court's preference for this narrow approach." *Id.* at 1669-70 (Alito, J. concurring).

Writing for himself and three other Justices, Justice Breyer concurred only in the Court's judgment that under the facts presented in *Kiobel*, where the defendants' "only presence" in the United States consisted of an office in New York City owned by a separate but affiliated company, "it would 'reach too far to say' that such 'mere corporate presence suffices' to state an actionable claim under the ATS. *Id.* at 1677-78 (Breyer, J. concurring (quoting Chief Justice Roberts's opinion, *id.* at 1669)). Justice Breyer, however, went farther than the Court in formulating the particular circumstances under which a claim under the ATS will be viable—"where (1) the alleged tort occurs on American soil, (2) the defendant is an American national, or (3) the defendant's conduct substantially and adversely affects an important American national interest," which specifically includes "a distinct interest in preventing the United States from becoming a safe harbor . . . for a torturer or other common enemy of mankind." *Id.* at 1671 (Breyer, J. concurring).

Given the limited language of the majority opinion itself, as well as the concurring opinions joined in by seven of the nine Justices recognizing the "narrow" approach taken by Chief Justice Roberts, it is not surprising that other district courts that have taken up the issue have disagreed with the restrictive reading of *Kiobel* adopted by the *Al Shimari* decision quoted by the INC. (*See* Br. at 8).[9] For example, in *Mwani v. Laden*, 947 F. Supp. 2d 1 (D.D.C. 2013),

[9]The court in *Al Shimari* actually conceded that the plaintiffs' reading of *Kiobel* in that case was "a fair one," given that the opinion's "'touch and concern' language is textually curious and may be interpreted by some as leaving the proverbial door ajar for courts to eventually measure its width." 2013 WL 3229720, at *9. The court nonetheless

the court noted that the majority opinion in *Kiobel* left open a narrow avenue for ATS claims based entirely on "acts that occurred outside the United States." *Id.* at 4. The court found this avenue in the majority's suggestion that "in some limited instances, an act occurring outside the United States could so obviously touch and concern the territory of the United States that the presumption against extraterritorial application of the ATS *is* displaced." *Id.* (court's emphasis). The court bolstered its reading by reference to the concurring opinions:

> The concurring Justices each offered either support for, or different variations of, the "touch and concern with sufficient force" test elucidated by the majority. Justices Alito and Thomas agreed outright that the Court's language left "much unanswered." Similarly, Justice Kennedy agreed that "leav[ing] open a number of significant questions regarding the reach and interpretation of the [ATS]" was "a proper disposition." *Kiobel,* 133 S. Ct. at 1669 (J. Kennedy, concurring). Justice Breyer, with whom Justices Ginsberg, Sotomayor, and Kagan joined, offered slightly different language, stating that he "would find jurisdiction under [the ATS]" where "the defendant's conduct substantially and adversely affects an important American national interest, and that includes a distinct interest in preventing the United States from becoming a safe harbor . . . for a torturer or other common enemy of mankind." *Id.* at 1671 (J. Breyer, concurring).

*Id.* at 4-5.

The *Mwani* court's holistic reading of the *Kiobel* opinions proved to be more than theoretical when the court then concluded that that case, which involved "events that occurred in and around the grounds of the United States Embassy in Nairobi, Kenya on August 7, 1998,

held that "legislative action" is the only way for the ATS to have extraterritorial application because "[n]owhere in the *Kiobel* decision does the Court explicitly state or even suggest that the facts of a case should or could, under certain circumstances, inform a court's judgment about whether the presumption is sufficiently rebutted and thus displaced." *Id.* at *8. But it is simply impossible to square that reading with the clear statement in *Kiobel* that "even where the *claims* touch and concern the territory of the United States, *they* must do so with sufficient force to displace the presumption against extraterritorial application." 133 S. Ct. at 1669 (emphasis added). Contrary to what the district court said in *Al Shimari*, that language cannot mean anything other than that the claims in a particular case may displace the presumption against extraterritoriality if they touch and concern the United States with sufficient force, without the need for further legislative action.

'touched and concerned' the United States with 'sufficient force' to displace the presumption against extraterritorial application of the ATS." *Id.* at 5. Other district courts have also considered all of the language in all of the opinions in discussing the "limited reach" of *Kiobel*. *Sexual Minorities Uganda v. Lively*, No. 12-cv-30051-MAP, 2013 WL 4130756, at *14 (D. Mass. Aug. 14, 2013) ("The separate concurrence of Justice Kennedy made the limited reach of *Kiobel* manifest."); *see also Tymoshenko v. Firtash*, No. 11-CV-2794 (KMW), 2013 WL 4564646, at *4 (S.D.N.Y. Aug. 28, 2013) ("Although the Supreme Court did note that there may be situations in which a tort committed outside the U.S. is nonetheless actionable—namely, "where the claims touch and concern the territory of the United States . . . with sufficient force to displace the presumption against extraterritorial application,' *Kiobel,* 133 S. Ct. at 1669—the Court failed to provide guidance regarding what is necessary to satisfy the 'touch and concern' standard, *see id.* (Alito, J., concurring) (noting that the majority's 'formulation obviously leaves much unanswered')." ).[10]

Interestingly, Judge Pooler, in her concurring opinion in the very recent decision in *Chowdhury v. Worldtel Bangladesh Holding, Ltd.*, No. 09-4483-cv, 2014 WL 503037 (2d Cir. Feb. 10, 2014), also noted the contrasting readings that the "touch and concern" language had been given by the district courts in cases such as *Lively* and *Al Shimari*. *Id.* at *10 & n.3. Judge Pooler concurred in the decision that the plaintiff had no viable ATS claims because,

---

[10]In *Lively*, the court concluded that the actions of a U.S. citizen in the United States and in Uganda contributing to acts of repression in Uganda against Ugandan citizens were the subject of a proper claim under the ATS. 2013 WL 4130756, at *13-15. In *Tymoshenko*, this Court concluded that the claim of a Ukranian citizen against a Ukranian bank, whose "presence in the United States [was] even less substantial—merely the use of New York bank accounts"—than that of the *Kiobel* defendants, was insufficient to rebut the presumption against extraterritorial application of the ATS. 2013 WL 4564646, at *4.

