UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK



------------------------------------X

SIKHS FOR JUSTICE INC on behalf of
Deceased and injured members of the
Sikh community, JASBIR SINGH, MOHENDER
SINGH, Individually and on behalf of
His deceased father: SARDAR DARSHAN
SINGH, et al.,

                Plaintiffs,               10 Civ. 2940

   -against-                     OPINION

INDIAN NATIONAL CONGRESS PARTY, et al.,

                Defendants,

   -and-

INDIAN LEGAL HERITAGE,

                Intervenor.

------------------------------------X

A P P E A R A N C E S:

        Attorney for Plaintiffs

        MICHAEL F. FITZGERALD, ESQ.
        410 Park Avenue, Suite 1530
        New York, NY  10022
        By:  Michael F. Fitzgerald, Esq.

        Attorney for Defendants

        THE LAW FIRM OF RAVI BATRA, P.C.
        The Batra Building, 142 Lexington Avenue
        New York, NY  10016
        By:  Ravi Batra, Esq.
           Todd B. Sherman, Esq.

**Sweet D. J.**

Defendant Indian National Congress Party a/k/a "Congress (I)" ("INC") has moved pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6) to dismiss the Second Amended Complaint ("SAC") of Plaintiffs Sikhs for Justice, Inc. ("Sikhs") on behalf of Jasbir Singh ("Jasbir"), Mohender Singh ("Mohender"), Sardar Darshan Singh ("Sardar") and others (collectively, the "Plaintiffs").

Upon the facts and conclusions set forth below, the motion is granted under Fed. R. Civ. P. 12(b)(1).

**Prior Proceedings**

The original Complaint in this action was filed on April 6, 2010 alleging nine claims against defendant Kamal Nath ("Nath") for purported violations of international law under the Alien Tort Statute, 28 U.S.C. § 1350 (the "ATS"), and under state law for wrongful death, negligence, public nuisance, battery, intentional infliction of emotional distress and negligent infliction of emotional distress.

1

On March 1, 2011, the Plaintiffs filed the First
Amended Complaint ("FAC"), adding additional Plaintiffs and the
Defendant INC, and dropping all state law claims. (Dkt. No. 16.)
In addition, the FAC added various allegations against the two
Defendants.  As to Nath, the Plaintiffs added allegations of
genocide, rape, torture, summary executions, extrajudicial
killings, and crimes against humanity under the ATS (FAC ¶¶ 160-
65); torture and extrajudicial killings under the Torture
Victims Protection Act of 1991 (the "TVPA") (*Id.* ¶¶ 166-73); and
for aiding and abetting the commission of those violations under
both the ATS and TVPA. (*Id.* ¶¶ 174-79). With regard to the INC,
the Plaintiffs alleged claims under the ATS for genocide, rape,
torture, summary executions, and extrajudicial killings (*Id.* ¶¶
146-53); and for aiding and abetting the commission and
conspiracy to commit those violations under both the ATS and
TVPA. (*Id.* ¶¶ 154-59).

According to the FAC, the individually-named
Plaintiffs and the individuals they represented were present
and/or injured in states throughout India when officials
organized, armed and led attacks on Sikhs. (*Id.* ¶¶ 34-66, 73-
106). During the relevant time period, the INC purportedly "had

2

complete control over the governance of India," and "[a]s the
ruling political party of India nationally and locally," was
responsible for these atrocities and able to do so "under color
of state law and with the apparent or actual authority of the
Government of India." (*Id.* ¶¶ 28-30, 108).  Nath appeared in the
FAC in connection with one site of violence in New Delhi on
November 1, 1984, during which he allegedly aided and abetted
the violence in India by his presence and participation at a
meeting of the INC where such attacks were planned. (*Id.* ¶¶ 37-
39, 66-72.)

On June 24, 2011, Nath moved to dismiss the FAC,
asserting lack of jurisdiction based upon failure of service,
immunity, lack of standing, and the act of state doctrine. (Dkt.
No. 31.) The motion was heard and marked fully submitted on
September 21, 2011 and the Court issued its Opinion granting
Nath's motion to dismiss the FAC on March 7, 2012. *See Sikhs for
Justice v. Nath,* 850 F.Supp.2d 435, 2012 WL 760164 (S.D.N.Y.
March 7, 2012) ("*Sikhs I*" or the "March Opinion").

While Nath's motion was *sub judice*, Plaintiffs moved
for default judgment against the INC pursuant to Rule 55(b)(2)
of the Federal Rules of Civil Procedure and Local Rule 55.2(b)

3

on February 2, 2012. The motion was heard and marked fully
submitted on May 9, 2012.

On March 21, 2012, the Plaintiffs filed their motion
for reconsideration pursuant to Rules 54(a), 59(e) and 60(b) of
the Federal Rules of Civil Procedure and Local Rule 6.3,
requesting that the Court revisit its March Opinion, which
dismissed without prejudice the FAC as to Nath. The motion was
heard on submission and marked fully submitted on April 18,
2012.