> [d]rawing from the principles and reasoning of the Supreme Court in *Kiobel,* I am convinced that this is not a case covered 'neither by the TVPA nor by the reasoning and holding of' *Kiobel,* and thus is not a case in which 'the proper implementation of the presumption against extraterritorial application [] require[s] some further elaboration. . . .'"

*Id.* at *11 (quoting *Kiobel*, 133 S. Ct. at 1669 (Kennedy, J., concurring)). Judge Pooler again:

> The analytical work of the Supreme Court in *Kiobel* led it to adopt a rule under the ATS which was "careful to leave open a number of significant questions regarding [its] reach and interpretation." *Kiobel,* 133 S. Ct. at 1669 (Kennedy, J., concurring). These questions require courts to answer, at least, whether the claims "touch and concern the territory of the United States." *Id.* at 1669.

*Id.* Because the record in *Chowdhury* sufficiently established that the claims alleged in that case involved "conduct that took place entirely in Bangladesh," Judge Pooler, like all of the Justices in *Kiobel*, was "convinced that we need not elaborate on what facts, if alleged or proved, might lead us to conclude that claims touch and concern the United States." *Id.* Rather, "[t]he elaboration of such 'significant questions'" was "properly left to a further panel of this Court." *Id.* (quoting *Kiobel,* 133 S. Ct. at 1669 (Kennedy, J., concurring)).

Thus, the question to be considered by the Court in applying the *Kiobel* decision is whether the Plaintiffs' claims "touch and concern the territory of the United States . . . with sufficient force to displace the presumption against extraterritorial application" of the ATS, keeping in mind that "mere corporate presence" does not suffice. *Kiobel*, 133 S. Ct. at 1669; *see also Dacer v. Estrada*, No. C10-04165 WHA, 2013 WL 5978101, at *2 (N.D. Cal. Nov. 8, 2013) (plaintiff's ATS claim based on extrajudicial killing of her father in the Philippines did not "touch and concern" the United States where the defendant had only a temporary presence in the United States before his extradition to the Philippines); *Ahmed-Al-Khalifa v. Salvation Army*, No.

3:13CV289-WS, 2013 WL 2432947, at *2 (N.D. Fla. June 3, 2013) ("[T]o overcome the presumption against extraterritoriality applicable to claims brought under the ATS, one would need to show that 'the claims touch and concern the territory of the United States' and that the claims do so 'with sufficient force to displace the presumption against extraterritorial application.'" (quoting *Kiobel*, 133 S. Ct. at 1669)). In this case, the INC's presence in the United States goes far beyond that found insufficient in *Kiobel* (owning an office in New York), *Tymoshenko* (using New York bank accounts), and *Dacer* (temporary presence in the United States before extradition).

For example, the Plaintiffs have alleged that "INC conducts ongoing, continuous, systematic and substantial activities in the United States particularly in the State and City of New York both directly and through its wholly owned subsidiary and affiliate" IOC, which is a corporation organized under New York law with its principal place of business in Nassau County, New York, and that IOC is a "mere department or agent of INC which controls its activities; it renders services exclusively on behalf of INC; and, is permanently dedicated to promoting the interests of INC in the United States." (SAC ¶ 15; *see also* SAC ¶¶ 147-162 (detailing the close connection between INC and IOC).) While INC tries to make hay out of the fact that IOC was not established in the United States until "after the alleged events complained of" (Br. at 6 (emphasis in original)), it is actually significant that IOC was formed in the United States only three months after the Sikh Massacre (SAC ¶ 147), which lends credence to the notion that INC established IOC as part of an effort "to use this country as a safe harbor to escape justice for the events of 1984 and the persecution that followed which continues to this day" (SAC ¶ 165). Indeed, defendant's recitation of the various reincarnations of IOC only serves to

establish the substantial presence INC has in this country. Br. at 6-7; Declaration of Ravi Batra, dated January 16, 2014, ¶¶ 1-3 and Exhibits 1-3 ("Batra Dec."). Further, the re-submission of the stale affidavit of Motilal Vora (4/23/12) (Br. at 6; D.E. 72, 112) on the subject of the connection between INC and IOC was already implicitly found by this Court to be unpersuasive. *See Sikhs For Justice*, *supra*, 893 F. Supp. 2d at 622-27; *see also* Affirmation of Michael F. Fitzgerald, Esq., affirmed 6/29/12, ¶¶ 36,46 (D.E. 85).