On May 29, 2012, the INC moved to dismiss the FAC, or
in the alternative, for a stay of proceedings pending the
Supreme Court's resolution of *Kiobel v. Royal Dutch Petroleum
Co.,* 621 F.3d 111 (2d Cir.2010) ("*Kiobel I*"), *cert. granted,* ---
U.S. ----, 132 S.Ct. 472, 181 L.Ed.2d 292 (2011) ("*Kiobel I*")*.*
The Plaintiffs subsequently filed a cross-motion on June 29,
2012 for consolidation of the pending motions, jurisdictional
discovery, a declaration that service had been effected or an
alternate method of service, and for leave to further amend the
complaint if the INC's Motion to Dismiss was granted in whole or
in part. The motion and cross-motion were heard on submission
and marked fully submitted on July 18, 2012, and the Court

4

issued its Opinion on September 12, 2013 denying the Motion for Reconsideration and Default Judgment, denying in part and granting in part the Motion to Dismiss, granting the INC's motion to stay the proceedings, and denying in part and granting in part Plaintiffs' cross-motion.  *See Sikhs for Justice v. Nath,* 893 F.Supp.2d 598 (S.D.N.Y. September 12, 2012) ("*Sikhs II*" or the "September Opinion").

On November 13, 2013, after the Supreme Court ruled in *Kiobel II*, the stay was lifted, and Plaintiffs were granted leave to file the SAC, which was subsequently filed on November 20, 2013.

On January 17, 2014, Defendant INC filed the instant motion to dismiss the SAC.  This motion was heard and marked fully submitted on March 19, 2014.

**The Facts**

The facts underlying this action are set out in the March and September Opinions, the parties' affidavits and the SAC, familiarity with which is assumed. The facts relevant to the instant motions are set forth below.

5

In 1984, the assassination of former Prime Minister
Indira Gandhi sparked violence throughout India, during which a
large number of Sikhs were killed and injured. (*Id.* ¶¶ 2, 31-36,
109-11.)

The Plaintiffs are a class consisting of resident and
non-resident Sikh men, women and children who survived the
allegedly unlawful attacks on them in India in November 1984 and
the lawful heirs and claimants of those men, women and children
who did not survive. (SAC ¶ 17.) The class also consists of
Sikhs whose homes, businesses, temples and personal property
were allegedly damaged. (*Id.*) The class period is from November
1 to November 4, 1984. (*Id.*)

The SAC references the same underlying facts alleged
in the FAC, including that the INC, as the ruling political
party of India, was allegedly able to pursue a policy of
genocide against the Sikhs under color of state law and with the
apparent or actual authority of the Government of India. (*Id.* ¶
108.)

6

In addition, the SAC adds allegations that the INC "conducts ongoing and significant business in the United States particularly in the State and City of New York both directly and through its wholly owned subsidiary 'Indian National Overseas Congress' (the "INOC"), which is a corporation organized and existing pursuant to the laws of the State of New York with its principal place of business located at Queens County, State of New York." (*Id.* ¶¶ 15; 147-65.) "Upon information and belief," Plaintiffs contend that the INC "operates INOC as a department or agent and controls its activities." (*Id.*)

Finally, the SAC also contends that local supporters of the INC have continued to threaten the families of certain Plaintiffs in India. (*See, e.g.*, SAC ¶ 79(a).) Specifically, the SAC states that: Mohender's "wife has been the target of local INC supporters and employees who have illegally invaded her home, falsely arrested, detained and imprisoned her, beaten her, threatened her with sexual assault and who, on August 15, 2013, led a violent attack on her home which was set on fire while she and their five year old daughter were inside." (*Id.*)

**The Motion to Dismiss is Granted**

7

Defendant INC moves to dismiss Plaintiffs' suit under 12(b)(1) and 12(b)(6) of the Federal Rules of Civil Procedure contending that this Court lacks subject matter jurisdiction over the Plaintiffs' claims, and that in any event Plaintiffs fail to state a claim upon which relief can be granted.

## Plaintiffs' SAC is Dismissed for Lack of Subject Matter Jurisdiction Pursuant to Fed. R. Civ. P. 12(b)(1) and 12(h)(3)

Defendants' subject matter jurisdiction allegations are addressed first. *See Magee v. Nassau County Med. Ctr.,* 27 F.Supp.2d 154, 158 (E.D.N.Y. 1998) ("A court faced with a motion to dismiss . . . must decide the jurisdictional question first because a disposition of a Rule 12(b)(6) motion is a decision on the merits and, therefore, an exercise of jurisdiction."); *see also Rhulen Agency, Inc. v. Alabama Ins. Guar. Ass'n,* 896 F.2d 674, 678 (2d Cir. 1990) (same).

The ATS provides, in relevant part, that "[t]he district courts shall have original jurisdiction of any civil action by an alien for a tort only, committed in violation of the law of nations or a treaty of the United States." 28 U.S.C. § 1350. However, a court must have subject matter jurisdiction under the statute, and "not all violations of the law of nations

8

give rise to an ATS cause of action." *Institute of Cetacean Research v. Sea Shepherd Conservation Society,* 860 F.Supp.2d 1216, 1227 (W.D.Wash. 2012). Accordingly, courts in this district and elsewhere have determined that under the ATS, "federal subject matter jurisdiction exists [only] when (1) an alien, (2) claims a tort, (3) was committed in violation of a United States treaty or the 'law of nations'—the latter now synonymous with 'customary international law.'" *Arndt,* 342 F.Supp.2d at 138.

Defendant INC contends that this Court lacks subject matter jurisdiction over Plaintiffs' remaining claim under the ATS for three independent reasons: because (1) the ATS does not extend to corporate defendants such as the INC; (2) Plaintiffs' claim constitutes an impermissible extraterritorial application of the ATS; and (3) Plaintiff Sikhs is not an "alien" under the statute, and the individual Plaintiffs lack proper authority to bring the alleged claims. (Defendants' Memorandum, "Def. Mem."; at 1.)  Each allegation will be addressed in turn.