Moreover, as alluded to at the end of ¶ 165, it is not true that the "events complained of" in this action were all over by February 1985 when IOC was organized in New York. To the contrary, "the campaign of terror and intimidation carried out by INC and those acting in concert with it against the Plaintiffs and their families for their activism and their participation in this action" continues to be "directed at and intended to be felt by those plaintiffs who have sought refuge in the United States as well as any other Sikh victim or survivor who fled to this country for their safety." (SAC ¶ 163(a).) For example, following Plaintiff Mohender Singh's emigration to the United States in 2008, INC has terrorized Mr. Singh's family (going so far as to set fire to the family home on August 15, 2013 while Mr. Singh's wife and five-year-old daughter were inside) and refused to let them out of India for any reason, knowing "that the impact will be felt by the intended target Mohender Singh in the United States." (SAC ¶ 79(a).) The attacks on the Singh family are directly related to this action pending in this New York court as the INC supporters and those acting in concert with them have indicated that their actions are motivated by the desire to coerce Mr. Singh into ceasing his participation in this action. (*Id.*)

In sum, INC's actions "touch and concern" the territory of the United States with a force well beyond that of the defendants in *Kiobel*, whose only presence in the United States was the

ownership of a New York office by a separate though affiliated entity. Here, INC's conduct continues to affect legal residents of the United States in a way that violates the law of nations. In addition, INC and IOC, a New York company, which are practically one entity, conduct substantial affairs in the United States related to furthering their political ambitions, which, going back to IOC's formation in New York shortly after the Sikh Massacre, include using this country as a safe harbor to escape justice for those events. Indeed, unlike the plaintiffs in *Kiobel* who had two jurisdictions outside of Nigeria (United Kingdom and Netherlands) in which to sue, absent the ability to bring suit in New York where INC and IOC are at home, Plaintiffs will have no recourse at all given the continuing threat to their families in India. Under these circumstances, Plaintiffs' ATS claims "touch and concern the territory of the United States with sufficient force to displace the presumption against extraterritorial application." *Kiobel*, 133 S. Ct. at 1669.

**B. Plaintiff Sikhs For Justice Inc. Has Standing**

INC argues that the organizational plaintiff Sikhs For Justice Inc. ("SFJ") should be dismissed from the action on the basis that it lacks standing to sue under the ATS. Br. at 11-12. In short, defendant misconstrues both the status of this plaintiff in this action and the principle of standing. As alleged in the SAC, SFJ is a New York not-for-profit corporation that was organized to "seek justice and compensation for those Sikhs who were injured or whose family members were killed and whose property was destroyed during the Sikh Massacre of November 1984." SAC, ¶ 8. In addition, SFJ also seeks a declaratory judgment holding that "[d]efendant's conduct was in violation of the laws of nations, customary international law and domestic laws." SAC, p. 57 (d). Furthermore, assuming SFJ is successful in this endeavor, it may also seek "such other and further relief as the Court may deem just and equitable" including an injunction against

INC to, *inter alia*, cease its campaign of threats and intimidation against its members and their families both here and in India. *Id.* at p. *57(f); see also SAC,* ¶¶ 79(a); 134-46; 163(a).

The Supreme Court has held that "[a]n association has standing to bring suit on behalf of its members when its members would otherwise have standing to sue in their own right, the interests at stake are germane to the organization's purpose, and neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Friends of the Earth, INC v. Laidlaw Environmental Services, Inc.*, 528 U.S. 167, 181 (2000) citing *Hunt v. Wash. State Apple Adver. Comm'n*, 432 U.S. 333, 343 (1977). "Even in the absence of injury to itself," associational standing allows an organization to bring suit. *Warth v. Seldin*, 422 U.S. 490, 511 (1975). Here, SFJ clearly has standing under the ATS to pursue at the very least the prospective relief requested in the SAC and, any other relief the Court deems "just and equitable." *See also* SAC, ¶¶ 17-21 (class action).[11]

### C. The Representative Plaintiffs Have Standing

INC contends that the individual plaintiffs who are bringing ATS claims on behalf of their deceased immediate family members do not have standing because they are not "legal representatives" duly appointed pursuant to New York State law. Br. at 12-14. Once again, defendant focuses on the wrong legal standard.

---

[11] INC suggests that this Court decided the question of SFJ's standing in its September 21, 2012 decision. Br. at 12. Simply put, INC is wrong. Significantly, while the Court dismissed, *sua sponte,* the claims of several individual plaintiffs based on a purported failure to allege their "alien" status, it did not dismiss SFJ from the action. *See Sikhs For Justice*, *supra*, 893 F. Supp. 2d at 619-20. Obviously, this Court recognized SFJ's associational standing and its right to pursue equitable relief on behalf of its members. Finally, it should be also noted that the SAC cured the deficiencies" regarding the alien status of certain plaintiffs. *See SAC*, ¶¶ 13,14, 17 and n.2; *see also Rasul v. Bush*, 542 U.S. 466, 484-85, 124 S.Ct. 2686, 159 L. Ed. 2d 548 (2004) (ATS creates no distinction between alien and nonresident aliens).

The TVPA provides that "any individual who . . . subjects an individual to extra judicial killing shall, in a civil action, be liable for damages to the individual's legal representative, *or to any person who may be a claimant in an action for wrongful death."* TVPA, § 2(a)(2) (emphasis added). Further, it is well settled that the TVPA standard applies as well to claims brought pursuant to the ATS. *See Bowoto v. Chevron Corp.*, 2006 WL 2455761, at *11 (N.D. Cal. 2006); *Cabello v. Fernandez-Larios*, 157 F. Supp. 2d 1345, 1356-58 (S.D. Fla. 2001); *Beanal* v. *Freeport-McMoran, Inc.*, 969 F.Supp. 362, 368 (E.D. La. 1997); *Xuncax v. Gramajo*, 886 F. Supp 162, 189-92 (D. Mass. 1995).