    A. *Corporate Liability under the ATS is an Open Issue in this Circuit and such Liability is Appropriate under the Text and Purpose of the Statute*

In reaching its decision in *Kiobel I,* the Second
Circuit held that the ATS "does not provide subject matter
jurisdiction over claims against corporations; . . . insofar as
plaintiffs [] seek to hold only corporations liable for their
conduct [] (as opposed to individuals within those
corporations), and only under the ATS, their claims must be
dismissed for lack of subject matter jurisdiction." *Kiobel I,*
621 F.3d at 148-49.  Thus, the divided panel determined that
corporate liability cannot "form the basis of a suit [alleging a
violation of the law of nations] under the ATS." *Kiobel,* 621
F.3d at 148-49; *see also Mastafa v. Chevron Corp.*, 759 F. Supp.
2d 297, 301 (S.D.N.Y. 2010) ("ATS claims cannot be brought
against corporations").

On April 17, 2013, the Supreme Court ruled in *Kiobel
II*, affirming that the doctrine of the "presumption against
extraterritoriality" applied to claims asserted under the ATS,
but finding that the presumption was not rebutted by the
circumstances in that case. *See Kiobel II*, 133 S.Ct. at 1169.
*Kiobel II* did not address the issue of corporate liability under
the statute.

10

Following the Supreme Court's decision, the parties in the instant action, as well as courts in this Circuit, have strongly disagreed about whether *Kiobel I*'s ban on corporate liability remains binding law following *Kiobel II*'s holding.

According to Plaintiffs, because the Supreme Court necessarily decided that it had subject matter jurisdiction before it addressed extraterritoriality, a doctrine directed at the merits, *see, e.g.*, *Steel Co. v. Communities for a Better Environment*, 523 U.S. 83, 8-89 (1998), the extraterritorial reach and scope of liability under the ATS do not present questions of subject matter jurisdiction, and if they do, the Supreme Court ruling evidences its intention to allow jurisdiction over corporations under the statute.  (Plaintiffs' Opposition Brief, "Opp. Br."; at 4-5.)

Defendants, in turn, contend that in not addressing the issue of corporate liability and in upholding *Kiobel I*, the Supreme Court left unchanged both that the determination of the statute's scope involves a jurisdictional analysis, and that the clear ban against corporate liability under the ATS remains.

11

The four opinions issued in this Circuit since *Kiobel II* was decided are evenly split between the two contentions.

Corroborating Defendants' view, the Second Circuit in *Chowdhury v. Worldtel Bangladesh Holding, Ltd.*, 2014 WL 503037, dismissed a plaintiff's ATS claims because the conduct alleged "took place entirely in Bangladesh," but noted in a footnote in the majority opinion written by Judge Cabranes, the author of *Kiobel I*, that: "the Supreme Court's decision in *Kiobel* did not disturb the precedent of this Circuit, *see Kiobel,* 621 F.3d at 145, *aff'd on other grounds by* 133 S.Ct. at 1669, that corporate liability is not presently recognized under customary international law and thus is not currently actionable under the ATS[1]." *Id.* at *13 n.6.

In *Tymoshenko v. Firtash*, 2013 WL 4564646 (S.D.N.Y. Aug. 28, 2013), the court agreed with Judge Cabranes, concluding the following:

---

[1] In a footnote of the concurrence, Judge Pooler clarified that this assertion was "not pertinent to our decision" and "thus dicta." *Id.* at *5 n.6. Judge Pooler further noted that "[a]t least one sister circuit has determined that, by not passing on the question of corporate liability and by making reference to 'mere corporate presence' in its opinion, the Supreme Court established definitively the possibility of corporate liability under the ATS." *Id.* at *10, n.2.

12

> Plaintiffs suggest that, because the Supreme Court did
> not expressly *foreclose* corporate liability, their ATS
> claim against [defendant corporation] may proceed.
> (Pls.' Supp. Mem. of Law in Opp. 1 [Dkt. No. 84]).
> Plaintiffs' argument is misplaced. The Supreme Court
> affirmed the Second Circuit decision and did not rule
> on corporate liability under the ATS. *See Kiobel,* 133
> S.Ct. at 1669 (Kennedy, J., concurring) (noting that
> the majority opinion "is careful to leave open a
> number of significant questions regarding the reach
> and interpretation of the Alien Tort Statute,"
> including the potential for corporate liability). . .
> .

*Id.* at *3.


In contrast, supporting Plaintiffs' contention, the

Second Circuit in *Licci ex rel. Licci v. Lebanese Canadian Bank,*

*SAL,* 732 F.3d 161, 174 (2d Cir. 2013) held that because the

Supreme Court affirmed *Kiobel I* "on different grounds" and "did

not directly address the question of corporate liability under

the ATS," it was appropriate to remand the case to "the district

court to address [the] issue [of corporate liability] in the

first instance." *Id.* In so doing, *Licci* effectively held that

the issue of corporate liability was undecided in the Second

Circuit following *Kiobel II*.


On April 17, 2014, in *In re South African Apartheid*

*Litigation*, 02 MDL 1499, Dk. No. 268 ("*In re South African*

*Apartheid*"), the Honorable Shira Scheindlin likewise adopted the

13

view that *Kiobel II* left open the issue of corporate liability in this Circuit, and subsequently concluded that the ATS did not bar corporate defendants. *See id.* at 6.  Further, the opinion looked to *Kiobel II*'s language that, because "[c]orporations are often present in many countries, . . . it would reach too far to say that mere corporate presence suffices," to confirm that the Court implicitly supported the determination that corporations *might* in some instances be liable under the ATS.  *Kiobel II*, 133 S. Ct. at 1669.