It should be noted at the outset that under ordinary circumstances the representative plaintiffs, if it were necessary, would have been able to proceed under Indian law as the personal representatives of their decedents' estates. *See Hindu Succession Act , 1956, §§ 8-10 ("HSA")*; *Indian Succession Act, 1956,* §218 ("ISA").[12] However, as this Court well knows, the circumstances confronting these plaintiffs from 1984 to the present are far from ordinary. *See generally* SAC. For the same reasons plaintiffs were unable to seek justice in India on the underlying claims, they were and are likewise precluded from being appointed personal representatives to carry out the same purpose. *Id.* at ¶¶ 79(a); 134-46; 163(a). In addition, while these plaintiffs are by definition beneficiaries and proper wrongful death claimants under state law, it is not clear that most would be able to satisfy the requirements of New York law for formal appointment. *See e.g., N.Y. S.C.P.A.* §707 (1) ( c ) (McKinney 2013) ( "non-domiciliary aliens" are ineligible to serve as fiduciaries); SAC ¶¶ 10, 13, 14.

---

[12] Although INC cites these two laws in support of its claim that legal representatives would be required under Indian law, it fails to cite any specific provisions or provide any analysis in support of that argument. (*See* Br. at 13 n. 5).

The legislative history of the TVPA makes clear that the court's mission is simply to confirm that the relationship between the claimant and the decedent is legally sufficient for a claim to proceed. For example, the House Report on the TVPA suggests that the court may look to state law for "guidance" regarding which parties would be proper wrongful death claimants but it does not instruct the court to impose state law or procedure in the matter. H. R. Rep. No. 102-367, at *4 (1991). Indeed, the Senate Report confirms that the TVPA "permits suit by the victim or the victim's legal representative [executor or executrix] or *a beneficiary in a wrongful death action.*" S. Rep. No. 102-249 at *7 (1991) (emphasis added).[13]

Here, since their decedents died intestate, each of the representative plaintiffs clearly set forth their status not as executor or executrix but as beneficiaries or distributees and thus proper claimants in a wrongful death or survival action under either Indian or New York law. For example, Mohender Singh sues on behalf of his late father; plaintiff Iqbal Kaur Bhatia sues on behalf of her late son and father; Manjit and Tejinder Singh, as sole survivors, sue on behalf of their late brother and Kamaljit Kaur Girin, sues on behalf of her late husband as the surviving spouse. SAC ¶¶ 10,12,13,14. *See* HSA, §§ 8, 9 and The Schedule (Class I heirs - son, daughter, widow, mother); (Class II heirs - II. (3) brother); *ISA*, §218 (no priority in who may serve). And, assuming they are not otherwise ineligible to serve, the representative plaintiffs would also satisfy New York law even though there is priority in appointment. *See N. Y. E.P.T.L.. 4-1.1 and*

---

[13] Not surprisingly, none of the cases relied on by INC involved actions brought under either the ATS or TVPA. *See* Br. at 14. Indeed, those cases essentially involved state law causes of action which required the court to apply New York's estate law. *See Grosshandels-Und Lagerei-Berufsgenossenschaft v. World Trade Center,* 435 F.3d 136 (2d Cir. 2006) ( state law based negligence and wrongful death claims); *In re September 11 Litigation*, 760 F.Supp. 2d 433 (S.D.N.Y. 2011) (lost profit and business loss claims); *Jerry Kubecka, Inc. v. Avellino*, 898 F.Supp. 963 (E.D.N.Y. 1995) (RICO and state law claims).

*N.Y. S.C.P.A. 1001 (McKinney 2013); SAC,* ¶¶ 10, 12 (priority waived or assigned to certain plaintiffs).

In addition, a fair reading of Indian succession law reveals that formal appointment as an executor or administrator of the estate of a decedent does not apply to plaintiffs:

> PART VIII - REPRESENTATIVE TITLE TO PROPERTY OF DECEASED ON SUCCESSION
>
> 211. Character and property of executor or administrator as such.
> (1) The executor or administrator, as the case may be, of a deceased person is his legal representative for all purposes, and all the property of the deceased person vests in him as such.
>
> (2) *When the deceased was a* Hindu, Muhammadan, Buddhist, *Sikh*, Jaina or Parsi or an exempted person, *nothing herein contained shall vest in an executor or administrator any property of the deceased person which would otherwise have passed by survivorship to some other person.* (*ISA, Part VIII, § 211 (emphasis added)).*

Under similar circumstances, courts in this circuit have not required formal appointment when foreign law vests property directly in the distributees particularly when the latter are pursuing claims under the ATS. *See Grosshandels-Und Lagerei-Berufsgenossenschaft v. World Trade Center,* 435 F.3d 136, 140 n.7 (2d Cir. 2006) (where the court endorsed an unrelated district court decision allowing plaintiffs to proceed without court appointment drawing a distinction with the case before it: "Here we are not faced with the situation where a distributee attempts, in extenuating circumstances, to press what might be styled a *survival action* under the rubric of a *permissible federal cause of action [ATS] . . .*." (emphasis added) analyzing *Bodner v. Banque Paribus*, 114 F. Supp. 2d 117, 126-27 (E.D.N.Y. 2000) (an ATS case where the court did not require representative plaintiffs to be appointed administrators of the estates of their Holocaust victim relatives because under French succession law property vested with them upon death); *see*

*also Schoeps v. Museum of Modern Art*, 594 F. Supp. 2d 461, 466-68 (S.D.N.Y. 2009) (formal appointment by New York Surrogate not required based on German succession law where property vested in beneficiaries upon death). Again, the TVPA contemplates examining state or foreign law for the limited purpose of expanding the class of representatives; it does not however contemplate incorporating the machinery of state or foreign law into ATS or TVPA actions which could very well undermine the noble purpose behind these very unique federal statutes. *See* S. Rep. No. 102-249 at note 10 ("Where application of Anglo-American law would result in no remedy whatsoever . . . application of foreign law recognizing a claim by a *more distant relation* in a wrongful death action is appropriate.") (citation omitted) (emphasis added).