Lower courts are bound by Second Circuit precedent "unless it is expressly or implicitly overruled" by the Supreme Court or an en banc panel of the Second Circuit *World Wrestling Entm't. Inc. v. Jakks Pac., Inc.*, 425 F. Supp. 2d 484, 499 (S.D.N.Y. 2006). Courts have interpreted this to mean that a decision of the Second Circuit is binding "'unless it has been called into question by an intervening Supreme Court decision or by one of [the Second Circuit] sitting *in banc*'" or "'unless and until its rationale is overruled, implicitly or expressly, by the Supreme Court, or [the Second Circuit] court *in banc*.'" *United States v. Agrawal*, 726 F3d 235, 269 (2d Cir. 2013) (quoting *United States v. Santiago*, 268 F.3d 151, 154 (2d Cir. 2001) and *In re Sokolowski,* 205 F.3d 532, 535 (2d Cir. 2000)).

14

As established, the Second Circuit has not explicitly held *en banc* or otherwise whether corporations are subject to liability following *Kiobel II*. *See, e.g.*, *Chowdhury*, 2014 WL 503037, *5 n.6 (clarifying that Judge Cabranes comments on corporate liability were merely dicta and not central to the holding of the case); *Balintulo*, 727 F.3d at 189 (not mentioning corporate liability and concluding only that "claims under the ATS cannot be brought for violations of the law of nations occurring within the territory of a sovereign other than the United States.").   Instead, "the Second Circuit panel in *Licci* and Judge Pooler's concurrence in *Chowdhury* recognized the possibility that *Kiobel II* has left the issue of corporate liability open in the Second Circuit."   *In re South African Apartheid* at 14-15[2].

Because the issue of corporate liability under the ATS is thus an open question in this Circuit, the issue is addressed as if in the first instance.

---

[2] This Court agrees with Judge Scheindlin's assessment that "*Kiobel I* is clear and unambiguous as to the as to the question of corporate liability. If the *Licci* panel found *Kiobel I* binding, it would have resolved the question immediately without further briefing. The argument that the Second Circuit would remand issues governed by controlling law because other non-ATS claims remained defies logic. The court's decision in *Licci* only makes sense if that panel no longer considered *Kiobel I* to be binding law."   *Id.* at 15.

The Supreme Court's recent opinions suggest that the holding corporate defendants liable under the statute, assuming other jurisdictional requirements are met, is appropriate.

For instance, in *Daimler*, an ATS case arising from allegations that the Defendant "collaborated with state securities forces to kidnap, detain, torture, and kill" families during Argentina's "Dirty War," the Supreme Court concluded that Daimler's contacts with California were insufficient to subject it to personal jurisdiction under California's long-arm statute, because a corporation's "'affiliations with the State' must be 'so continuous and systematic' as to render [it] essential at home in the forum State," jurisdiction was inappropriate. "[T]he Court made no reference to corporate liability, despite addressing the question of personal jurisdiction over a corporation in an ATS case." *In re South African Apartheid*, at 9 (citing *Daimler*, 134 S. Ct. at 763).

Similar to *Kiobel II*, by addressing the issue of extraterritoriality over a corporate defendant, *Daimler* seems to concretely establish that a corporate defendant *can* be liable under the ATS, assuming that the statute's "touch and concern" requirements are adequately alleged.  To conclude otherwise—

16

namely that the Supreme Court twice addressed the issue of
extraterritoriality over a defendant that had no jurisdiction
under the statute in the first place—would be illogical.

The court in *In re South African Apartheid* has
likewise adopted this interpretation, finding that the language
of the Supreme Court's opinions in *Kiobel II* and *Daimler,*

> directly undermine the central holding of *Kiobel I* – that
> corporations cannot be held liable for claims brought under
> the ATS.  The Opinions explicitly recognize that corporate
> presence alone is insufficient to overcome the presumption
> against extraterritoriality or to permit a court to
> exercise personal jurisdiction over a defendant in an ATS
> case, respectively.  By necessity, that recognition implies
> that corporate presence *plus* additional factors can suffice
> under either holding. . . . [T]he Supreme Court has not
> written two opinions contemplating that certain factors in
> combination with corporate presence could overcome the
> presumption against extraterritoriality to permit a court
> to exercise personal jurisdiction over a foreign
> corporation in an ATS case.  This language makes no sense
> if a corporation is immune from ATS suits as a matter of
> law.  The Supreme Court's opinions in *Kiobel II* and *Daimler*
> cannot be square with *Kiobel I*'s rationale.

*Id.* at 13-14.

Independently, precedent in other circuits, as well as
Second Circuit precedent prior to *Kiobel I*, suggest that
corporate liability should be permitted.

17

To begin with, "*Kiobel I* is the only opinion by a
federal court of appeals, before and after *Kiobel II*, to
determine that there is no corporate liability under the ATS."
*In re South African Apartheid* at 17.