Finally, in the event the Court does not fashion a rule of decision for these purposes and instead finds that the representative plaintiffs need to be formally appointed by the Surrogate's Court before they can proceed, plaintiffs respectfully request that they be afforded a reasonable time to obtain the necessary authorizations and join the real parties in interest in the action. *See* Rule 17(a)(3), Fed. R. Civ. P. ( "The court may not dismiss an action for failure to prosecute in the name of the real party in interest until, after an objection, a reasonable time has been allowed for the real party in interest to ratify, join or be substituted into the action. After ratification, joiner, or substitution, the action proceeds as if it had been originally commenced by the real party in interest.").[14]

**D. <u>The Statute of Limitations Does Not Bar Plaintiffs' Claims</u>**

In its decision and order of September 21, 2012, this Court reserved judgment on the

---

[14] Plaintiffs respectfully request leave to further amend the complaint to clarify plaintiffs' status as the Court so directs and reserve their right to supplement their response to the motion.

statute of limitations issue "until a later stage in this case" because "questions of jurisdiction have not yet been resolved and remain open." *Sikhs For Justice, supra,* 893 F. Supp. 2d at 628. Although the jurisdictional issues have yet to be resolved and remain open, INC once again moves to dismiss plaintiffs' claims based on the statute limitations. Br. at 14-20. For the reasons set forth in plaintiffs' original opposition to this contention and as summarized below, the statute of limitations has not expired and the doctrine of equitable tolling applies to this action. *See* MOL III at 20-25.

As a preliminary matter it is important to observe that INC incorrectly presents its statute of limitations argument as a question of subject matter jurisdiction and tucks it into its motion under Rule 12(b)(1), Fed. R. Civ. P. *See* Br. at (I) (Table of Contents) and pp. 2-20. This Court, however, correctly noted that statute of limitations is properly contested in the context of a Rule 12(b)(6) motion. *See Sikhs For Justice, supra,* 893. F. Supp. 3d at 628 (citing *Magee v. Nassau County Med. Ctr.*, 27 F. Supp.2d 154, 158 (E. D. N. Y. 1998)); *see also Ghartey v. St. John's Queens Hospital*, 869 F.2d 160, 162 (2d.Cir. 1989) (motion to dismiss based on running of statute of limitations should be treated "as a Rule 12(b)(6) motion to dismiss for failure to state a claim upon which relief can be granted rather than a Rule 12(b)(1) motion to dismiss for lack of jurisdiction over the subject matter); *Ruane v. County of Suffolk*, 923 F.Supp.2d 454, 458 ( E. D . N. Y. 2013) ("A motion to dismiss on statute of limitations grounds is properly viewed as a Rule 12(b)(6) motion to dismiss for failure to state a claim upon which relief can be granted.").

The distinction is critical because on a motion to dismiss under Rule 12(b)(6) the district

court must limit its consideration to the facts alleged in the pleadings[15], and may not consider extraneous materials[16]. *See Newman & Schwartz v. Asplundh Tree Expert Co., Inc.*, 102 F.3d 660, 662 (2d Cir. 1996). Here, however, INC – erroneously proceeding under 12(b)(1) – directs this Court to sources and documents[17] beyond the pleadings, and urges that the Court weigh this "evidence" to determine the merits of plaintiffs' equitable tolling arguments. Br. at 17-19. This tactic is inappropriate for several reasons. First, the Court must not consider extraneous materials, nor arguments based upon these materials. *Id.*; *Festa v. Local 3 Int'l Brotherhood*, 905 F.2d 35, 37 (2d Cir. 1990) ("Court's function on a Rule 12(b)(6) motion is not to weigh the evidence [] but merely to determine whether the complaint itself is legally sufficient."). Rather at this juncture, the Court must simply "assess the legal feasibility of the complaint" itself. *Ryder Energy Distribution Corp. v. Merrill Lynch Commodities, Inc.*, 748 F.2d 774, 779 (2d Cir.1984). Second, INC's argument is based on the fallacy that the SAC incorporates by reference the

[15] Pleadings include written instruments attached to the complaint, statements and documents incorporated into the complaint by reference and documents possessed by or known to the plaintiff and which are "integral" to the complaint. *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 153 (2d.Cir. 2002). A document is "integral" to a complaint where the complaint "relies heavily upon its terms and effect." *Id.*

[16] Were the Court inclined to consider this extraneous material, then it must convert the motion to dismiss into a motion for summary judgment and provide plaintiffs notice and a reasonable opportunity to present theirown evidence on the contested point. *See Sahu v. Union Carbide Corporation*, 548 F.3d 59, 67-68 (2d.Cir. 2008).