Prior to *Kiobel II*, the Seventh, Ninth, Eleventh and
D.C. Circuits had each held that corporations can be found
liable under the ATS. *See id.* at 11 n.32 (citing *Flomo*, 643 F.3d
at 1021; *Sarei v. Rio Tinto, PLC*, 671 F.3d 736, 764-65 (9th Cir.
2011) (en banc), *vacated on other grounds*, 133 S.Ct. 1995
(2013)*; Exxon,* 654 F.3d at 57; *Romero v. Drummond Co., Inc.*, 552
F.3d 1303, 1315 (11th Cir. 2008)).  The Ninth Circuit, the only
court of appeals to explicitly address the issue of corporate
liability following *Kiobel II*, has confirmed "that corporations
can face liability for claims brought under the Alien Tort
Statute." *Nestle*, 738 F.3d at 1049.

In addition, *Kiobel I* followed decades of established
Second Circuit holdings that did not once even "hint" that such
cases should be barred. *See In re South African Apartheid
Litig.*, 617 F. Supp. 2d at 254 (citations omitted).

18

Finally, nothing in the text, purpose or history of the Alien Tort Statute supports *Kiobel I*'s reasoning.

The ATS, enacted as part of the Judiciary Act of 1789, confers federal jurisdiction over "any civil action by an alien for a tort only, committed in violation of the law of nations or a treaty of the United States." "[B]y its terms [the ATS] does not distinguish among classes of defendants." *Argentine Republic v. Amerada Hess Shipping Corp.*, 488 U.S. 428, 438 (1989)[3].

*Kiobel I* limited liability for corporations under the ATS based in large part on *Sosa v. Alvarez-Machain,* 542 U.S. at 732-33, where the court reasoned that the question of nature and scope of liability under the ATS should be left to customary international law. *Kiobel I*, 621 F.3d at 133.   Because corporations have not been liable for violations of international norms, *Kiobel I* extended this principle to the ATS.

However, while courts "look to customary international law to determine whether the alleged conduct violates a definite and universal international norm necessary to sustain an ATS

---

[3] Courts have noted that the Judiciary Act read as a whole "evidences that the First Congress knew how to limit, or deny altogether, subject matter jurisdiction over a class of claims." *Exxon,* 654 F.3d at 46.

action," the "question of *who* can be held liable for a violation
of a norm requests a determination of the means of enforcement –
or remedy – for that violation, rather than the substantive
obligations established by the norm.  This is an issue governed
by federal common law."  *In re South African Apartheid* at 19
(citing *Flomo*, 643 F.3d at 1019 ("[i]nternational law imposes
substantive obligations and the individual nations decide how to
enforce them," including whether, for example, to hold a
corporation responsible for the conduct of its agents."))[4].

It is thus within the province of the federal courts
to decide whether corporations should be liable for the tortious
conduct of their agents under the ATS.  *See Exxon*, 654 F.3d at
41.

Based on the established governing principles of tort
law, *see, e.g.*, *Sarei*, 671 F.3d at 771 (Reinhardt, J.,
concurring) ("Domestic law [continues to] abide[] no distinction

---

[4] As the court explained in *In re South African Apartheid*, *Kiobel I*'s reliance
on Footnote 20 in *Sosa* is similarly misplaced.  *Id.* at 20-21. As Judge
Pierre Leval noted in his concurring opinion in *Kiobel I*, "the *Sosa* footnote
refers to the concern . . . that some forms of noxious conduct are violations
of the law of nations when done by or on behalf of a State, but not when done
by a private actor independently of a state. . . ." *Kiobel I* at 165 (Leval,
J., concurring).  "Far from implying that natural persons and
corporations are treated *differently* for purposes of civil liability under
the ATS, the intended inference of the footnote is that they are treated
*identically*." *Id.* (emphasis in original).

between corporate and individual tort liability, and this rule is just as clear in the ATS context as in any other."), the differences in the statutory language and history of the TVPA and the ATS[5], and the text, history and purpose of the ATS itself, no principle of law exists supporting the conclusion "that the norms enforceable through the ATS – such as the prohibition by international law of genocide, slavery, war crimes, privacy etc. – apply only to natural persons and not to corporations." *Kiobel I* at 153 (Leval J., concurring).  Rather, the "implication that an actor may avoid liability merely by incorporating is inconsistent with the universal and absolute nature of the" prohibitions established by international norms, as well as the underlying principles encompassed in the protection of the ATS.  *Sarei*, 671 F.3d at 760.

Accordingly, the fact that Defendants are incorporated does not, in and of itself, relieve them of liability under the statute or remove this Court's jurisdiction over Plaintiffs' allegations.

---

[5] The text of the TVPA limits the universe of Defendants, but Congress did not "amend the ATS to preclude corporate liability when it enacted the TVPA's clear restriction to natural person defendants" in 1992, or any time since. *Sarei*, 671 F.3d at 785 (McKeown, J., concurring in part and dissenting in part).

A jurisdictional analysis as to whether Plaintiffs'
claims rebut the presumption against extraterritoriality is thus
appropriate and follows below.

### B. *Plaintiffs' Claim Constitutes an Impermissible Extraterritorial Application of the ATS*

The Supreme Court in *Kiobel II* affirmed both
that "the presumption against extraterritoriality applies to
claims under the ATS," and that there are certain circumstances
in which it may be overcome.  The Chief Justice, writing for the
Court, clarified that claims may "touch and concern" the United
States, but that "they must do so with sufficient force to
displace the presumption against extraterritorial application."
*Kiobel II,* at 1669.  Justice Breyer in his concurrence
elaborated that "sufficient force" might include instances where
"(1) the alleged tort occurs on American soil, (2) the defendant
is an American national, or (3) the defendant's conduct
substantially and adversely affects an important American
national interest, and that includes a distinct interest in
preventing the United States from becoming a safe harbor (free
of civil as well as criminal liability) for a torturer or other
common enemy of mankind."  *Id.* at 1674.  On the facts presented
in *Kiobel II*, the Court reasoned that where "all the relevant

22

conduct took place outside the United States . . . it would reach too far to say that mere corporate presence [in the U.S.] suffices [for liability under the ATS]. If Congress were to determine otherwise, a statute more specific than the ATS would be required." *Id.* at 1669.