[17] These include the final report of the *Justice Nanavati Commission of Inquiry* "records certified by the Indian Prime Minister's Office" and alleged State Department reports on the current political climate of India. (*See* Br. at 17-19). While these reports are not part of the pleadings and therefore beyond the scope of this Court's 12(b)(6) inquiry, plaintiffs also dispute that they constitute admissible evidence under F.R.E. 803(8)(C) as claimed by INC. (Br. at 18, n.8). Defendant has not, for instance, demonstrated that the opinions and conclusions it references are either factual, objective, or otherwise trustworthy. *See Baker v. Firestone Tire & Rubber Co.*, 793 F.2d 1196, 1199 (11th Cir. 1986) (F.R.E. 803(8)(c) only permits the introduction into evidence of "factual findings of an objective government investigation."); *Pearce v. E.F. Hutton Group, Inc.*, 653 F.Supp. 810, 814 (D.D.C. 1987) (report of investigation by Congressional subcommittee was not free of political bias and thus inadmissible under the public records exception to the hearsay rule because not inherently trustworthy).

material it seeks to introduce (Br. at 17); in fact, it expressly directs the reader to where he can find the evidence of *defendant's* atrocities. SAC, ¶ 132. Simply put, the factual allegations of the SAC are more than sufficient to establish that plaintiffs' claims are timely.

As this Court has previously held, the statute of limitations applicable to claims made under the ATS is the ten-year period set forth in the TVPA. *Sikhs For Justice, supra,* 893. F. Supp. 2d at 627-28. This Court has also held that the doctrine of equitable tolling applies to ATS claims. *Id.* at 628. Equitable tolling is appropriate where "extraordinary circumstances" prevent plaintiff from timely asserting his claims. *SAC ¶¶ 134-46*; *Sikhs For Justice, supra,* 893. F. Supp. 2d at 628 (10 year limitations period for ATS claim "may be equitably tolled in exceptional circumstances in which parties are prevented in some extraordinary way from exercising [their] rights.") (citing *Johnson v. Nyack Hosp.*, 86 F.3d 8, 12 (2d Cir. 1996) (internal quotations omitted). Plaintiffs have previously briefed, with extensive citation to authority[18], the various kinds of circumstances that courts routinely hold meet the "extraordinary circumstances" threshold. *See* MOL III at 20-25. Plaintiffs respectfully direct the Court's attention to its earlier briefing which it incorporates herein by reference.[19] Further, in light of this authority it is plain

[18] To the list of authorities already cited in plaintiffs previous brief, plaintiffs add the recent case of *Hassen v. Nahyan*, 2010 WL 9538408 (C.D.Cal. 2010). In that case the district court held that a complaint arising under the TVPA was sufficient to survive a 12(b)(6) dismissal motion based on timeliness. Specifically, the court found that plaintiff's factual averments that he feared retribution from his torturers for 25 years following his kidnapping and incarceration in the UAE, even though he lived in the U.S. during that period, was sufficient to demonstrate entitlement to equitable tolling of the claim for that period.

[19] "Extraordinary circumstances" have been held to exist when, *inter alia,* 1) the regime responsible for the atrocities either remains in power in whole or in part, or, if not "officially" in power, continues to operate through proxy regimes or allies; 2) where the plaintiffs legitimately fear, have been threatened with, or have suffered reprisals for speaking out or seeking redress; 3) where the regime or its proxies have suppressed evidence or otherwise attempted to cover up its violations; 4) where the regime has failed to fully or legitimately investigate or hold accountable those

that the factual averments contained in the SAC are more than sufficient to establish that "extraordinary circumstances" have prevented these plaintiffs' from pursuing their claims earlier. *See* e.g. SAC at ¶¶ 73-95;105-06;134-46;163. In addition to the extraordinary circumstances previously recounted in plaintiffs' first amended complaint – and which are incorporated into the second amended complaint – the latter complaint also details further horrific acts of reprisal by INC that occurred as recently as last summer. These include a violent attack on plaintiff Mohender Singh's wife by INC employees and supporters in India, as well as the torching of his house while his wife and five year old daughter were in it. *See* SAC at ¶¶ 79(a), 163(a). The perpetrators expressly indicated that these crimes were in reprisal for this lawsuit. *Id.* These events only underscore the powerful headwinds that have confronted – and which continue to confront -- these plaintiffs in their quest for justice, and which, under a legion of authority, constitute extraordinary circumstances meriting the tolling of the statute of limitations on their ATS claims. Since the facts set forth in the SAC are more than sufficient to justify equitable tolling, defendant's motion to dismiss on timeliness grounds must be denied.

## II. PLAINTIFFS HAVE STATED VALID CLAIMS UNDER THE ATS

INC next seeks dismissal of the SAC pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure for failure to state a claim under the ATS upon which relief can be granted. "To survive dismissal under Rule 12(b)(6), 'a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face.'" *Sikhs for Justice v. Nath*,

---

responsible for violations; 5) where there is no reasonable likelihood of obtaining a meaningful adjudication in the home country because of political climate. *See* MOL III at 21-22, n.13.

893 F. Supp. 2d 598, 616 (S.D.N.Y. 2012) (quoting *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009)). "'A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'" *Anderson News, L.L.C. v. Am. Media, Inc.*, 680 F.3d 162, 182 (2d Cir. 2012) (quoting *Iqbal*, 556 U.S. at 678), *cert. denied,* 133 S. Ct. 846 (2013). In determining whether a complaint states a claim that is plausible, the court need not credit legal conclusions but "is required to proceed 'on the *assumption that all the [factual] allegations in the complaint are true.*'" *Id.* at 185 (alteration and emphasis by Second Circuit) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). "Even if their truth seems doubtful, 'Rule 12(b)(6) does not countenance . . . dismissals based on a judge's disbelief of a complaint's factual allegations.'" *Id.* (alteration by Second Circuit) (quoting *Twombly*, 550 U.S. at 556). In addition, if the facts alleged, taken as true, are sufficient to state a plausible claim for relief, then "it is not the province of the court to dismiss the complaint on the basis of the court's choice among plausible alternatives," the choice among plausible interpretations of the evidence being "a task for the factfinder." *Id.* at 190; *see also In re Crude Oil Commodity Futures Litig.*, 913 F. Supp. 2d 41, 50 (S.D.N.Y. 2012) (a court ruling on a motion to dismiss "may not properly dismiss a complaint that states a plausible version of the events merely because the court finds a different version more plausible" (quoting *Anderson News*, 680 F.3d at 185)).