Applying the holding of *Kiobel II* and related precedent to the facts of this case, Plaintiffs' claim presents an impermissible extension of the scope of extraterritorial liability under the statute.

Plaintiffs allege that the "INC conducts ongoing, continuous, systematic and substantial activities in the United States particularly in the State and City of New York both directly and through its wholly owned subsidiary and affiliate" INOC, a corporation organized under New York law and with its principal place of business in Nassau County, New York.  (SAC ¶ 15; ¶¶ 147-162.)  In addition, Plaintiffs contend that INOC is a "mere department or agent of INC which controls its activities; it renders services exclusively on behalf of INC; and is permanently dedicated to promoting the interests of INC in the United States." (*Id.*) INC allegedly established INOC as part of an effort "to use this country as a safe harbor to escape

23

justice for the events of 1984 and the persecution that followed which continues to this day." (SAC ¶ 165.) Finally, Plaintiffs maintain that, "the campaign of terror and intimidation carried out by INC and those acting in concert with it against the Plaintiffs and their families for their activism and their participation in this action" continues to be "directed at and intended to be felt by those plaintiffs who have sought refuge in the United States as well as any other Sikh victim or survivor who fled to this country for their safety." (SAC ¶ 163(a).) For instance, the SAC alleges that following Mohender's emigration in 2008, the INC terrorized his family and refused to let them out of India, knowing that the "impact" would be felt by Mohender here in the United States. (SAC ¶ 79(a).)

Even if INOC were an agent of the INC, *Kiobel II* established that "mere corporate presence" in the United States, or an organization attempting to use the United States "as a safe harbor," is insufficient to rebut the presumption of extraterritoriality[6]. *Kiobel II* at 1669; *see also Daimler*, 134 S. Ct. at 751 (a corporation's "'affiliations with the State'

---

[6] In addition, the INOC was established after the underlying incidents of violence occurred in 1984. As such, the INOC's presence in the United States cannot be attributed to those attacks. (*See* SAC ¶¶ 8, 147.)

must be 'so continuous and systematic' as to render [it]
essential at home in the forum State."). Further, the SAC does
not allege any supporting facts or evidence for its conclusory
assertion that the INOC is an "agent" of the INC, or explain how
the INOC has any control over the conduct in India of which
Plaintiffs' complains. In addition, Plaintiffs' allegations
that the local supporters of INC carried out acts in India
intending to harass an individual in the United States does not
alter the fatal flaw that all of the purported conduct—however
cruel and egregious—occurred outside the territory of the United
States, against Indian nationals, with no apparent connection to
American interests. (*See* SAC ¶ 79(a).) As the court held in
*Mohammadi v. Islamic Republic of Iran*, 947 F. Supp. 2d 48, 70-71
(DDC 2013),

> All nine Justices agreed [in *Kiobel II*] that
> jurisdiction was lacking on the facts of *Kiobel*
> itself. Even though the respondents in *Kiobel* had
> American corporate affiliates and allegedly
> orchestrated and incited heinous actions against the
> Nigerian petitioners (including extrajudicial killing,
> torture, and crimes against humanity), the Supreme
> Court concluded that there was not a sufficient nexus
> to the territory or interests of the United States to
> confer ATS jurisdiction. In other words, the Supreme
> Court appears to have set a very high bar for
> plaintiffs asserting jurisdiction under the ATS for
> claims arising out of conduct occurring entirely
> abroad. Hence, although the conduct underlying the
> plaintiffs' claims . . . in the instant case are

25

undoubtedly egregious, they do not meet the threshold set out in *Kiobel*.

*Id.* at 70-71; *see also Chen Gang v. Zhao Zhizhen*, 2013 WL 5313411 (D. Conn. Sept. 20, 2013) (holding that under *Kiobel*, the ATS does not confer jurisdiction even where the defendant used control of Chinese media allegedly directed at United States citizens to encourage human rights violations because the defendant was foreign and the "crimes against humanity and violations of the rights" took place entirely abroad).

Similarly here, even if the INOC acted as a corporate affiliate of the INC, and even if the INC orchestrated acts directed at individuals in the United States, the performing actors and the actual conduct at issue occurred entirely abroad. Precedent establishes that such circumstances do not provide a sufficient nexus to confer jurisdiction over Plaintiffs' claims. *See, e.g.*, *Balintulo v. Daimler AG*, 727 F.3d 174, 188 (2d Cir. 2013) (allegations that corporate defendants in New York took "affirmative steps in this country to circumvent the sanctions regime" abroad were not sufficient to "touch and concern" the United States because the asserted "violation[s] of the law of nations [still] occurr[ed] outside the United States"; *Kiobel II* provided "clear guidance" that "claims occurring solely abroad

26

cannot be adjudicated under the ATS."); *Tymoshenko v. Firtash*, No. 11-CV-2794 (KMW), 2013 WL 4564646, at *4 (the use of U.S. bank accounts insufficient where all relevant conduct occurred outside the United States); *Chowdhury*, 2014 WL 503037, at *5 ("relief [under the ATS] for violations of the law of nations occurring outside the United States is barred."); *cf. Mwani v. Laden*, 947 F. Supp. 2d 1, 5 (D.D.C. 2013) (allegations "touched and concerned" the United States because they involved "events that occurred in and around the grounds of the United States Embassy in Nairobi, Kenya on August 7, 1998").