INC argues that the SAC should be dismissed because the Plaintiffs do not "plausibly delineate any involvement by the INC as a unified body. Rather, the entirety of the SAC is based upon the misguided and supportable [sic] notion that because certain named people are alleged to be involved, then the entire INC is responsible." (Br. at 21.) In making this argument, INC

ignores both the law regarding who may be held liable for a violation of the ATS and the facts alleged in the SAC concerning INC's role in bringing about the Sikh Massacre.[20]

It is well settled in this Circuit that acts constituting genocide, attempted genocide, torture, mass rape, extrajudicial killing, and crimes against humanity violate "universally recognized norms of international law" and are therefore cognizable under the ATS. *See, e.g., Presbyterian Church of Sudan v. Talisman Energy, Inc.*, 582 F.3d 244 (2d Cir. 2009), *cert. denied*, 131 S. Ct. 79 (2010); *Khulumani v. Barclay Nat'l Bank Ltd.*, 504 F.3d 254 (2d Cir. 2007), *aff'd under 28 U.S.C. § 2109*, 553 U.S. 1028 (2008); *Kadic v. Karadzic*, 70 F.3d 232 (2d Cir. 1995), *cert. denied*, 518 U.S. 1005 (1996); *Filartiga v. Pena-Irala*, 630 F.2d 876 (2d Cir. 1980). INC may be held liable for such violations of the ATS, all of which are alleged here, either primarily, *see, e.g., Tachiona v. Mugabe*, 169 F. Supp. 2d 259, 310-18 (S.D.N.Y. 2001) (where the District Court entered a default judgment against a foreign political party organization based on direct liability under the ATS), *aff'd in part & rev'd in part on other grounds*, 386 F.2d 205 (2d Cir. 2004), *cert. denied*, 547 U.S. 1143 (2006), or secondarily, as a co-conspirator, aider and abettor, or joint tortfeasor along with other individuals, groups, and forces that it acted in concert with in the nationwide assault on the Sikhs, *see, e.g., Khulumani*, 504 F.3d at 260 ("[I]n this Circuit a plaintiff may plead a theory of aiding and abetting liability under the [ATS]."); *Presbyterian Church*, 582 F.3d at 259-60 (discussion of conspiracy claims actionable under the ATS); *In re Brooklyn Navy Yard Asbestos Litig.*, 971 F.2d 831, 840-41 (2d Cir. 1992) ("Proof of in-concert action would have subjected the [defendants] to joint and several liability. N.Y.

---

[20]INC also supports its Rule 12(b)(6) motion by reference to matters outside the pleadings. (*See id.*). As established earlier herein,, such tactics are not permitted. *See, supra*, I, D.

C.P.L.R. § 1602(11) (McKinney 1992) . . . [Concert of action] requires jointly undertaken tortious conduct."); *In re Asbestos Litig.*, 986 F. Supp. 761, 768-69 (S.D.N.Y. 1997) (RWS) (same).

Plaintiffs' first cause of action alleges that INC is directly liable under the ATS for orchestrating, directing, and commanding the attacks on the Sikh community in India in November 1984. Contrary to INC's claim that the Plaintiffs make only "sweeping and conclusory" allegations concerning its role in the events (Br. at 20), the Plaintiffs specifically refer to eyewitness testimony indicating that the genocidal rampage was "planned at a meeting held at Congress (I) headquarters located at 24 Akbar Road, New Delhi on October 31, 1984" that was attended by various INC members of parliament and senior officers, including Jagdish Tyltler, Sajjan Kumar, HKL Bhagat, Lalit Maken, Arjun Das, Daramdas Shastri, and Kamal Nath (SAC ¶¶ 37-38, 112). At the meeting, the INC leaders and officials delivered inflammatory speeches and created slogans like "blood for blood" and "splashes of blood should reach the doorsteps of Sikhs" in order to incite the genocidal riot directed at the Sikhs. (SAC ¶¶ 39, 112 (INC "leaders announced in this meeting that Congress (I) will avenge the death of Indira Gandhi by killing Sikh people and destroying their properties"), 113.) But the INC's participation did not stop at mere words as it is further alleged in the SAC that INC leaders hired "[p]risoners, criminals and professional thugs," as well as using workers already employed by the INC, and then gave them the necessary tools to carry out the rampage planned by INC. (SAC ¶¶ 41 (specifically alleging that INC leaders supplied the rioters "with flammable substances including kerosene oil, to burn Sikhs as well as their houses, businesses and temples"), 121 (detailing the items that attackers were armed with to carry out the atrocities).) The SAC further alleges that

"[b]etween November 1 and 4, 1984, Congress (I) ruled and controlled 18 states where it organized, directed, controlled and/or purposefully aided and abetted 'The Sikh Massacre'" (SAC ¶ 44; *see also* SAC ¶ 113 ("Different leaders of Congress (I) took responsibility to carry out and make possible the attacks on Sikhs in their respective areas of influence.")), then provides details concerning the actions taken by INC officials and leaders in those states to direct and carry out the Sikh Massacre (*see, e.g.,* SAC ¶¶ 45-66, 116, 123 (INC officials directed trains to make non-scheduled stops at designated locations were attackers were waiting to pull the Sikhs out of the trains to torture and kill them)).