Accordingly, Plaintiffs' combined facts, even if credited, are insufficient to establish that the conduct sufficiently "touched and concerned" the United States to establish jurisdiction under the ATS and dismissal is appropriate under 12(b)(1)[7].

   *C. Plaintiffs Lack Standing under Fed. R. Civ. P. 12(b)(1) because Sikhs is not an "Alien" pursuant to the ATS and*

---

[7] Plaintiffs also contend, noting Justice Kennedy's concurrence in *Kiobel II*, that in this circumstance there is no form of alternative relief and as such jurisdiction is appropriate.  To the contrary, laws in India were instituted following the acts of 1984 to provide relief to victims, and courts there have and will continue to hear actions relating to the incident.  (*See* Opp. Br. at 15.)  Regardless, precedent establishes that a lack of alternative cannot yet in and of itself rebut the presumption against extraterritoriality. (*Id.*)

> *the Individual Plaintiffs lack Proper Authority to Bring*
> *the Alleged Claim*

Finally, jurisdiction is inapplicable because Plaintiff Sikhs is not an "alien" under the ATS, and the individual Plaintiffs lack proper authority to raise the allegations in the SAC. *See, e.g.*, *Presbyterian Church of Sudan v. Talisman Energy, Inc.*, 453 F.Supp.2d 633, 661 (S.D.N.Y.2006) ("A district court lacks subject matter jurisdiction under the ATS if the plaintiff is not an alien.").

The scope of the ATS is limited to providing prospective relief in a "civil action by an *alien* for a tort only, committed in violation of the law of nations or a treaty of the United States." ATS; *see, e.g.*, *Orkin v. Swiss Confederation*, 770 F. Supp. 2d 612, 617 (S.D.N.Y. 2011) (emphasis added) *aff'd*, 444 F. App'x 469 (2d Cir. 2011).

With respect to Sikhs, Plaintiffs' reliance on the definition of "alien" contained within the Immigration and Nationality Act, which includes "any person not a citizen or national of the United States" (SAC fn. 2 citing 8 U.S.C. § 1101(a)(3)) and 28 U.S.C. § 1332(c)(1), which provides that a

corporation is a "citizen of every State . . . by which it has
been incorporated," is inappropriate.  28 U.S.C. § 1332(c)(1).

The Second Circuit has instead definitively held that
an institutional plaintiff that is a United States corporation
"is not an alien and may not bring suit under the ATS."
*Presbyterian Church of Sudan v. Talisman Energy, Inc.*, 453 F.
Supp. 2d 633, 661 (S.D.N.Y. 2006) *aff'd*, 582 F.3d 244 (2d Cir.
2009); *see also S.K. Innovation, Inc. v. Finpol*, 854 F. Supp. 2d
99, 113 (D.D.C. 2012) ("the American corporate Plaintiffs, as
non-aliens, lack standing to bring claims under the ATS").

Sikhs is a New York corporation with a principal place
of business in New York County, established in response to
incidents in India in 1984.  As such, Sikhs is not an "alien"
under the ATS.

To avoid dismissal, Plaintiffs contend that Sikhs is
pursuing relief on behalf of third-party individuals, and that
the organization has representative authority to pursue such
claims based on the purpose of the organization, which was
"formed to seek justice and compensation for those Sikhs who
were injured or whose family members were killed and whose

29

property was destroyed" during the 1984 riots. (SAC ¶ 8.)   In addition, Plaintiffs maintain that the individual Plaintiffs are proper heirs of individuals with valid claims under the ATS, and as such have proper authority under the statute.

Under New York law, "[a] personal representative is a person who has received letters to administer the estate of a decedent."  Est. Powers & Trusts Law § 1-2.13.  To be "a claimant in an action for wrongful death" a person must be the decedent's "personal representative, duly appointed in this state or any other jurisdiction."  *Id.* § 5-4.1(1).  If the laws of the Republic of India were being applied, the Plaintiffs, or anyone seeking to be a "legal representative," would still have to obtain judicial authority from a Court of competent jurisdiction to act as such a "legal representative[8]."  *See,*

---

[8] Specifically, PART VIII of Indian Succession Act ("ISA"), § 211, Representative Title to Property of Deceased on Success, States:

> 211. Character and property of executor or administrator as such.
> (1) The executor or administrator, as the case may be, of a deceased person is his legal representative for all purposes, and all the property of the deceased person vests in him as such.
> (2) When the deceased was a Hindu, Muhammadan, Buddhist, Sikh . . . or exempted person, nothing herein contained shall vest in an executor or administrator any property of the deceased person which would otherwise have passed by survivorship to some other person.

*Id.*  Even under this statute Plaintiffs' claims fail; there is no evidence that any of the Plaintiffs are legal representatives, and no authority relating to survivorship is explained other than unsupported allegations of familial ties. In addition, the ISA requires appointment of an

*e.g.*, Indian Succession Act, 1925; Hindu Succession Act, 1956. Even under the TVPA, the statute suggests looking to state law for "guidance" regarding which parties would be proper wrongful death claimants, and permits suit "by the victim or the victim's *legal representative* or a *beneficiary* in a wrongful death action."  S. Rep. No. 102-249 at *7 (1991) (emphasis added).