The recurring fallacy in INC's argument is that all of these specific factual allegations are supposedly insufficient to state a claim because "there is no plausible link to the INC as a corporate political entity" even though the Plaintiffs have identified various "non-party" INC leaders as being responsible for the outrages committed against the Sikhs. (Br. at 21; *see also* Br. at 22 (SAC "fails to attribute any conduct to the INC as a corporate body"), 23 ("Rather critically, the SAC fails to plausibly attribute any alleged conduct to the INC[.]").) But it is elementary that entities - organizations, corporations, etc. - can act only through its agents. *E.g., In re Parmalat Sec. Litig.*, 684 F. Supp. 2d 453, 471 (S.D.N.Y. 2010), *aff'd*, 423 F. App'x 73 (2d Cir. 2011); *United States v. Dist. Council of New York City*, 941 F.Supp. 349, 372 (S.D.N.Y. 1996) ("Unions, like all organizations, can only act through individual officers or agents."). As such, when the Plaintiffs state that they were injured by actions specifically directed by INC leaders such as Bhola Ram, Jagdish Tytler, HKL Bhagat, Bharti Mishra, Sajjan Kumar, Ganeshi Lal, and Kamal Nath, some of whom were even present at the meeting where the attacks were initially planned by various high-ranking INC officials (SAC ¶¶ 37-38, 73, 76, 82, 90, 97-100, 106, 112-

113), that is more than sufficient to allege a "plausible link" between the ATS violations and the INC as an organization (*see* SAC ¶ 170 ("Congress (I) and its officials, leaders and employees who were acting under and with its authority are liable, jointly, severally and vicariously, for the torts committed by them[.]")).

Plaintiffs' second cause of action alleges that Congress is secondarily liable under the ATS for aiding and abetting, conspiring, and acting in concert with others in the commission of the atrocities carried out against the Sikhs in 1984. (*See* SAC ¶¶ 175-177.) INC takes issue with the cause of action, arguing that the Plaintiffs' "broad allegations" are insufficient to state a secondary liability claim. (Br. at 25.) But it is difficult to allege a conspiracy with much greater specificity "[b]ecause unlawful conspiracies tend to form in secret," thus requiring that "conspiracies 'nearly always . . . be proven through inferences that may fairly be drawn from the behavior of the alleged conspirators.'" *In re Elec. Books Antitrust Litig.*, 859 F. Supp. 2d 671, 681 (S.D.N.Y. 2012) (quoting *Anderson News*, 680 F.3d at 183). Accordingly, "to present a plausible [conspiracy] claim at the pleading stage, the plaintiff need not show that its allegations suggesting an agreement are more likely than not true or that they rule out the possibility of independent action." *Anderson News*, 680 F.3d at 184. "Asking for *plausible* grounds to infer an agreement *does not impose a probability requirement at the pleading stage*; it simply calls for enough fact to raise *a reasonable expectation* that *discovery* will reveal evidence of illegal agreement." *Id.* (Second Circuit's emphasis) (quoting *Twombly*, 550 U.S. at 556).

Here, the Plaintiffs' allegations are sufficient to state a plausible claim that INC aided and abetted and conspired and acted in concert with various other entities, including local police departments, governments, and para-military groups in carrying out the ATS violations. While it

may be possible (however unlikely) that those groups, as well as the INC's own employees and sympathizers, not to mention transportation officials responsible for buses and trains, all independently decided to target Sikhs in the wake of Indira Gandhi's assassination, the Plaintiffs' factual allegations that the attacks were actually planned by INC leaders at the October 31, 1984 meeting and then carried out in the following days under their direction and with the assistance of those groups, are certainly plausible. That is all that is required at this stage, as the Court may not choose among plausible versions of the events when ruling on a Rule 12(b)(6) motion to dismiss. *See Anderson News*, 680 F.3d at 184-85, 189-90. As such, the Plaintiffs have pleaded all of the necessary elements and allegations of valid ATS claims. Thus, INC's motion must be denied.

## III. DEFENDANT'S FINAL ARGUMENT SHOULD BE WITHDRAWN

Prior to filing the present application, INC requested and received a five page enlargement of the page limitation for briefs purportedly to provide a memorandum of law with "30 substantive pages." (D. E. 107,108). As it turns out, those additional five pages were devoted to what can only be charitably described as a wild-eyed, misguided rant about unrelated actions which is not offered in support of the present application or any request for relief. Br. at 26-30. Clearly, defendant's final point is an attempt to poison the well. Batra Dec., ¶¶ 10-13. INC would be well advised to withdraw that "argument."[21]

[21] To the extent INC is making a legal argument that the alleged change in immigration status should result in dismissal, *see Wiwa v. Royal Dutch Petrol. Co.*, 626 F. Supp. 2d 377, 389 (S.D.N.Y. 2009) ( plaintiff not required to remain an alien throughout duration of suit particularly where status existed at time of underlying incident and it was not abandoned in successive pleadings).

**CONCLUSION**

For all the foregoing reasons, plaintiffs respectfully submit that defendant's motion to dismiss the second amended complaint should be denied in its entirety.

DATED: New York, New York
February 17, 2014

Respectfully submitted,

By s/________________________

Michael F. Fitzgerald, Esq. (MF-4704)
Attorney for Plaintiffs
410 Park Avenue - Suite 1530
New York, New York 10022
(212) 939-7281
(212) 751-3500(f)
Mfitzjustice@aol.com