Despite its broad mission statement, Sikhs has not established a "membership," or documented any actual individual that it represents who is eligible to bring a claim under the ATS[9].  Further, there are no allegations that any person with the right to bring a claim vested authority in Sikhs, or that any Court appointed Sikhs as "legal representative" or beneficiary of any proper claimant.

---

"administrator" by a "competent authority" to administer the estate of the deceased where there is no executor.  ISA § 2(a).  Only the appointed administrator may commence or prosecute a lawsuit as the decedent's representative.  As such, Plaintiffs' claims fail under Indian law as well.

[9] The lack of such pleadings alleging associational facts in the SAC also precludes Plaintiffs' claim of associational standing.  *See, e.g., Bd. Of Managers of Mason Fisk Condominium v. 72 Berry St., LLC*, 801 F. Supp. 2d 30, 34 (E.D.N.Y. 2011) ("where equitable relief is sought, the organization lacks standing to assert claims of injunctive relief on behalf of its members where the facts and extent of the injury that gives rise to the claims for injunctive relief would require individualized proof.") (internal citations omitted); *Disability Advocates, Inc. v. New York Coalition for Quality Assisted Living, Inc.*, 675 F.3d 149, 152 (2d Cir. 2012) (non-member organization lacked standing to sue where members did not have mental ability to vest authority and the organization did not notify its constituents of the suit).

The individual Plaintiffs lack similar authority. Mohender bases his claim on being "the lawful heir and next of kin" of Sardar Darshan Singh (SAC ¶ 10), Plaintiff Iqbal Kauer Bhatia ("Batia") claims that she is "the lawful heir and next of kin of her late father and son" (*id.* ¶ 12), Kaur Girin claims to be a "lawful heir, next of kin and proper claimant" of an unnamed individual (*id.* ¶ 14), and Manhit Singh and Tejinder Singh collectively claim that they are "the lawful heirs, next of kin and proper claimants" under the statute (*id.* ¶ 13.). However, none of the individuals provides any documented authority to support his claim as rightful heir, or as beneficiary of the claimed decedent's estate.  Nor is there any evidence or allegation that the individuals are "legal representatives" of the actual claimants, or that they were appointed in any court with authority to confer comparable status[10].

---

[10] *Bodner v. Banque Paribas,* 114 F.Supp.2d 117 (E.D.N.Y.2000), cited by Plaintiffs to establish an independent ability to bring claims by relatives, is distinguishable.  There, the intestate distributees were *statutory* distributes, which allowed authority under both French succession and New York law.  *See id.* at 126.  Here, in contrast, Plaintiffs' have failed to establish any statutory authority under either New York or Indian law.  *Cf. Schoeps v. Museum of Modern Art*, 594 F. Supp. 2d 461, 466-68 (S.D.N.Y. 2009) (formal appointment not required based on German succession law where property vested in beneficiaries upon death).

Because Plaintiffs have failed to allege any authority
to support their status, and because Sikhs as a domestic
corporation lacks standing under the ATS, the SAC is
additionally dismissed for lack of standing.  *See, e.g.*,
*Grosshandels-Und Lagerei-Beufsgenossenschaft v. World Trade Ctr.
Properties, LLC*, 435 F.3d 136, 140 (2d Cir. 2006) *quoting
Mingone v. State of New York*, 100 A.D.2d 897, 899 (2d Dept.
1984) ("[a] personal representative who has received letters of
administration of the estate of a decedent is the only party who
is authorized to bring a survival action for personal injuries
sustained by the decedent . . . on account of his or her
death"); *In re September 11 Litig.*, 760 F. Supp. 2d 433, 443
(S.D.N.Y 2011) (wrongful death "plaintiff must be the duly
appointed 'personal representative' of the decedent"); *Jerry
Kubecka, Inc. v. Avellino*, 898 F. Supp. 963, 973 (E.D.N.Y. 1995)
("[a] claim for wrongful death can be brought only by the
decedent's personal representative"); *see also* Est. Powers &
Trusts Law § 1l-3.2(b); *Carrick v. Cent. Gen. Hosp.*, 51 N.Y.2d
242 n.2 (1980) ("existence of a qualified administrator"
appointed through "issuance of letters of administration" is a
condition precedent to maintaining a survival action).

In light of the jurisdictional defects surrounding the presumption against extraterritoriality, any attempt by Plaintiffs to cure standing would be futile, and as such Plaintiffs' request to amend on this issue is denied.

## Defendants' Allegations for Dismissal of the SAC under 12(b)(6)

Given that the Court lacks jurisdiction to hear Plaintiffs' case, the Court will not reach dismissal on the merits. *See* September 2012 Opinion at 628 (citing *Magee v. Nassau County Med. Ctr.,* 27 F.Supp.2d 154, 158 (E.D.N.Y. 1998) ("A court faced with a motion to dismiss . . . must decide the jurisdictional question first because a disposition of a Rule 12(b)(6) motion is a decision on the merits and, therefore, an exercise of jurisdiction."); *Rhulen Agency, Inc. v. Alabama Ins. Guar. Ass'n,* 896 F.2d 674, 678 (2d Cir. 1990)).

## Conclusion

Based on the conclusions set forth above, Defendants' motion to dismiss the SAC is granted.

34

It is so ordered.

New York, NY
April 2⁄4 2014

_____
ROBERT W. SWEET
U.S.D.J.